# EXHIBIT A



475 Riverside Drive, Suite 302
New York, NY 10115

(646) 745-8500
info@knightcolumbia.org

March 19, 2020

Roger Andoh
CDC/ATSDR FOIA Officer
Attn: FOIA Office, MS-D54
1600 Clifton Road, N.E.
Atlanta, GA 30333

FOIARequests@cdc.gov

Re:   **Freedom of Information Act Request**
      **Expedited Processing Requested**

To whom it may concern,

The Knight First Amendment Institute at Columbia University[1] submits this request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, for copies of policies issued by the Centers for Disease Control and Prevention ("CDC") governing the circumstances in which CDC employees may communicate with members of the press and the public.

### I. Background

The mission of the CDC is to "provide[] health information that protects our nation against expensive and dangerous health threats."[2] Yet in the face of a new public health emergency, reports suggest that White House officials have prioritized political expediency over accuracy, and are pressuring CDC employees to do the same.[3] These reports are troubling. First, they raise

---

[1] The Knight First Amendment Institute is a New York not-for-profit corporation based at Columbia University that works to preserve and expand the freedoms of speech and the press through strategic litigation, research, and public education.

[2] *See Mission, Role and Pledge*, CDC (May 13, 2019), https://perma.cc/68ZC-YQ8X.

[3] *See* Dan Diamond, *Trump's Mismanagement Helped Fuel Coronavirus Crisis*, Politico (Mar. 7, 2020, 9:02 PM), https://perma.cc/E8CK-3URE ("As the outbreak has grown, Trump has become attached to the daily count of coronavirus cases . . . , reiterating that he wants the U.S. numbers kept as low as possible. Health officials have found explicit ways to oblige him by highlighting the most optimistic outcomes in briefings, and their agencies have tamped down on promised transparency."); *see*

questions about the accuracy of information being conveyed to the public in the midst of an emerging crisis. Second, they raise constitutional concerns to the extent the government is attempting to control what its employees say in their private capacities.

Just over two months ago, the local government in Wuhan, China confirmed dozens of cases of a new illness, later named "COVID-19," after the novel form of coronavirus determined to cause it.[4] By the end of January, the CDC had confirmed the first instance of this novel coronavirus on U.S. soil.[5] One month later, Dr. Nancy Messonnier, the Director of the CDC's National Center for Immunization and Respiratory Diseases, explained that community spread of the coronavirus was inevitable: "It's not so much a question of if it will happen anymore, but rather more a question of exactly when this will happen and how many people in this country will have severe illness."[6]

As of March 19, 2020, there have been over 9,415 people in the United States diagnosed with COVID-19 and 150 deaths. The virus has infected more than 222,000 people worldwide.[7]

Accurate and trustworthy information is critical during public health emergencies like this one, but reports suggest that the White House is supplying the public with incomplete or distorted information while also restricting the ability of CDC officials to communicate with the press or the public about the virus and its spread. The *New York Times* recently reported that the White House has restricted the flow of information related to the

---

*also* Deirdre Shesgreen et al., *From "Great" to "Blindsided": How Trump Changed His Coronavirus Message Amid Fear, Confusion in the White House*, USA Today (Mar. 10, 2010, 2:50 PM), https://perma.cc/JW2Q-7MU6 (quoting Rep. Tom Malinowski as saying "[t]he message that the White House is sending is that they don't want anybody who tells the president or the public something that the president doesn't want to hear . . . . This becomes an urgent problem in a public health emergency"); Denise Grady, *Not His First Epidemic: Dr. Anthony Fauci Sticks to the Facts*, N.Y. Times (Mar. 8, 2020), https://perma.cc/JYE2-CJLU.

[4] Sui-Lee Wee & Donald G. McNeil Jr., *China Identifies New Virus Causing Pneumonialike Illness*, N.Y. Times (Jan. 21, 2020), https://perma.cc/5MJD-WUWR.

[5] See Elizabeth Cohen, *First US Case of Wuhan Coronavirus Confirmed by CDC*, CNN (Jan. 21, 2020, 8:48 PM), https://perma.cc/S39C-W7N6.

