UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY,<br>    Plaintiff<br><br>v.<br><br>CENTERS FOR DISEASE CONTROL AND PREVENTION and UNITED STATES DEPARTMENT OF HEATLH AND HUMAN SERVICES,<br>    Defendant | Civil Action No. 20-2761-AT |

## SUPPLEMENTAL DECLARATION OF ROGER ANDOH

Pursuant to 28 U.S.C. § 1746, I, Roger Andoh, declare the following to be a true and correct statement of facts to the best of my knowledge and belief:

1. I am the Freedom of Information Act ("FOIA") Officer for the Centers for Disease Control and Prevention ("CDC") and the Agency for Toxic Substances and Disease Registry ("ATSDR"), both agencies within the U.S. Department of Health and Human Services ("HHS"). I have held this position since June 26, 2016. I make this declaration based upon my personal knowledge and upon information available to me in my official capacity, and if called and sworn as a witness, I could and would testify as set forth herein.

2. As the FOIA Officer, I supervise and direct the day to day activities of the CDC/ATSDR FOIA Office (hereinafter referred to as "CDC FOIA Office"). The CDC FOIA Office is the central office responsible for responding to requests for information under the FOIA for records from all operating divisions of the CDC and the ATSDR. FOIA requests are disseminated electronically to areas within the agency that are considered most likely to possess responsive records. In my position, I determine whether to release or withhold records, or portions of

records, in accordance with the FOIA and the HHS implementing regulations. I also coordinate efforts, as necessary, when one or more of the CDC Centers/Institutes/Offices or one of the ATSDR Divisions is involved in responding to a FOIA request.

3. Due to the nature of my official duties, I am familiar with procedures followed by the CDC in responding to the FOIA request of Plaintiff, Knight First Amendment Institute (hereinafter "Plaintiff").

4. This supplemental declaration provides additional explanations of the procedures that were followed in responding to Plaintiff's FOIA request and the statutory justifications for the withholding of any identified, responsive records or information.

## I. The Administrative Search Process

5. As has been previously noted, CDC's FOIA Office received the FOIA request that is the subject of this litigation, dated March 19, 2020, from Stephanie Krent on behalf of Plaintiff, on March 20, 2020. In relevant part, the request sought the following documents:

> 1. Any records relating to policies or procedures governing public communications by CDC employees or contractors about the coronavirus;
>
> 2. Any records relating to policies or procedures for the coordination of communications strategy between the CDC (or its employees) and the Coronavirus Task Force led by Vice President Pence;
>
> 3. The CDC's policies on employee communications with news media and the public in effect from January 2017 to present; and
>
> 4. Any directives or guidance related to the policies on employee communications with news media and the public in effect from January 2017 to the present.

6. Based upon the plain language of the itemized request for documents from Plaintiff, the CDC understood and believed that the focus of the request was upon the policies, procedures, and guidance identified in the request, in descending order of specificity:

   a. General policies on employee communications with news media and the public in effect from January 2017 to present;

   b. Directives or guidance related to those general policies on employee communications with news media and the public in effect from January 2017 to the present,

   c. Policies or procedures governing public communications by CDC employees or contractors about the coronavirus; and

   d. Policies or procedures for the coordination of communications strategy between the CDC (or its employees) and the Coronavirus Task Force led by Vice President Pence;

Nothing in the request itself or in Plaintiff's subsequent communications with CDC indicated that Plaintiff sought or was interested in documents from CDC that fell outside the four corners of the language of the request. Specifically, nothing in the request suggested that for the general communications policies and directives related to communications with the media and the public Plaintiff was interested only in the policies themselves but for the specific policies and procedures related to communications with the media and the public about the coronavirus and for the coordination of such communication with the Coronavirus Task Force led by Vice President Pence Plaintiff had an interest, albeit an unexpressed one, in CDC's internal dissemination of and communication about those policies. Consequently, CDC applied the same search standards and parameters to its search for documents responsive to each of the four

elements of Plaintiff's request, i.e., it sought to identify records related to the policies, procedures, and guidance themselves.