[6] Eliott C. McLaughlin & Steve Almasy, *CDC Official Warns Americans It's Not a Question of If Coronavirus Will Spread, but When*, CNN Health (Feb. 26, 2020, 4:47 AM), https://perma.cc/UHE2-AR2Z.

[7] *See Coronavirus COVID-19 Global Cases by the Center for Systems Science and Engineering (CSSE) at Johns Hopkins (JHU)*, ArcGIS, https://gisanddata.maps.arcgis.com/apps/opsdashboard/index.html#/bda7594740fd40299423467b48e9ecf6 (last visited Mar. 19, 2020).

coronavirus by requiring government health officials and scientists to "coordinate all statements and public appearances with the office of Vice President Mike Pence."[8] This restriction is concerning given widespread reporting that the White House has downplayed the severity of the outbreak and withheld important facts from the public. President Trump's directive was allegedly a response to Dr. Messonnier's explanation of the risk of community spread, which President Trump felt "contradicted the public messaging from the White House."[9] According to the *Times*, after Dr. Messonnier "came under fire from the administration," she "toned down her advisories."[10] The former director of the CDC, Thomas Frieden, explained that "she was 100 percent right, and they silenced the messenger."[11] The CDC's first press conference after reports emerged about the new directive marked a shift in tone, reflecting "a more positive embrace of the president that was in line with White House talking points."[12]

These coronavirus-related restrictions on the speech of CDC employees appear to build on a policy, implemented by the Trump administration in 2017, that prevents CDC employees from communicating directly with members of the press, even in their personal capacities. According to reports, the policy requires all employees to obtain preapproval for "any and all correspondence with any member of the news media, regardless of the nature of the inquiry."[13]

If these reports are accurate, the restrictions on the ability of CDC employees to share critical information about public health emergencies without political interference raise serious concerns. And to the extent these directives or others also limit what CDC employees can say in their personal capacities on matters of great public concern, they implicate the First Amendment. We are filing this request in an effort to help the public better understand these policies and their effect on the flow of information about the coronavirus.

---

[8] Michael D. Shear & Maggie Haberman, *Pence Will Control All Coronavirus Messaging from Health Officials*, N.Y. Times (Feb. 27, 2020), https://perma.cc/822B-DWJH.

[9] Merideth McGraw and Nancy Cook, *Trump's Coronavirus Conflict: Science vs. Politics*, Politico (Feb. 26, 2020, 4:28 PM), https://perma.cc/AAS7-5C4G.

[10] Grady, *supra* note 3.

[11] *Id.*

[12] Elizabeth Kim, *CDC's First Press Briefing After Pence Took Charge of Coronavirus Was Full of Praise for Trump's Response*, Gothamist (Feb. 28, 2020, 4:52 PM), https://perma.cc/B8VQ-CWYX.

[13] Sam Baker, *CDC Cracks Down on Communications with Reporters*, Axios (Sep. 12, 2017), https://perma.cc/B28A-EDEE.

## II. Records Requested

The Knight Institute seeks the release of the following:

1. Any records relating to policies or procedures governing public communications by CDC employees or contractors about the coronavirus;

2. Any records relating to policies or procedures for the coordination of communications strategy between the CDC (or its employees) and the Coronavirus Task Force led by Vice President Pence;

3. Emails sent by CDC Public Affairs Officer Jeffrey Lancashire on or around August 31, 2017, that contain instructions for employees regarding communications with members of the news media or the public;[14]

4. The CDC's policies on employee communications with news media and the public in effect from January 2017 to present; and

5. Any directives or guidance related to the policies on employee communications with news media and the public in effect from January 2017 to the present.

In light of the urgent public interest in information from the CDC regarding the novel coronavirus, we ask that you prioritize and produce on a rolling basis records responsive to the first two items of the request.