7. As has been previously noted, on March 26, 2020, the CDC FOIA Office informed Plaintiff that its request was overly broad and asked:

> To assist the agency to conduct a reasonable search for items #1 and #2, please provide our office with additional information, such as: names and email addresses of persons within the agency in whose records you seek; a date range for records; recommended non-universal coronavirus pandemic search terms; office(s) likely to have records requested; and/or, the precise document you seek.

In a response via an email dated March 27, 2020, Plaintiff stated that CDC could limit its search to records created on or after January 29, 2020; it also identified 3 offices and 11 individuals as potential custodians. Plaintiff did not then or at any future date provide CDC with suggested search terms for the records it sought.

8. As has been previously noted, on April 6, 2020, the CDC FOIA Office authorized an electronic (enterprise) search of the agency-wide email system for documents responsive to request items 1 and 2. Using the time frame supplied by Plaintiff in its narrowed request (January 29, 2020 through April 6, 2020), that search examined the contents of the mailboxes of the 11 potential custodians also identified by Plaintiff in its narrowed request.

9. That initial search produced an extremely large number of documents. CDC ran a number of electronic analyses on the search results in order to better understand their composition, distribution among the individual accounts, and general responsiveness to the topics identified in the request.

10. As has been previously noted, the CDC FOIA Office consulted and received advice from agency communications SMEs about revising and refining its search, including the use of particular search terms, in order to strike a balance between fully and completely capturing emails dealing with the subject matter of Plaintiff's requests and eliminating the large number of nonresponsive emails captured by the first search.  It was in order to eliminate such excess, nonresponsive emails that the SMEs advised against using specific terms from the request such as "task force" and "Vice President" that were likely to be used in a variety of other contexts unrelated to the subject matter of the request such that they would fail to isolate materials pertinent to Plaintiff's inquiry.  Similarly, variants of the search terms such as "comm" or "comms" were not included because they were unlikely to produce uniquely responsive documents; that judgment was validated by the number of responsive documents containing "comm" or "comms" despite the fact that neither was included as one of the agency's search terms.

11. Using the search terms suggested by the SMEs and the same time parameters as the first search, on or about May 6, 2020, CDC conducted a new enterprise search of the mailboxes of 10 of the 11 CDC officials named as potential records guardians by Plaintiff.[1]

12. Plaintiff has alleged that the enterprise search was inadequate, because it did not specifically include searches for records located in the Office of the Director, the Office of the Associate Director for Communications, and the Speaker's Bureau.  However, as I noted in my original declaration, communications SMEs Michele Bonds and Loretta Lepore assisted the FOIA Office

---

[1] Due to a drafting error, my original declaration inaccurately indicated that this search only examined the contents of the mailboxes of 8 of the 11 potential custodians also identified by Plaintiff in its narrowed request.  Actually, only the mailbox of Amy Heldman was inadvertently, rather than intentionally, excluded from the search.  Fortunately, as evidenced by the documents the agency produced, Ms. Heldman's emails related to Plaintiff's request were nonetheless recovered because her supervisor, Ms. Bonds, was included in all correspondence to or from Ms. Heldman concerning items 1 and 2 of Plaintiff's request.

in constructing the search parameters. Ms. Lepore is the lead for communications issues in the Office of the Director, which included potential custodians Dr. Robert Redfield and Dr. Anne Schuchat. Ms. Bonds is the agency's Associate Director for Communications, and her office includes the Speaker's Bureau; she was also identified as a potential custodian by Plaintiff. Their assistance in framing the search helped to ensure that all responsive documents located in those three offices were captured by the agency's electronic search.

13. The agency remains confident that its search produced all documents responsive to the subject of the final narrowed request as it understood the meaning and scope of that request. It does not believe that any of the alternative search strategies suggested by Plaintiff after the fact would have uncovered additional responsive documents.

## II. Exemption 5 Withholdings

### A. The Presidential Communications Privilege

14. As was noted at paragraph 23 of my original Declaration, emails identified as documents 9, 10, 11, and 35 in the agency's Vaughn Index were withheld pursuant to the protection provided by the presidential communications privilege. Documents 9 and 10 were emails authored on February 25 and February 27 by Mr. Mick Mulvaney, who was the President's acting White House Chief of Staff at the time, regarding a proposal for a coordinated media communication strategy for COVID-19; document 11 was a copy of Mr. Mulvaney's first email forwarded by the Office of CDC's Director to a small group of senior Agency officials – his Principal Deputy, his Chief of Staff, and CDC's Chief Operating Officer -- and two members of the Director's personal staff who were routinely tasked with handling on his behalf the issues discussed in the email; and document 35 was an email to a new agency official that contained a direct reference to the subjects discussed in Mr. Mulvaneny's two emails.