We ask that you disclose all segregable portions of otherwise exempt records. *See* 5 U.S.C. § 552(b). We also ask that you provide responsive electronic records in their native file format. *See* 5 U.S.C. § 552(a)(3)(B). Alternatively, please provide the records electronically in a text-searchable, static-image format (*e.g.*, PDF), in the best image quality in the agency's possession, and in separate, Bates-stamped files.

## III. Application for Expedited Processing

The Knight Institute requests expedited processing pursuant to 5 U.S.C. § 552(a)(6)(E). There is a "compelling need" for the documents sought because the information they contain is "urgent[ly]" needed by an organization primarily engaged in disseminating information "to inform the

---

[14] One such email reportedly instructs employees that "effective immediately and until further notice, any and all correspondence with any member of the news media, regardless of the nature of the inquiry, must be cleared through CDC's Atlanta Communications Office." *Id.*

4

public concerning actual or alleged Federal Government activity." 5 U.S.C. § 552(a)(6)(E)(v)(II).

### A. The Knight Institute is primarily engaged in disseminating information in order to inform the public about actual or alleged government activity.

The Knight Institute is "primarily engaged in disseminating information" within the meaning of FOIA. 5 U.S.C. § 552(a)(6)(E)(v)(II).

The Knight First Amendment Institute was established at Columbia University to defend and strengthen the freedoms of speech and the press in the digital age. Research and public education are essential to the Institute's mission.[15] Obtaining information about government activity, analyzing that information, and publishing and disseminating it to the press and public are among the core activities the Institute performs. *See ACLU v. DOJ*, 321 F. Supp. 2d 24, 29 n.5 (D.D.C. 2004) (finding a non-profit public interest group that "gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw material into a distinct work, and distributes that work to an audience" to be "primarily engaged in disseminating information") (quoting *Elec. Privacy Info. Ctr. v. Dep't of Defense*, 241 F. Supp. 2d 5, 11 (D.D.C. 2003)).[16]

For example, the Institute disseminates information about government activity—including information about government activity obtained through FOIA—through a variety of means, including its website,[17] Twitter account,[18]

---

[15] Mike McPhate, *Columbia University to Open a First Amendment Institute*, N.Y. Times (May 17, 2016), https://perma.cc/YC9M-LUAD; James Rosen, *New Institute Aspires to Protect First Amendment in Digital Era*, McClatchy DC (May 20, 2016, 4:43 PM), https://perma.cc/ZS2K-FPED.

[16] *See About the Knight Institute*, Knight First Amendment Institute, https://perma.cc/8UYT-RUUZ (explaining that a priority of the Knight Institute's work is "ensuring access to information necessary for self-government").

[17] *See* Knight First Amendment Institute, https://knightcolumbia.org (last visited Mar. 19, 2020).

[18] *See* Knight First Amendment Institute (@knightcolumbia), Twitter, https://perma.cc/HJG9-HEH9 (Knight Institute account with over 11,000 followers).

5

press releases,[19] blog posts,[20] op-eds,[21] and regular engagement with the press.[22] The Institute also publishes records obtained through FOIA in "Reading Rooms" on the Institute's website, which allows the public to search, filter, and view the records.[23]

Through its research program, the Institute has published three influential essay series, one focused on emerging threats to the system of free expression, a second focused on reimagining the First Amendment in the digital age, and a third addressing the technology giants' power to shape public discourse.[24] In addition, the Institute has convened two research symposia—drawing practitioners, lawyers, academics, and journalists—to debate, discuss, and reflect on key issues in First Amendment doctrine and free speech theory. The first, "A First Amendment for All? Free Expression in

---

[19] *Knight Institute Calls on DOJ's Executive Office for Immigration Review to Suspend Policy Silencing Immigration Judges*, Knight First Amendment Institute (Jan. 6, 2020), https://perma.cc/GT69-A8SC (describing an agency policy obtained through FOIA).

[20] *See, e.g.*, Carrie DeCell & Harsha Panduranga, *Social Media Vetting of Visa Applicants Violates the First Amendment*, Just Security (Dec. 6, 2019), https://perma.cc/XNZ9-RNT6; Ramya Krishnan & Trevor Timm, *Report Reveals New Details about DOJ's Seizing of AP Phone Records*, Colum. Journalism Rev. (May 23, 2019), https://perma.cc/6AUS-53YY.