15. Mr. Mulvaney's email were closely held and were not widely disseminated either originally by Mr. Mulvaney or subsequently by CDC.

    a.   There were 48 recipients of both of Mr. Mulvaney's emails, with an additional 7 individuals from the Executive Office of the President (EOP) copied on the second email.  Of the 48 recipients, 36 were individuals from the EOP.  Consequently, only 12 of the 48 recipients held non-EOP positions with any of the 15 Executive Branch Departments or any of the myriad other Federal agencies: of those 12, 4 were members of the White House COVID-19 Task Force. In other words, only 8 officials from throughout the Executive Branch who were neither employed in the EOP nor members of the White House Task Force received copies of Mr. Mulvaney's emails.

    b.   Those 8 governments officials who received a copy of Mr. Mulvaney's email included one individual from CDC: Dr. Martin Cetron, the Director of the Division of Global Migration and Quarantine.  Dr. Cetron received a copy of the email for the simple and straightforward reason that he led the CDC division responsible for the Federal government's only direct action to limit the spread of COVID-19: screening (and quarantining when and if appropriate) travelers from Wuhan, China arriving at 3 U.S. airports starting on January 17, 2020 and screening (and quarantining when and if appropriate) all travelers from China arriving at 20 U.S. airports starting on January 31, 2020. He was not simply a low-level functionary charged with carrying out an already-established Presidential policy; he was, instead, the subject matter expert not just at CDC but within the Federal government about issues involving quarantines (which CDC alone has the authority to enforce).  As such, he was deeply involved in the discussions about when, whether, and how to act in order to control and prevent the spread of coronavirus infections from China to the United States.

    c. The only other CDC employee who received Mr. Mulvaney's emails was Dr. Redfield, who was and still is a member of the White House Task Force; Dr. Redfield's office, as noted in paragraph 12 above, forwarded the email only to the 3 other most senior CDC officials and to two members of his staff whose work for him was directly affected by the subject of the emails.  While the contours of the information Mr. Mulvaney conveyed was ultimately disseminated to other CDC officials in general terms, neither the emails themselves nor their exact language were ever widely disseminated at CDC.

16. Mr. Mulvaney's emails addressed what was clearly a proposed strategy for what was then expected to be a short-term situation.  Documents 27 and 28 in the Vaughn Index, an ongoing email conversation between Dr. Cetron and Caitlin Shockey, his division's Associate Director for Communications, indicated that they did not consider the contents of Mr. Mulvaney's February 25, 2020 proposal to be a firm set of instructions (i.e., a final policy) to which Dr. Cetron had no recourse but to obey. In an email on February 25, Dr. Cetron indicated that he planned to suggest a change to the proposal Mr. Mulvaney had just distributed.  Moreover, in an email dated February 26 Ms. Shockey's view appeared to be that Dr. Cetron could ignore the framework Mr. Mulvaney had laid out the day before.  Finally, on February 27 Mr. Mulvaney sent out a follow-up to his earlier email that coincided with a White House announcement – effectively erasing the framework suggested in his February 25 email.

17. For all the reasons noted in paragraphs 15 and 16 directly above, the email identified as document 11 was equally entitled to protection under the presidential communications privilege. Mr. Mulvaney's email was kept confidential and was forwarded by Dr. Redfield's office for information purposes only to an extremely small group consisting of CDC's top three officials after Dr. Redfield and the two members of his personal staff engaged in the activities addressed

by Mr. Mulvaney's email.

18. The reasons noted in paragraphs 15 and 16 likewise applied to the email identified as document 35. The document is characterized in its subject line as a "rundown" of procedures for Rachel Oury, who had been detailed to handle communications efforts at CDC precisely because of her close connection to the President. Clearly, she was a person in a position to give advice to the President. Just as clearly, the communication was of a confidential manner. Although other CDC communications officials were copied on the email from CDC's OD, the details and full meaning of the privileged information being conveyed would have been understood only by her.