[21] *See, e.g.*, Alex Abdo, *Facebook Is Shaping Public Discourse. We Need to Understand How*, Guardian (Sept. 15, 2018, 6:00 AM), https://perma.cc/6LUM-QC32; Jameel Jaffer & Ramya Krishnan, *We May Never See John Bolton's Book*, N.Y. Times (Jan. 30, 2020), https://perma.cc/HGY9-638T.

[22] *See* Cora Currier, *Government Can Spy on Journalists in the U.S. Using Invasive Foreign Intelligence Process*, Intercept (Sept. 17, 2018, 11:43 AM), https://perma.cc/YQ7F-NZ5R (reporting on DOJ rules obtained by the Knight Institute under FOIA); Ellen Nakashima, *U.S. Spy Agencies Sued for Records on Whether They Warned Khashoggi of Impending Threat of Harm*, Wash. Post (Nov. 20, 2018, 8:57 PM), https://perma.cc/NT7Q-9MML (describing FOIA lawsuits); Charlie Savage, *Trump Administration Sued Over Social Media Screening for Visa Applicants*, N.Y. Times (Dec. 5, 2019), https://perma.cc/ZMB2-6LSH (describing this APA and First Amendment lawsuit); Charlie Savage, *U.S. Government Went Through These People's Phones at the Border. Read Their Stories.*, N.Y. Times (Dec. 22, 2017), https://perma.cc/H7P2-RK2T (describing and publishing several hundred complaints obtained by the Knight Institute about warrantless searches of electronic devices at the border).

[23] *See, e.g.*, *Ideological Screening at the Border*, Knight First Amendment Institute, https://perma.cc/GCQ3-B79R.

[24] *See Research*, Knight First Amendment Institute, https://perma.cc/4DLY-MZD4.

an Age of Inequality," was held in March 2018;[25] the second, "The Tech Giants, Monopoly Power, and Public Discourse," was held in November 2019;[26] and a third, "Data and Democracy," is scheduled for Fall 2020.[27] In addition, the Institute regularly holds and co-sponsors public events in support of its mission to defend freedom of speech and the press in the digital age.[28]

### B. The records sought are urgently needed to inform the public about actual or alleged government activity.

The documents sought are urgently needed to inform the public about actual or alleged government activity. *See* 5 U.S.C. § 552(a)(6)(E)(v)(II). Specifically, the requested records relate to the ability of CDC employees to speak with members of the press and the public, including about the current outbreak of the coronavirus.

As the coronavirus public health emergency unfolds, CDC employees are in a unique position to provide the public with accurate and updated information about the spread of the coronavirus and prevention techniques. But recent reports indicate that CDC messages are being routed through political channels before reaching the public, undermining public confidence in those communications.[29] As long as the policies governing CDC employee communications with the press and the public remain secret, it is impossible for the public to assess whether it is receiving factual, unbiased information about the coronavirus.[30] As the scope of the crisis continues to

---

[25] *A First Amendment for All? Free Expression in an Age of Inequality*, Knight First Amendment Institute (Mar. 23, 2018, 8:30 AM), https://perma.cc/DM59-74KG.

[26] *Leading Legal Scholars, Economists, and Technologists to Headline Fall Symposium*, Knight First Amendment Institute (July 11, 2019), https://perma.cc/9ABK-4HGK.

[27] *Knight Institute to Convene Data and Democracy Symposium*, Knight First Amendment Institute (Jan. 8, 2020), https://perma.cc/86DE-TPQS.

[28] *See Events*, Knight First Amendment Institute, https://perma.cc/3PMC-D3GC.

[29] *See* Kim, *supra* note 12; Hersh Shefrin, *Coronavirus Politics Infects U.S. As It Infected China*, Forbes (Mar. 2, 2020), https://perma.cc/K77B-8FFJ (describing warnings from journalists that "the Trump administration is structuring public health messaging with a view to managing its political reputation at the expense of combating the spread of the virus").