**B. The Deliberative Process Privilege**

19. The records discovered in response to Plaintiff's request but withheld in full pursuant to the deliberative process privilege included 17 separate draft versions of a CDC document titled "Communication Strategy for the Coronavirus Disease 2019 Response." The document was never finalized because the size, scope, and complexity of the coronavirus pandemic evolved and grew so rapidly that it was impossible for the agency ever to develop a static "final" strategy that could in any way adequately address all the novel and unexpected communications challenges it presented.

20. There were so many drafts of the strategy (many of them duplicates or near duplicates) discovered by CDC's search that there was no logical criteria available for CDC to identify any single version as being the nearest-to-final or even the most representative of the development process. Consequently, the version provided to Plaintiff as part of the agency's initial release (document 1 on the Vaughn Index) was simply chosen at random; its lack of any sort of uniqueness is best illustrated by the fact that an exact duplicate of document 1 also appears as document 29.

21. Plaintiff has cited 5 factors as support for its allegation that the only truly distinctive draft of the strategy among the many versions of the document discovered by the agency was document 12 on the Vaughn Index, and has suggested that this is because document 12 represents a final, or at least an operational, version of the strategy. However, Plaintiff is mistaken.  There is nothing unique about document 12. For example, while it is true that only this draft carries the date of March 18, 2020, while the others are dated May 8, 2020, CDC is aware of no particular reason for that anomaly.  Similarly, the reason why the description of the withheld information on the Vaughn Index is different for this draft than for the other versions is fairly straightforward.  The language was originally intended to be used for document 1, the first of the drafts to be listed on the Vaughn Index; however, since document 1 had been heavily edited, it was determined that the language should instead be used to describe the first of the many "clean," i.e., unedited, versions of the strategy listed on the Vaughn Index.  By pure happenstance, document 12 was the initial unedited iteration of the strategy to be listed. Furthermore, while Plaintiff is correct in noting that document 12 has a table of contents while most of the other versions do not, there are nonetheless 4 other copies (16, 23, 24, and 25) that also have tables of contents; 1 of those drafts (23) is unedited just like document 12, as are 8 drafts (14, 15, 19, 20, 21, 22, 31, and 32) without tables of contents. Finally, while document 12 lacks an introductory email, the absence of any explanatory document whatsoever militates against any other possibility than that it is simply one of many predecisional drafts of a policy that was never implemented, much less finalized.

22. The ever-changing situation in which the various drafts were developed explains why it was determined that no "factual" portions of the drafts could reasonably be segregated and released. While facts are usually thought to be static and unchanging, quite the opposite was the case in

regard to the facts associated with the pandemic. Because the agency's knowledge and understanding of the characteristics of the virus in specific and the pandemic in general were changing on an almost daily basis, decisions about what information to convey to the public and how and by whom it would best be conveyed were also changing. Disclosing what might in other, less dynamic situations be considered "facts" would in the case of this document have been no more than the release of hypotheses advanced but later revised or rejected altogether. To provide to the public even seemingly factual statements that were based on imperfect, changing, and often inaccurate information would cause damage both to the agency – by contradicting and/or undercutting the more reliable information that it ultimately released – and to the public, by creating confusion and potentially sowing mistrust in the guidance provided by the CDC and other Federal agencies.

23. As they were described in the Vaughn Index, documents 33 and 34 dealt with an interim clearance process for HHS and EOP. An interim process is the equivalent of a first draft of a policy. It is a suggestion about one way to try to deal with the issue at hand. No final decision has been made about the issue or the manner in which it will be addressed. It is quite possible that the suggestion of the interim process will generate comments and other feedback that reveal it to be unwieldly or even completely unworkable. It is the opportunity to offer such feedback that makes the interim offering a pre-decisional one.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

    Executed on this _____ day of_____2020, in Atlanta, Georgia.

_____*Roger Andoh*_____
Roger Andoh
Freedom of Information Act Officer
Centers for Disease Control and Prevention
Agency for Toxic Substances and Disease Registry
United States Department of Health and Human Services