[30] *See*, Ronald Klain (@RonaldKlain), Twitter (Feb. 27, 2020, 2:09 PM), https://perma.cc/LZY9-7LKC ("I was the [White House's] Ebola Response Coordinator in 2014–15. We never told [the CDC] or [National Institute for Health] what they could say, or ever censored their medical statements. If the [White House] is doing that now, it is a danger to public health.").

grow, records are urgently needed to inform the public of any restrictions on speech.

For these reasons, the Knight Institute is entitled to expedited processing.

### IV. Application for waiver or limitation of fees

The Knight Institute requests a waiver of document search, review, and duplication fees on the grounds that disclosure of the requested record is in the public interest and that disclosure is "likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii).

For the reasons explained above, disclosure of the record would be in the public interest. Moreover, disclosure would not further the Knight Institute's commercial interest. The Institute will make any information disclosed available to the public at no cost. Thus, a fee waiver would fulfill Congress's legislative intent in amending FOIA to ensure "that it is 'liberally construed in favor of waivers for noncommercial requesters.'" *See Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1312 (D.C. Cir. 2003) (quoting *McClellan Ecological Seepage Situation v. Calucci*, 835 F.2d 1282, 1284 (9th Cir. 1987)).

The Knight Institute also requests a waiver of search and review fees on the grounds that it qualifies as an "educational . . . institution" whose purposes include "scholarly . . . research" and the records are not sought for commercial use. 5 U.S.C. § 552(a)(4)(A)(ii)(II). The Institute has a substantial educational mission. Situated within a prominent academic research university, the Institute performs scholarly research on the application of the First Amendment in the digital era. The Institute's research program brings together academics and practitioners of different disciplines to study contemporary First Amendment issues and offer informed, non-partisan commentary and solutions. It publishes that commentary in many forms, including in scholarly publications and in short-form essays.

The Knight Institute also requests a waiver of search and review fees on the grounds that it is a "representative[] of the news media" within the meaning of FOIA and the records are not sought for commercial use. 5 U.S.C. § 552(a)(4)(A)(ii)(II).

The Institute meets the statutory definition of a "representative of the news media" because it is an "entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience." 5 U.S.C. § 552(a)(4)(A)(ii); *see also Nat'l Sec. Archive v. DOD*, 880 F.2d 1381, 1387 (D.C. Cir. 1989) (finding that an organization that gathers information, exercises editorial discretion in selecting and organizing documents,

"devises indices and finding aids," and "distributes the resulting work to the public" is a "representative of the news media" for purposes of the FOIA); *accord Serv. Women's Action Network v. DOD*, 888 F. Supp. 2d 282 (D. Conn. 2012); *ACLU of Wash. v. DOJ*, No. C09-0642RSL, 2011 WL 887731, at \*10 (W.D. Wash., Mar. 10, 2011); *ACLU*, 321 F. Supp. 2d at 30 n.5. Courts have found other non-profit organizations, whose mission of research and public education is similar to that of the Knight Institute, to be "representatives of the news media." *See, e.g., Cause of Action v. FTC*, 799 F.3d 1108 (D.C. Cir. 2015); *Elec. Privacy Info. Ctr.*, 241 F. Supp. 2d at 10–15 (finding that a non-profit group that disseminated an electronic newsletter and published books was a "representative of the news media" for purposes of the FOIA); *Nat'l Sec. Archive*, 880 F.2d at 1387; *Judicial Watch, Inc. v. DOJ*, 133 F. Supp. 2d 52, 53–54 (D.D.C. 2000) (finding Judicial Watch, self-described as a "public interest law firm," a news media requester).

For these reasons, the Knight Institute is entitled to a fee waiver.

\*   \*   \*

Thank you for your attention to our request. We would be happy to discuss its terms with you over the phone or via email to clarify any aspect of it.

    /s/ Stephanie Krent
Stephanie Krent
Anna Diakun
Alex Abdo
Knight First Amendment Institute at
  Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
stephanie.krent@knightcolumbia.org