**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

KNIGHT FIRST AMENDMENT
INSTITUTE AT COLUMBIA
UNIVERSITY,

        Plaintiff,

    v.

CENTERS FOR DISEASE CONTROL AND
PREVENTION and U.S. DEPARTMENT OF
HEALTH AND HUMAN SERVICES,

        Defendants.

No. 1:20-cv-02761-AT

## REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

Anna Diakun
Jennifer Pinsof
Alex Abdo
Knight First Amendment Institute
  at Columbia University
475 Riverside Drive
New York, NY 10115
(646) 745-8500
anna.diakun@knightcolumbia.org

*Counsel for the plaintiff*

# TABLE OF CONTENTS

ARGUMENT ............................................................................................................1

I.    The CDC has improperly withheld information under the presidential
      communications privilege. ...........................................................................1

      A.    The CDC's new disclosures show that the withheld emails were
            widely disseminated. .......................................................................... 3

      B.    The emails were disseminated for non-advisory purposes well beyond
            the circle of close presidential advisors. ............................................ 4

II.   The CDC has improperly withheld information under the deliberative process
      privilege. .....................................................................................................8

      A.    CDC Communications and Media Strategy Plan (Document 12) .................... 8

      B.    CDC Communications and Media Strategy Plan (Document 1) .................... 16

      C.    Emails applying communications clearance processes (Documents 27
            and 28) .............................................................................................. 17

      D.    Emails conveying COVID-19–related communications clearance
            procedures (Documents 33, 34, and 35) ........................................... 19

III.  The Court should review the withheld documents *in camera*. ...................................21

IV.   The CDC's search for records responsive to Items 1 and 2 was inadequate. ..............21

      A.    The CDC adopted an unreasonably narrow interpretation of Items 1
            and 2 of Plaintiff's request. ............................................................ 22

      B.    The CDC's search terms and methods were unreasonable. ........................... 24

      C.    The CDC has failed to search all custodians who were reasonably
            likely to possess responsive documents. ........................................... 28

CONCLUSION .....................................................................................................30

## TABLE OF AUTHORITIES

**Cases**

*ACLU v. DOD*, 435 F. Supp. 3d 539 (S.D.N.Y. 2020) .................................................. 8

*ACLU v. DOD*, No. 15 CIV. 9317 (AKH), 2017 WL 4326524 (S.D.N.Y. Sept. 27, 2017) ............................................................................................................... 9, 10, 18

*ACLU v. DOJ*, 90 F. Supp. 3d 201 (S.D.N.Y. 2015) .................................................. 23

*ACLU v. DOJ*, No. 12 Civ. 7412 (WHP), 2014 WL 956303 (S.D.N.Y. Mar. 11, 2014) ............................................................................................................................ 21

*ACLU v. DOJ*, No. 15 Civ. 1954 (CM), 2016 WL 889739 (S.D.N.Y. Mar. 4, 2016) ........................................................................................................................ 2, 4, 6

*Am. Immigr. Council v. DHS*, 905 F. Supp. 2d 206 (D.D.C. 2012) .................................. 9, 10, 18

*Brennan Ctr. for Just. v. DOJ*, 377 F. Supp. 3d 428 (S.D.N.Y. 2019) ........................................ 25

*Brennan Ctr. for Just. v. DOJ*, 697 F.3d 184 (2d Cir. 2012) ........................................ 13

*Campbell v. DOJ*, 164 F.3d 20 (D.C. Cir. 1998) ........................................................ 28

*Charles v. Off. of Armed Forces Med. Exam'r*, 730 F. Supp. 2d 205 (D.D.C. 2010) ............................................................................................................ 23, 30

*Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854 (D.C. Cir. 1980) ............................ 10

*Color of Change v. DHS*, 325 F. Supp. 3d 447 (S.D.N.Y. 2018) ................................................ 13

*Conservation Force v. Ashe*, 979 F. Supp. 2d 90 (D.D.C. 2013) ................................................ 24

*Ctr. for Effective Gov't v. Dep't of State*, 7 F. Supp. 3d 16 (D.D.C. 2013) .......................... passim

*Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90 (D.D.C. 2019) ............................................................................................................ 13

*Fox News Network, LLC v. Dep't of Treasury*, 678 F. Supp. 2d 162 (S.D.N.Y. 2009) ............................................................................................................................ 10

*Gen. Elec. Co. v. Johnson*, No. CIV.A.00-2855 (JDB), 2006 WL 2616187 (D.D.C. Sept. 12, 2006) ................................................................................................ 12

*Gov't Accountability Project v. DHS*, 335 F. Supp. 3d 7 (D.D.C. 2018) .................................... 26

*Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473 (2d Cir. 1999) ........................................ 15, 29

*Heffernan v. Azar*, 317 F. Supp. 3d 94 (D.D.C. 2018) ................................................. 12

*Knight First Amendment Inst. at Columbia Univ. v. DHS*, 407 F. Supp. 3d 311
(S.D.N.Y. 2019) ........................................................................................ 21, 24, 25, 26

*Miller v. Casey*, 730 F.2d 773 (D.C. Cir. 1984) .......................................................... 23

*N.Y. Times Co. v. DOJ*, 756 F.3d 100 (2d Cir. 2014) .................................................. 12

*NAACP Legal Def. & Educ. Fund, Inc. v. DOJ*, No. 18-cv-4354 (PKC), 2020 WL
5237765 (S.D.N.Y. Sept. 2, 2020) ........................................................................... 13

*NAACP Legal Def. & Educ. Fund, Inc. v. DOJ*, No. 18-CV-9363 (AJN), 2020
WL 2793015 (S.D.N.Y. May 29, 2020) ..................................................................... 25

*Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't Agency*, 811 F.
Supp. 2d 713 (S.D.N.Y. 2011)................................................................................... 18

*Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't Agency*, 877 F.
Supp. 2d 87 (S.D.N.Y. 2012)................................................................. 25, 26, 28, 30

*Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't*, No. 16-civ-
387 (PAE), 2020 WL5518114 (S.D.N.Y. Sept. 14, 2020) ...................................... 12

*Nat'l Res. Def. Council v. U.S. Env't Prot. Agency*, No. 17-cv-5928 (JMF), 2019
WL 4142725 (S.D.N.Y. Aug. 30, 2019)................................................................... 14

*Nation Mag. v. U.S. Customs Serv.*, 71 F.3d 885 (D.C. Cir. 1995) ............................ 24

*Pub. Citizen, Inc. v. Dep't of Educ.*, 292 F. Supp. 2d 1 (D.D.C. 2003)...................... 25

*Pub. Citizen, Inc. v. OMB*, 598 F.3d 865, 868 (D.C. Cir. 2010)........................... 10, 18

*Tarzia v. Clinton*, No. 10 Civ. 5654 (FM), 2012 WL 335668 (S.D.N.Y. Jan. 30,
2012) ........................................................................................................................ 26

*Tigue v. DOJ*, 312 F.3d 70 (2d Cir. 2002) .......................................................... 15, 19

*United States. v. Aetna Inc.*, No. 1:16-CV-1494 (JDB), 2016 WL 8738423
(D.D.C. Oct. 19, 2016)............................................................................................. 12

*Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321 (D.C. Cir. 1999) ...................... 29

**Statutes**

5 U.S.C. § 552................................................................................................................ 21

**Other Authorities**

"Ryan Murphy," U.S. Dep't of Health & Hum. Servs. (last updated on Nov. 7, 2019), https://perma.cc/75NU-4MME ...................................................................... 20

## INTRODUCTION

In the four weeks since Plaintiff filed its opening brief, another 1.4 million people in the United States have reported COVID-19 infections, and another 20,000 people have died. And in that time, the media have reported even more instances of the White House preventing government scientists from speaking to the public about the pandemic. Yet the CDC continues its efforts to hide information about the policies put into place in the early days of the pandemic concerning who can speak to the public about the crisis and what they are permitted to say.

The agency's arguments for why it is entitled to withhold this information come up short. For the four records withheld under the presidential communications privilege, the agency's supplemental declaration shows that the information was widely shared in a manner inconsistent with the privilege. Meanwhile, the agency's arguments that it can categorically withhold temporary policies and procedures under the deliberative process privilege—even if at one point operative—fail as a matter of law. Finally, the agency's explanations in defense of its search only further demonstrate the search's inadequacy. The Knight First Amendment Institute at Columbia University (the "Knight Institute" or "Plaintiff") thus respectfully asks the Court to order the release of the withheld records and require the agency to conduct a new search.

## ARGUMENT

### I.   The CDC has improperly withheld information under the presidential communications privilege.

The government withheld four records under the presidential communications privilege. It claims protection over two of these records, the February 25 Executive Office of the President ("EOP") email and the February 27 EOP email chain (Documents 9 and 10, respectively), because they were authored by a close presidential advisor. *Vaughn* Index ¶¶ 9–10, ECF No. 34–1; Supplemental Declaration of Roger Andoh ("Suppl. Andoh Decl.") ¶ 14, ECF No. 42. The

government claims protection over the remaining two records, Documents 11 and 35, because they contain information that *originated* in the EOP emails. Suppl. Andoh Decl. ¶ 14. Document 11 forwards the February 25 EOP email, while Document 35 "contain[s] a direct reference to" the February 25 and 27 EOP emails. *Id.*; Declaration of Jennifer Pinsof ("Pinsof Decl.") Ex. 1, ECF No. 40-1. Thus, if the government has waived privilege over the February 25 and 27 EOP emails, it has also waived privilege over the information in Documents 11 and 35.

In its opening brief, Plaintiff explained that given the government's apparent widespread dissemination of these documents for non-advisory purposes, it had not established that it kept the information confidential in the manner required by the privilege.[1] *See* Pl.'s Br. 8–9, ECF No. 39; *see also Ctr. for Effective Gov't v. Dep't of State*, 7 F. Supp. 3d 16, 27 (D.D.C. 2013) ("[D]ocuments distributed from the Office of the President for non-advisory purposes do not implicate the goals of candor, opinion-gathering, and effective decision-making that confidentiality under the privilege is meant to protect."); *ACLU v. DOJ*, No. 15 Civ. 1954 (CM), 2016 WL 889739, at *4 (S.D.N.Y. Mar. 4, 2016) ("[T]ransmittal of a document to persons who are unlikely to be in a position to give advice to the President waives the privilege."). In its Reply, the CDC does not dispute that the presidential communications privilege can be waived through such transmission for non-advisory purposes. Instead, it argues that (1) the February 25 and 27 EOP emails, though sent to more than fifty people, were "closely held" and not "widely disseminated"; and (2) *some* of those fifty-plus recipients were "in a position to give advice to the

---

[1] In light of the agency's new disclosures in its supplemental declaration, Plaintiff no longer argues that the records cannot be withheld for the independent reasons described in Parts I.B and I.C of its opening brief. *See* Pl.'s Br. 9–11.

President." Gov't Reply 13–14, ECF No. 41. Because these arguments do not establish that the records were kept confidential in the manner required by the privilege, the government may not withhold them.

### A. The CDC's new disclosures show that the withheld emails were widely disseminated.

The CDC claims that "Mr. Mulvaney's email[s] were closely held and were not widely disseminated either originally by Mr. Mulvaney or subsequently by CDC." Suppl. Andoh Decl. ¶ 15. However, its own supplemental declaration shows the opposite. *See id.* The February 25 EOP email was originally sent to forty-eight individuals across EOP and multiple agencies, while the February 27 EOP email chain was sent to fifty-five. *See id.* ¶ 15(a). In addition, Dr. Redfield's office forwarded the February 25 EOP email to another five individuals within CDC, *see id.* ¶ 15(c), while Dr. Cetron forwarded that email to at least one other person within CDC. *See Vaughn* Index ¶ 27; Pinsof Decl. Ex. 2.

Additionally, the *information* within the February 25 and 27 EOP emails that the government seeks to protect was also shared with an unknown number of CDC employees. *See* Suppl. Andoh Decl. ¶ 15(c) ("[T]he contours of the information" in the emails "was ultimately disseminated to other CDC officials in general terms."). The agency does not explain the extent of this dissemination, though it acknowledges that two months later, an email with a "direct reference" to the EOP emails was sent to certain employees. *Id.* ¶ 14; *see also* Pinsof Decl. Ex. 1.

As shown above, this information was in fact widely disseminated, and as explained in Part II.B, this dissemination was for non-advisory purposes. But even if the Court does not agree that the above-described dissemination was inconsistent with the privilege, it bears emphasizing that it is not clear that this represents the extent of dissemination. Because the government did not include information about whether certain recipients subsequently distributed the emails, it is impossible

to know how much further they spread. These omissions include: (1) whether Dr. Cetron or the five individuals who were forwarded the February 25 EOP email by Dr. Redfield's office then sent it to anyone else; (2) whether any of the CDC recipients of the February 27 EOP email subsequently forwarded it; and (3) whether and how far the emails were distributed *outside* the CDC by the forty-six non-CDC recipients of the February 25 email and the fifty-three non-CDC recipients of the February 27 email chain. *See* Suppl. Andoh Decl. ¶ 15. If any of these recipients forwarded the EOP emails, the actual number of individuals who ultimately received them could be significantly higher.

> **B.    The emails were disseminated for non-advisory purposes well beyond the circle of close presidential advisors.**

Critically, the CDC makes no showing that the fifty-plus recipients of the February 25 and 27 EOP emails or the information therein were all either close presidential advisors or otherwise "in a position to give advice to the President" on the topic of the emails. *ACLU v. DOJ*, 2016 WL 889739, at *4. Nor does it claim that these emails were distributed for "advisory purposes." *Ctr. for Effective Gov't*, 7 F. Supp. 3d at 29. Instead, it tries to downplay the extent of their distribution, stating that "only 12 of the [initial] 48 recipients held non-EOP positions" and, of those twelve, only eight were not on the Coronavirus Task Force. *See* Gov't Reply 13. But the government has failed to show that the privilege applies for six independent reasons.

First, as Plaintiff explained in its opening brief, the information in the February 25 and 27 EOP emails were not seeking advice or otherwise distributed for "advisory" purposes; they instead consist of clearance processes disseminated for implementation. *See* Pl.'s Br. 8. Such records, even if authored by the president himself, cannot be withheld under the presidential communications privilege. *See Ctr. for Effective Gov't*, 7 F. Supp. 3d at 27–29 ("The purposes underlying the distribution of a presidential communication beyond the President's closest presidential advisers

is paramount. If distribution is limited to advisory purposes, the privilege may apply; but if distribution is far broader, the purposes animating the privilege will not justify its application."). And while the government describes these records as containing "a proposal for a coordinated media communication strategy," Suppl. Andoh Decl. ¶ 14, this characterization is not credible. The widespread distribution of these records from the White House to subordinates, *id.* ¶ 15(a); the fact that recipients of the February 25 EOP email discussed "how to apply" the "clearance process" laid out within it, *Vaughn* Index ¶¶ 27–28; Andoh Decl. ¶ 22, ECF No. 34; and the fact that, even two months later, a CDC employee included a "direct reference" to the EOP emails in her "rundown" of operative clearance policies to a new communications staffer, Suppl. Andoh Decl. ¶ 14, all show that Documents 9 and 10 were not "proposals" or "advisory" communications in any sense. They thus cannot be withheld.

Second, the government presumes, without explanation, that all of the thirty-six EOP recipients of the February 25 email and all forty-three EOP recipients of the February 27 email chain automatically fall within the scope of the privilege. This premise is faulty: as Plaintiff explained, "not all EOP officials qualify to claim the privilege." Pl.'s Br. 10 (quoting *Ctr. for Biological Diversity v. OMB*, No. C 07-4997 MHP, 2008 WL 5129417, at *12 (N.D. Cal. Dec. 4, 2008)). Because the government has not shown that these recipients were immediate presidential advisors or were otherwise sent the emails for advisory purposes, it has not established that this distribution was consistent with the privilege. *See Ctr. for Effective Gov't*, 7 F. Supp. 3d at 27.

Third, the government has not shown that all of the initial *non*-EOP recipients were close presidential advisors or were otherwise sent the emails for advisory purposes. Eight agency employees who received the February 25 and 27 EOP emails were neither EOP employees nor members of the Coronavirus Task Force. *See* Gov't Reply 13. The government identifies only one

of those eight recipients, Dr. Martin Cetron. *Id*. Though the government explained that Dr. Cetron was not a "low-level functionary" and that he played a significant role in the government's COVID-19 response, it notably did *not* claim that he was in a position to advise the president or that he was sent this for advisory purposes. *Id.* at 13–14; Suppl. Andoh Decl. ¶ 15(b).

And as for the other seven recipients at other agencies, the government has not even attempted to show that they received the February 25 and 27 EOP emails for advisory purposes— an omission that is enough, on its own, to preclude the government from relying on the presidential communications privilege. *See, e.g.*, *ACLU v. DOJ*, 2016 WL 889739, at *5 ("If a document authored by the President is transmitted to multiple agencies and to staffers who serve in non-advisory roles to the President, the document loses any claim to the presidential communications privilege."); *Ctr. for Effective Gov't*, 7 F. Supp. 3d at 26 ("[I]t is axiomatic that the privilege's purpose of promoting candor and confidentiality between the President and his closest advisers becomes more attenuated, and the public's interest in transparency and accountability more heightened, the more extensively a presidential communication is distributed.").

Fourth, the government has not explained why the transmittal of the February 25 EOP email to Caitlin Shockey, a CDC communications staffer unlikely to be in a position to advise the president, would not waive the privilege over Document 9. *See id.*; Suppl. Andoh Decl. ¶ 16.

Fifth, the government's admission that other CDC officials received information contained within the February 25 and 27 EOP emails also precludes the government from relying on the privilege. The government claims that these other CDC officials received the information in "general terms," but it does not cite any case for the proposition that it can maintain privilege over a document whose contents have been shared, so long as the contents were first paraphrased or reworded. *See* Gov't Reply 14 ("[W]hile the contours of the information Mr. Mulvaney conveyed

was ultimately disseminated to other CDC officials in general terms, neither the emails themselves nor their exact language was ever widely disseminated at CDC."). Such dissemination is inconsistent with the presidential communications privilege, which requires confidentiality of the information at issue to be maintained. *Ctr. for Effective Gov't*, 7 F. Supp. 3d at 24–25.

Finally, and most damning to the government's assertion of privilege, the CDC has *admitted* that certain recipients were not sent the information for advisory purposes. Dr. Redfield's office forwarded the February 25 EOP email to five other individuals, not because he sought their advice to convey to the president, but "for information purposes only." Gov't Reply 14 (citing Suppl. Andoh Decl. ¶ 15(c)). This alone shows that the presidential communications privilege does not apply either to the February 25 EOP email itself (Document 9) or to Dr. Redfield's email forwarding it (Document 11). *See Ctr. for Effective Gov't*, 7 F. Supp. 3d at 27 (explaining that even more selective distribution—on a "need-to-know" basis—did not "cure the problem where there is no claim of an advisory role between the document-recipient and the President").

Likewise, the CDC implicitly acknowledges that three of the CDC recipients of Document 35, the April 30 email "contain[ing] a direct reference" to the EOP emails, were not sent the email for advisory purposes. *See* Gov't Reply 14; Pinsof Decl. Ex. 1. While the government asserts in a conclusory manner that the fourth recipient, Rachael Oury, "was in a position to give advice to the President," the agency excuses its distribution to the others by arguing that they somehow did not *understand* the relevant information in the April 30 email. *See* Suppl. Andoh Decl. ¶ 18; Gov't Reply 14 ("Although other CDC communications officials were copied on the email . . . , the details and full meaning of the privileged information being conveyed would have been understood only by her."). This defense is meritless, and should be rejected.

In sum, the government has admitted that some of the recipients who received the February 25 and 27 EOP emails or the information therein were neither presidential advisors nor received the information for advisory purposes. And for many other recipients, the government was silent as to their role altogether. Thus, because "'[t]he circle within which the presidential communications privilege extends has a narrow diameter,' and 'the transmittal of a document to persons who are unlikely to be in a position to give advice to the President waives the privilege,'" *ACLU v. DOD*, 435 F. Supp. 3d 539, 559 (S.D.N.Y. 2020) (quoting *ACLU v. DOJ*, 2016 WL 889739, at *4), the government has failed to establish that the privilege applies.

## II.    The CDC has improperly withheld information under the deliberative process privilege.

### A.    CDC Communications and Media Strategy Plan (Document 12)

At the beginning of the pandemic, the CDC spent several weeks developing a communications and media strategy for COVID-19, just as it had for the Ebola outbreak two years before. *Compare* Pinsof Decl. Ex. 14 *with* Pinsof Decl. Ex. 5. In its Reply, the CDC does not argue that the media strategy died on the vine or deny that the media strategy was ever implemented or operative. Instead, it doubles down on the idea that an agency policy—even if operative—is not "final" if the agency intends it to be updated routinely, and thus can be withheld under the deliberative process privilege. The CDC also tries to cast doubt on the reasons indicating that Document 12, in particular, either is or was operative, without substantiating its own claim that the record is predecisional and deliberative. At bottom, because FOIA requires the disclosure of policies that are or were operative, and because Document 12 appears to be precisely that, this Court should reject the agency's invocation of the deliberative process privilege.

8

### i. The CDC must disclose operative agency policies, even if they are temporary.

To begin, the CDC's expansive view of the deliberative process privilege is untenable. It argues that because "the coronavirus pandemic evolved . . . so rapidly," the agency could not develop any "static 'final' strategy," and because of this, it has no obligation to disclose versions that are or were operative. *See* Suppl. Andoh Decl. ¶ 19. This is not what the law requires.

Courts have rejected precisely this argument in the past. For example, much like the situation at hand, the agency in *ACLU v. DOD* argued that the withheld information was deliberative because it consisted of "preliminary input in advance of a final decision from Headquarters as to how to conduct" an interrogation. No. 15 CIV. 9317 (AKH), 2017 WL 4326524, at *9 (S.D.N.Y. Sept. 27, 2017) (citation omitted). Rejecting the agency's argument that the information was not "final," the court concluded that "this guidance was clearly intended to have 'operative effect.'" *Id.* (quoting *Brennan Ctr. for Just. v. DOJ*, 697 F.3d 184, 198 (2d Cir. 2012)). It continued that even if "further guidance was forthcoming," this "d[id] not undercut the finality of the guidance already given," and ordered the agency to disclose that information. *Id.*

Similarly, in *American Immigration Council v. DHS*, the agency argued that the withheld memorandum about the "Role of Consultants in the Credible Fear Interview" "was not a final policy statement," and that it "was developed *prior* to the issuance of formal guidance on the topic" and "explain[s] that further guidance will be issued." Defs.' Reply to Pl.'s Opp. to Defs.' Mot. to Dismiss & for S.J. at 18 (citation omitted), *Am. Immigr. Council v. DHS*, 905 F. Supp. 2d 206 (D.D.C. 2012), ECF No. 20 (Sept. 6, 2012). The court nonetheless rejected the agency's invocation of the deliberative process privilege, explaining that "'[m]ore guidance soon,' . . . does not undercut the finality of the guidance already given." *Am. Immigr. Council*, 905 F. Supp. 2d at 220.

The CDC's argument that it can withhold all versions of its COVID-19 media strategy—even if operative at one time—simply because the situation was evolving thus fails. *See also, e.g.*, *Fox News Network, LLC v. Dep't of Treasury*, 678 F. Supp. 2d 162, 169 (S.D.N.Y. 2009) ("[A] document that never was finalized might nevertheless have operated to dictate policy within the agency."); *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 867 (D.C. Cir. 1980) ("A strong theme of our opinions has been that an agency will not be permitted to develop a body of 'secret law,' used by it in the discharge of its regulatory duties and in its dealings with the public, but hidden behind a veil of privilege because it is not designated as 'formal,' 'binding,' or 'final.'"). Instead, any version that had "operative effect" or was "used by the agency in its dealings with the public" must be disclosed. *ACLU v. DOD*, 2017 WL 4326524, at *6; *Coastal States*, 617 F.2d at 866. This is so even if that version was later updated or replaced. *See Pub. Citizen, Inc. v. OMB*, 598 F.3d 865, 868, 876 (D.C. Cir. 2010) (requiring disclosure of "outdated" versions of a memo); *Am. Immigr. Council*, 905 F. Supp. 2d at 219 ("[A] document embodying a then-final decision does not gain protection when it becomes outdated.").

### ii. The CDC has failed to show that Document 12 is deliberative and predecisional.

In its opening brief, the Knight Institute explained the many reasons to believe that Document 12, in particular, is or was an operative version of the media strategy. Instead of establishing that the CDC properly withheld Document 12, the agency tries to cast doubt on the evidence Plaintiff has compiled. It claims that "Plaintiff is mistaken" that the five factors Plaintiff cites indicate that Document 12 is a final or operational version of the strategy. *See* Suppl. Andoh Decl. ¶ 21. It even highlights its own arbitrary decisionmaking and disorganized recordkeeping to show this. *See, e.g.*, Gov't Reply 8 (explaining that Document 12 was described differently in the *Vaughn* Index "[b]y pure happenstance"); *id.* (responding to Plaintiff's argument that while one

version is dated March 18, the others appear to have an autogenerated date, Pl.'s Br. 19, by stating that "CDC is aware of no particular reason for that anomaly"); *see also id.* at 9 (explaining that the version of the media strategy disclosed in the first production "was simply chosen at random"). Ultimately, though, because the CDC has failed to bear its burden of showing that Document 12 was never operative, the record cannot be withheld.

To start, contrary to the CDC's claim, Document 12 is indeed "unique." *See* Gov't Reply 8. Most importantly, Document 12 is the last-in-time version produced to Plaintiff, a fact that the agency did not acknowledge. *See* Pl.'s Br. 19; Suppl. Andoh Decl. ¶ 10 (explaining that Document 1, the only other version without a cover letter, was a duplicate of Document 29). But it is also the only version that has all three of the following traits: (1) it does not have an autogenerated date; (2) it is unedited; *and* (3) it contains a table of contents. *See* Gov't Reply 8. The agency tries to downplay this, noting that one other version is both unedited and has a table of contents. *Id*. That version, though, was from an earlier stage of the drafting process. As shown by its cover email, that version was circulated three weeks prior and was the culmination of the initial drafting process within CDC, sent up for review to the Department of Health and Human Services ("HHS") Office of the Assistant Secretary for Public Affairs. *See Vaughn* Index ¶ 23; Supplemental Declaration of Jennifer Pinsof ("Suppl. Pinsof Decl.") Ex. 1. Document 12, meanwhile, appears to be the culmination of HHS's review and subsequent revisions.

Conversely, there is nothing to indicate that Document 12 was *not* an operative version. The CDC points to the lack of a cover letter accompanying the document, arguing that "the absence of an explanatory document actually militates against any other possibility than that it is simply one of many predecisional drafts of a policy that was never implemented, much less finalized." Gov't Reply 8. But just because no cover email was *produced* in response to Plaintiff's request

does not mean there was none, and the government does not explicitly state that this was the case. In fact, given that the agency searched only the custodians' *email* inboxes, *see* Suppl. Andoh Decl. ¶ 11, it seems unlikely that Document 12 was not attached to a transmittal email. More likely, the agency did not view the accompanying email as responsive to the Request. That would be unsurprising, since the government admits it did not view "incidental documents related to the manner in which . . . policies and other guidance were *disseminated* to agency employees" as responsive to the Request. *See* Andoh Decl. ¶ 17 (emphasis added). In other words, the government cannot claim support from the fact that it did not produce a cover email for this record.

Critically, it is the agency's burden to establish that the privilege applies—that is, to show that Document 12 was *not* operative or implemented. *See, e.g.*, *Gen. Elec. Co. v. Johnson*, No. CIV.A.00-2855 (JDB), 2006 WL 2616187, at *5 (D.D.C. Sept. 12, 2006) ("[T]he agency must establish that it has never implemented the opinions or analyses contained in the document . . . or otherwise treated them as if the constitute agency protocol." (citing *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 161 (1975))); *United States v. Aetna Inc.*, No. 1:16-CV-1494 (JDB), 2016 WL 8738423, at *3 (D.D.C. Oct. 19, 2016) (same); *see also N.Y. Times Co. v. DOJ*, 756 F.3d 100, 112 (2d Cir. 2014) ("The agency asserting the exemption bears the burden of proof, and all doubts as to the applicability of the exemption must be resolved in favor of disclosure." (quoting *Wilner v. NSA*, 592 F.3d 60, 69 (2d Cir. 2009))). Indeed, because the agency could simply state that Document 12 was never operative or implemented, it is telling that it has not. *See, e.g.*, *Heffernan v. Azar*, 317 F. Supp. 3d 94, 122 (D.D.C. 2018) (noting that the agency's declaration "emphatically states that HHS 'has not implemented'" the record in question); *Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't*, No. 16-civ-387 (PAE), 2020 WL5518114, at *12 (S.D.N.Y.

Sept. 14, 2020) (remarking that "the Vaughn entries" for the disputed records each "represents that the policy proposals contained in the memoranda 'were never adopted or implemented by DHS'").

And even though Plaintiff highlighted the omission of basic information necessary to determine whether Document 12 was both predecisional and deliberative, *see* Pl.'s Br. 20–21, the agency has still declined to fill in those gaps. For example, "[a] key feature under both the 'predecisional' and 'deliberative' criteria is the relation between the author and recipients of the document." *Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 102 (D.D.C. 2019) (citation omitted). Yet the CDC has not disclosed whether anyone received this record or for what reason. This alone precludes a finding that the privilege applies. *See id.* at 103 (holding that the agency had failed to establish that the privilege applied because "[t]he defendants have made essentially no effort to satisfy the 'key feature' by identifying 'the relation between the author and recipients of the document'" (citation omitted)).

Nor has the agency alleged that this record "reflects the personal opinions of the writer rather than the policy of the agency," a primary consideration when determining whether the record is "deliberative" for the purposes of the privilege. *Brennan Ctr.*, 697 F.3d at 202 (citation omitted). Additionally, although the cases the government cites involved instances where the drafts at issue "died on the vine," *see, e.g., Color of Change v. DHS*, 325 F. Supp. 3d 447, 451, 454 (S.D.N.Y. 2018); *NAACP Legal Def. & Educ. Fund, Inc. v. DOJ*, No. 18-cv-4354 (PKC), 2020 WL 5237765, at *2, *7 (S.D.N.Y. Sept. 2, 2020), nothing in the CDC's declarations indicates that the CDC's media strategy document likewise "died on the vine."

> ### iii.   The CDC still has not established that the media strategy plan relates to substantive agency policymaking.

In its opening brief, Plaintiff explained that "messaging" records, like the COVID-19 media strategy at issue here, are not necessarily withholdable under the deliberative process

privilege, even in draft form. *See* Pl.'s Br. 22–23. Instead, "'[t]he key inquiry' in determining whether a messaging document is protected by the deliberative process privilege 'is whether the drafts or communications reflect deliberations about what 'message' should be delivered to the public about an already-decided policy decision, or whether the communications are of a nature that they would reveal the deliberative process underlying a *not-yet-finalized* policy decision." *Nat'l Res. Def. Council v. U.S. Env't Prot. Agency*, No. 17-cv-5928 (JMF), 2019 WL 4142725, at *8 (S.D.N.Y. Aug. 30, 2019) (citation omitted).

In response, the agency misunderstands or elides this distinction, arguing that "[w]hether or not the CDC's communication and media strategy for the coronavirus response relates to the agency's substantive policymaking is therefore irrelevant to the disclosure analysis because the draft messaging strategy was never finalized." Gov't Reply 9–10. This is incorrect. *Nat'l Res. Def. Council*, 2019 WL 4142725, at *8 (rejecting argument "that the deliberative processes that necessitate shielding these records from public view surround the messaging decisions themselves, not the underlying substantive policymaking decisions"). Because the CDC has not attempted to argue that Document 12 would reveal underlying deliberations over substantive policymaking, as opposed to revealing "deliberations about what 'message' should be delivered to the public about an *already-decided* policy decision," *id.* (citation omitted), it cannot withhold this record.

### iv. The agency has failed to segregate and release factual information.

In its opening brief, Plaintiff argued that the CDC had failed to show that it released all segregable factual information from the COVID-19 media strategy plan. *See* Pl.'s Br. 23. Because it was modeled after the CDC's Ebola media strategy plan written two years before, the COVID-19 media strategy document almost certainly likewise contains factual background information that could be segregated and released. For example, the Ebola strategy document starts with a

standalone section called "Situation," which begins as follows: "On August 1, 2018, the Ministry of Health (MoH) of the Democratic Republic of Congo (DRC) confirmed an outbreak of Ebola virus disease in the province of Nord-Kivu, in eastern DRC." Pinsof Decl. Ex. 14 at 2. This section contains no policy or strategy, but instead is "purely factual." *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 482 (2d Cir. 1999) (citation omitted).

The agency does not deny that the COVID-19 media strategy document contains such information. Instead, it argues that "[w]hile facts are usually thought to be static and unchanging, quite the opposite was the case in regard to the facts associated with the pandemic." Gov't Reply 15. Essentially, the agency proposes that courts not require disclosure of factual information that no longer reflects the agency's understanding, even if that information accurately reflected the agency's understanding at the time of drafting. But the government cites no case law for this novel take on its disclosure obligations under FOIA. Indeed, the law is clear: even if a record is otherwise covered by the deliberative process privilege, "[t]he privilege does not . . . cover 'purely factual' material." *Grand Cent. P'ship, Inc.*, 166 F.3d at 482 (citation omitted). When "factual material" can be withheld, it is because it is "too intertwined with evaluative and policy discussions." *Tigue v. DOJ*, 312 F.3d 70, 82 (2d Cir. 2002). Thus, while an agency may be able to withhold an actual *deliberation* over what the facts *are*, that does not appear to be what is withheld here. Instead, the agency seems to argue that the factual material can be withheld even on its own, not because it is intertwined with deliberations about policy. *See* Gov't Reply 15–16. This is incorrect.

Moreover, permitting the government to withhold information on that basis would not only deny the public access to a wealth of historical information, but such a standard would also be unworkable in practice. The Court should therefore reject this unworkable conception, and consistent with precedent, order the release of any purely factual segregable material.

**B.      CDC Communications and Media Strategy Plan (Document 1)**

In arguing that Document 1 is covered by the deliberative process privilege, the agency

essentially admits that it did not make a good faith effort to comply with this Court's June 4, 2020

Order. *See* ECF No. 24. In that Order, the Court required the agency, by June 9, to

> complete processing of records responsive to Plaintiff's 'prioritized records' request . . .
> for (i) the CDC's currently operative employee communications or speech policies and (ii)
> any policies or guidelines concerning the coordination of statements and/or public
> appearances with the Office of Vice President Mike Pence or the White House Coronavirus
> Task Force, other than any records in these categories for which consultation, referral, or
> coordination is required pursuant to 45 C.F.R. § 5.25(b)[.]

*Id.* On June 9, the agency produced Document 1, along with a number of other records reflecting

policies and guidelines. *See* Pinsof Decl. Ex. 13. Consistent with the Court's order, the Knight

Institute understood Document 1 to fall within one of the categories described above. The CDC

now admits, however, that the produced record was "simply chosen at random," without any

attempt to discern which version of the media strategy document may be the operative or even the

last-in-time version. *See* Gov't Reply 9; Suppl. Andoh Decl. ¶ 20. In light of the agency's belated

admission that Document 1 is a duplicate of Document 29, *id.*, Plaintiff no longer challenges the

withholding of Document 1.

However, given the agency's failure to make reasonable efforts to identify the version of

the media strategy actually responsive to Plaintiff's "prioritized records" request, Plaintiff

respectfully requests that the Court order the CDC to conduct a new search for the appropriate

responsive record. Although the CDC claims that "there was no logical criteria available for CDC

to identify any single version as being the nearest-to-final or even the most representative of the

development process," *id.*—this is demonstrably false. *Plaintiff*, even with its much more limited

information, has managed to identify Document 12 as the last-in-time version of those produced.

*See* Pl.'s Br. 19; Suppl. Andoh Decl. ¶ 10. Moreover, given that the CDC extracted these records

from individuals' inboxes, it could have identified the appropriate record by considering the content of the emails attaching each of the versions. Finally, it could have consulted the individuals involved in the media strategy's drafting. From the remainder of the production, it is clear that a number of CDC officials would have been in a position to answer this question, including Dagny Olivares, the member of the "JIC [Joint Information Center] Leadership Team" who appears to have coordinated the "initial Communication Strategy Group meeting" and thereafter shepherded the drafting and review process for the media strategy document. *See, e.g.*, Pinsof Decl. Ex. 12.

### C.   Emails applying communications clearance processes (Documents 27 and 28)

In its opening brief, Plaintiff explained that the CDC could not withhold Documents 27 and 28 under the deliberative process privilege for three reasons: first, the agency had not shown that the records were predecisional; second, the records concerned the application of an established policy; and third, the agency had not identified a reasonably foreseeable harm that would result from their disclosure. *See* Pl.'s Br. 13–14.

In response, the agency argues that because Documents 27 and 28 discuss the February 25 EOP email (Document 9), which it claims is only "a *proposed* strategy for what was expected to be a short-term situation," the records "do not concern discussions about 'post-decisional application' of an 'established policy.'"[2] *See* Gov't Reply 10 (citation omitted) (emphasis added). But this conflicts with the agency's original description of Documents 27 and 28, which indicates that the February 25 EOP email contained a process to be *implemented*. Andoh Decl. ¶ 22

_____

[2] Notably, although the agency relies on the February 25 EOP email's status as a "proposal" to claim that Documents 27 and 28 are deliberative, the agency does not invoke the deliberative process privilege to withhold the February 25 EOP email.

(Documents 27 and 28 contain "discussions about a clearance process at issue"); *Vaughn* Index ¶¶ 27–28 (discussing "how to apply" the February 25 EOP email). Moreover, the unredacted content of Document 28 shows that Dr. Cetron and Caitlin Shockey discussed modifying their plans in light of the February 25 EOP email. *See* Pinsof Decl. Ex. 2 ("You have an interview . . . about quarantine tomorrow. I'll try to get it cleared, otherwise we can cancel."). It is hard to imagine that they would consider canceling a scheduled interview if the February 25 EOP email did not convey an operative clearance process.

Trying to undermine this, the agency claims that the redacted emails show that Dr. Cetron "planned to suggest a change" to the clearance process at issue, and that "Ms. Shockey's view appeared to be that Dr. Cetron could ignore the framework Mr. Mulvaney had laid out the day before." Gov't Reply 10. While that may be true, that a lower-level employee wants to change, circumvent, or ignore a policy decision makes the policy no less operative in the first instance.

The agency also argues that the February 25 "framework" did not convey agency policy because it addressed "what was then expected to be a short-term situation" and was "effectively eras[ed]" by the February 27 EOP email. *Id.* But as explained above, *see supra* Part II.A.i, the deliberative process privilege does not permit an agency to withhold once–operative policies or procedures even if they were soon supplanted. *See, e.g.*, *ACLU v. DOD*, 2017 WL 4326524, at *9; *Pub. Citizen, Inc.*, 598 F.3d at 868, 876; *Am. Immigr. Council*, 905 F. Supp. 2d at 219.

Thus, the February 25 EOP email clearly conveys instructions regarding agency policy, and because Documents 27 and 28 contain discussions about how to apply that policy, they are not of the sort protected by the deliberative process privilege and cannot be withheld. *See* Pl.'s Br. 13; *Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't Agency*, 811 F. Supp. 2d 713, 736 (S.D.N.Y. 2011) ("The privilege . . . does not extend to materials related to the explanation,

interpretation or application of an existing policy, as opposed to the formulation of a new policy")
(citation omitted)); *see also Tigue*, 312 F.3d at 80 ("[T]he privilege does not protect a document
which is merely peripheral to actual policy formation[.]" (citation omitted)). Moreover, the records
may not be withheld for the independent reason that the agency still makes no effort to satisfy its
"independent and meaningful burden[]" of explaining how disclosure of these records would
"harm the agency's deliberative process." Pl.'s Br. 13–15 (quoting *Nat'l Res. Def. Council v. U.S.
Env't Prot. Agency*, No. 17-cv-5928 (JFM), 2019 WL 3338266, at *1 (S.D.N.Y. July 25, 2019)).

### D.    Emails conveying COVID-19–related communications clearance procedures (Documents 33, 34, and 35)

The CDC maintains that information within Documents 33 and 34, May 2020 emails
conveying communications clearance procedures, can be withheld because they reflect "interim
process[es]" which were not "final." Gov't Reply 11; *see* Pinsof Decl. Exs. 3, 4. On October 16,
2020—the day of filing—Plaintiff obtained what appear to be versions of these precise documents,
disclosed by HHS in response to a FOIA request by another organization, American Oversight.
*See* Suppl. Pinsof Decl. ¶¶ 5–6. Copies of these records, which contain only minimal redactions
under Exemption 6, are attached to the Supplemental Declaration of Jennifer Pinsof. *See* Suppl.
Pinsof Decl. Exs. 2 (unredacted version of Document 33); 3 (unredacted version of Document 34).

In the event that the agency confirms that these records accurately reflect the redacted
contents of Documents 33 and 34, Plaintiff asks the Court to deny the agency's motion for
summary judgment as to those records. If the agency refuses to confirm this information, Plaintiff
asks the Court to order the release of the records because the agency has failed to establish that
they can be withheld under the privilege. The agency provides no authority for its claim that
operative policies can be withheld so long as they are intended to be temporary or intended to be

updated. *See generally* Gov't Reply 10–11. Nor does the agency acknowledge or address the numerous cases Plaintiff cited holding the opposite. *See* Pl.'s Br. 15–16.

Instead, the CDC tries to shoehorn these records into the deliberative process privilege by claiming that "[a]n interim process is the equivalent of a first draft of the policy," and "is a suggestion about one way to try to deal with the issue at hand." Gov't Reply 11. This characterization is incorrect. An operative process is not deliberative, even if it is "interim." And the text of the emails makes clear that the interim process was disseminated for implementation: high-level HHS officials—Michael Caputo, the HHS Assistant Secretary for Public Affairs, and Ryan Murphy, the Principal Deputy Assistant Secretary for Public Affairs—were disseminating then-operative policies to numerous lower-level staff for the purpose of implementation. *See* Pinsof Decl., Exs. 3, 4; "Ryan Murphy," U.S. Dep't of Health & Hum. Servs. (last updated on Nov. 7, 2019), https://perma.cc/75NU-4MME. The unredacted versions of these records confirm this. *Compare* Pinsof Decl. Ex. 3, *with* Suppl. Pinsof Decl. Ex. 2 at 1 (conveying instructions about how to obtain "WH and OVP" clearance); *compare* Pinsof Decl. Ex. 4 *with* Suppl. Pinsof Decl. Ex. 3 (informing recipients that "media inquiries and press materials" would be "pass[ed] . . . by other authorities, like the White House, as needed").

Additionally, the agency still has not articulated a harm that would result from these records' disclosure, as is necessary to sustain its burden under the privilege. *See* Pl.'s Br. 16. Nor could any harm possibly result now that the HHS has released these records to another FOIA requester. These records thus cannot be withheld under the deliberative process privilege.

Notably, the CDC's reply brief does not defend the agency's withholding of Document 35 under the deliberative process privilege. As Plaintiff's opening brief explained, Document 35 is an

April 30 email providing a "rundown" of communications clearance processes, and the email's instructions cannot be withheld under the privilege. *See* Pl.'s Br. 14–16; Pinsof Decl. Ex. 1.

## III.     The Court should review the withheld documents *in camera*.

As described above, the government has used dubious characterizations to describe several of the records, omitted critical information from its declarations, and failed to segregate and release factual information. Because the government has failed to sustain its burden of showing that the privileges it invokes apply, this Court should order the release of the records.

If the Court has remaining questions about the nature of a specific record or redacted information, Plaintiff respectfully requests that the Court exercise its broad discretion to "examine the contents of such agency records in camera." 5 U.S.C. § 552 (a)(4)(B). For example, though the government characterizes Document 9, the February 25 EOP email, as a mere "proposal," Plaintiff has pointed to ample evidence that this record was disseminated for implementation. *See supra* Part II.C. If the Court has any doubts, reviewing that record *in camera* may shed light on the issue. Such review is appropriate where, like here, "the number of records involved is relatively small." *ACLU v. DOJ*, No. 12 Civ. 7412 (WHP), 2014 WL 956303, at *3 (S.D.N.Y. Mar. 11, 2014) (citation omitted).

## IV.     The CDC's search for records responsive to Items 1 and 2 was inadequate.

An agency must "show beyond material doubt that it has conducted a search reasonably calculated to uncover *all* relevant documents." *Knight First Amendment Inst. at Columbia Univ. v. DHS*, 407 F. Supp. 3d 311, 323 (S.D.N.Y. 2019) (emphasis added) (citing *Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't Agency*, 877 F. Supp. 2d 87, 95 (S.D.N.Y. 2012)). As explained in Plaintiff's opening brief, the CDC's search for records responsive to Items 1 and

2 was not calculated to do so, but instead was unreasonably limited. *See* Pl.'s Br. 24–30. The CDC's counterarguments, which fail to cite a single authority, are unavailing.

A.      **The CDC adopted an unreasonably narrow interpretation of Items 1 and 2 of Plaintiff's request.**

Items 1 and 2 of Plaintiff's request sought "*[a]ny records relating to*" certain CDC policies and procedures regarding the coronavirus. Request at 4, ECF No. 1-1 (emphasis added). As is clear from the plain language of the Request, records that "relat[e] to" CDC policies and procedures include not just the policies themselves, but also emails disseminating those policies, providing commentary on them, or otherwise discussing them. *See* Pl.'s Br. 25.

Although the agency's search uncovered the policy documents themselves and records related to their formulation, emails otherwise "relating to" those policies were missing. After the Knight Institute inquired about their absence, the agency responded that it did not understand the "primary subjects" of the Request to include "incidental documents related to the manner in which those policies and other guidance were disseminated to agency employees." Andoh Decl. ¶ 17. Instead, the agency decided that the "primary subjects" were "the actual policies, directives, and guidance," and designed its search to uncover those records. *Id.*

As explained, because the CDC based its search on this unreasonably narrow reading of the Request, its search was inadequate. *See* Pl.'s Br. 24–26. In response, the CDC claims that it based its interpretation "upon the plain language" of the Request and that "nothing in the request suggested" that the intended scope of Items 1 and 2 was broader than the other Items. Suppl. Andoh Decl. ¶ 6; Gov't Reply 4.[3] These arguments are not credible for two reasons.

_____

[3] The agency also argues that Items 1 and 2 were not "broader in scope" than Items 3–5 because Items 1 and 2 sought coronavirus-specific policies and the others concerned "more general

First, the agency's claim that the various Items are indistinguishable in scope is in direct conflict with its position earlier in the administrative process, when it acknowledged that Items 1 and 2 were broader in scope than the others. *See* ECF No. 17-3 at 2 (asserting its view that Items 1 and 2 were "overly broad" because they, unlike the other Items, requested "any records").

Second, the "plain language" of the Request is clear: while Items 1 and 2 include the modifying phrase "[a]ny records relating to," the remaining Items in the Request do not. Request at 4. The agency gives no explanation for this clear difference in phrasing, or for how records concerning the "dissemination of and communications *about those policies*"—that is, the coronavirus-specific policies named in Items 1 and 2—are not "*relat[ed] to*" those policies. *See* Suppl. Andoh Decl. ¶ 6. The agency instead seems to solve this problem by simply writing out the modifying phrase "[a]ny records relating to" from its reimagined "focus" of the Request, spelled out explicitly in its supplemental declaration. *Compare id. with id.* ¶ 5; *see also* Gov't Reply 4.

The agency's attempt to unilaterally narrow the Request cannot be credited. *See Charles v. Off. of Armed Forces Med. Exam'r*, 730 F. Supp. 2d 205, 216 (D.D.C. 2010) ("Applying a unilateral limitation . . . to exclude otherwise responsive records does not comport with the fundamental FOIA policy of maximum disclosure."); *Miller v. Casey*, 730 F.2d 773, 777 (D.C. Cir. 1984) ("The agency was bound to read [the request] as drafted, not as . . . agency officials . . . might wish it was drafted."); *ACLU v. DOJ*, 90 F. Supp. 3d 201, 214 (S.D.N.Y. 2015) (same). And even if the Request *were* susceptible to that reading—which it is not—the agency "had a duty

---

policies." Gov't Reply at 4–5. This misconstrues what Plaintiff means by "broader" and is thus beside the point. Items 1 and 2 are broader in that they sought not just the policies themselves, but also records "related to" those policies. Request at 4.

under the FOIA to select the interpretation that would likely yield the greatest number of responsive documents." *Conservation Force v. Ashe*, 979 F. Supp. 2d 90, 102 (D.D.C. 2013). *See also Nation Mag. v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995) ("[A]n agency . . . has a duty to construe a FOIA request liberally.").

The agency also argues "there is no basis to conclude" that the CDC's search "necessarily 'excluded' other types of related records." Gov't Reply 4. But the agency *admits* that it did not design its search to uncover such records. *See, e.g.*, Andoh Decl. ¶ 17 ("[T]he agency conducted its search based upon its understanding that the primary subjects of that request were . . . not incidental documents related to the manner in which those policies and other guidance were disseminated to agency employees."); Suppl. Andoh Decl. ¶ 6 (explaining that because it did not understand Items 1 and 2 to seek records concerning the "CDC's internal dissemination of and communication about those policies," it "applied the same search standards and parameters to its search for documents responsive to each of the four elements of Plaintiff's request"). Because the agency has failed to meet its initial burden of "show[ing] beyond material doubt that it has conducted a search reasonably calculated to uncover all relevant documents," *Knight First Amendment Inst.*, 407 F. Supp. 3d at 323 (citation omitted), its search was plainly inadequate.

**B.      The CDC's search terms and methods were unreasonable.**

Though the agency has now provided more detail about its search in its supplemental declaration, it has still not established that its search terms and methods were "reasonably calculated to uncover all relevant documents." *Id.* at 325. The agency offers four arguments as to why its search terms and methods were reasonable, all of which fail.

First, the agency has misconstrued its burden under FOIA, defending its "use of particular search terms" by explaining that they were chosen "in order to strike a balance between fully and

completely capturing emails dealing with the subject matter of Plaintiff's requests and eliminating the large number of nonresponsive emails captured by the first search." Suppl. Andoh Decl. ¶ 10. But the government's burden under FOIA requires more than "striking a balance": it must construct its search "to uncover *all* relevant documents, not most relevant documents." *Nat'l Day Laborer*, 877 F. Supp. 2d at 102; *cf. Pub. Citizen, Inc. v. Dep't of Educ*., 292 F. Supp. 2d 1, 8 (D.D.C. 2003) (finding the agency "failed to sustain its burden" because "[w]hile a computerized search may well be far more efficient and less costly than a manual search of the paper discharge files, . . . only the more cumbersome procedure is likely to turn up the requested information").

Second, the CDC's explanation for why it excluded certain search terms "is illogical and thus insufficient." *NAACP Legal Def. & Educ. Fund, Inc. v. DOJ*, No. 18-CV-9363 (AJN), 2020 WL 2793015, at *7 (S.D.N.Y. May 29, 2020). In its opening brief, Plaintiff pointed out that the CDC had failed to include common variants of search terms that "the agency itself . . . used in referring to the" subject. Pl.'s Br. 27; *Knight First Amendment Inst.*, 407 F. Supp. 3d at 325–26. In response, the CDC claimed that it did not do so "because they were unlikely to produce uniquely responsive documents, a decision that was validated by the number of responsive documents in the search results containing variants." Gov't Reply 5–6; *see also* Suppl. Andoh Decl. ¶ 10. But this logic is plainly flawed: the frequency with which those variants appeared within the production shows just how commonly they were used, making it *more* likely that the variants would yield uniquely responsive records, not less. Because the agency has "offer[ed] no reasonable justification to support its decision" to exclude these commonly used variants, it has not established the adequacy of its search. *See Knight First Amendment Inst.*, 407 F. Supp. 3d at 325–26.

Likewise, the CDC's explanation for excluding other "clearly relevant" search terms is also unconvincing. *See Brennan Ctr. for Just. v. DOJ*, 377 F. Supp. 3d 428, 434 (S.D.N.Y. 2019).

According to the agency, subject matter experts "advised against using specific terms from the request such as 'task force' and 'Vice President'" "in order to eliminate . . . excess, nonresponsive emails." Suppl. Andoh Decl. ¶ 10. While the agency certainly has an interest in eliminating nonresponsive emails, the search still must be "reasonably calculated to uncover all relevant documents." *Knight First Amendment Inst.*, 407 F. Supp. 3d at 323; *see also Tarzia v. Clinton*, No. 10 Civ. 5654 (FM), 2012 WL 335668, at *9 (S.D.N.Y. Jan. 30, 2012) ("[T]he fact that a broader search might produce documents unrelated to [plaintiff's] Request is irrelevant . . . . If conducting a more thorough search would *not* result in an undue burden, the agency must conduct the search." (citations omitted)). And if the agency determines that using a particular search term on its own would yield too many nonresponsive records, it must still come up with a substitute process to capture all responsive records. *See Gov't Accountability Project v. DHS*, 335 F. Supp. 3d 7, 13 (D.D.C. 2018) (agency's "concern that searches for commonly-used words . . . may return too many records for the agency to digest . . . dictates using more sophisticated search techniques, including additional filtering keywords or Boolean operators and connectors, to winnow the results to a manageable level"). Instead, the CDC chose to exclude obvious search terms used in the Request, accepting the trade-off between "fully and completely capturing emails dealing with the subject matter" of the Request and expediency—almost certainly eliminating responsive records in the process. *See* Suppl. Andoh Decl. ¶ 10. This decision was unreasonable.

Third, the CDC still has not provided sufficient information about "[t]he method in which [the terms were] combined and deployed," *Nat'l Day Laborer,* 877 F. Supp. 2d at 107 (citation omitted); *see also Knight First Amendment Inst*., 407 F. Supp. 3d at 323; Pl.'s Br. at 28, including how it combined terms and if it used Boolean operators. For example, the agency listed one of its search terms as "social media and news media." Andoh Decl. ¶ 15. If searched for in quotes, that

search term would be quite restrictive, only surfacing records with that precise five-word phrase. However, if the search was for "'social media' and 'news media,'" it would likely yield more results—although it would still require both phrases to appear in the record. Instead of providing this information, the CDC only acknowledges that "the search terms were applied to all email fields." Gov't Reply at 6. n.3. This alone is not sufficient to establish that the search was adequate.

Finally, the agency has tried to undercut Plaintiff's arguments above by suggesting *the Knight Institute* is to blame for the inadequate search because "Plaintiff did not provide CDC with any suggested search terms for the records sought, despite CDC requesting search terms." Gov't Reply 5. Although this argument appears to be more atmospheric than legal, its mischaracterization of the parties' previous communications merits correcting.

After the Knight Institute submitted its request, the CDC responded with a letter asserting its view that Items 1 and 2 were "overly broad." ECF No. 17-3 at 2. The agency suggested five independent ways in which Plaintiff could narrow these Items. *See id.* Though it disagreed that the Request was overbroad, the Knight Institute nonetheless agreed to narrow those Items in an effort to reduce processing time. *See* May 28 Joint Letter Ex. A at 1, ECF No. 23-1. The Knight Institute proposed narrowing along three of the five dimensions the CDC suggested, providing "a date range for records," "names . . . of persons within the agency," and "office(s) likely to have records requested." *See id.*; ECF No. 17-3 at 2. Although the Knight Institute informed the CDC that it "would be happy to discuss this proposal with you at your earliest convenience," ECF No. 23-1 at 1, the agency did not respond. Instead, it accepted the proposal and began its search. At no point thereafter did the CDC ask for additional clarification.

The agency insinuates that because the Knight Institute did not *also* provide suggested search terms at that juncture, it cannot now question the adequacy of the agency's search terms.

*See* Gov't Reply 5. This is without merit. If it continued to have concerns about the scope of the Request, it could have engaged in further discussions with the Knight Institute, or challenged the reasonableness of the scope of the Request in this litigation. It did neither, yet still tries to escape its obligation under FOIA to choose terms reasonably calculated to uncover all responsive records.

> **C.     The CDC has failed to search all custodians who were reasonably likely to possess responsive documents.**

For three reasons, the government has yet to sustain its burden of establishing that it "searched all custodians who were reasonably likely to possess responsive documents." *Nat'l Day Laborer*, 877 F. Supp. 2d at 96; Pl.'s Br. 29–30. First, the CDC has not adequately explained its failure to search the offices identified in Plaintiff's narrowing proposal. Second, it used circular logic to justify excluding Amy Heldman as a custodian. And third, the CDC's new disclosures bring to light additional custodians who possess responsive records but were not searched.

To begin, the CDC still has not adequately explained its failure to search the Office of the Director, the Office of the Associate Director of Communications, and the Speaker's Bureau. Strikingly, the CDC's Reply fails to even acknowledge the thirteen individuals from those offices that Plaintiff identified in its opening brief, all of whom possessed responsive records. *See* Pl.'s Br. 30; Pinsof Decl. Exs. 1, 9, 15, 16. Even though the agency had an obligation to follow up on these leads, it provides no explanation for its failure to search these individuals' mailboxes. *See Nat'l Day Laborer*, 877 F. Supp. 2d at 102–03 (finding unreasonable agency's decision not to search custodians when emails indicated that they were involved in relevant discussions); *Campbell v. DOJ*, 164 F.3d 20, 28 (D.C. Cir. 1998) (an agency must "account for leads that emerge during its inquiry" and "the court evaluates the reasonableness of an agency's search based on what the agency knew at its conclusion rather than what the agency speculated at its inception").

Instead, the CDC simply asserts, in general terms, that its decision not to search the offices was reasonable because subject matter experts "assist[ed] in framing the search . . . to ensure that all responsive documents located in those three offices were captured by the agency's electronic search." Suppl. Andoh Decl. ¶ 12. This conclusory assertion is not enough to carry the agency's burden. *See Grand Cent. P'ship*, 166 F.3d at 478 (explaining that agency affidavits must "contain *reasonable specificity* of detail rather than merely conclusory statements" (citation omitted)). This is especially so given the countervailing evidence Plaintiff has identified. *See Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 326 (D.C. Cir. 1999) ("[W]hat causes us to conclude that the search was inadequate arises from the fact that the record itself reveals 'positive indications of overlooked materials.'" (citation omitted)).

Second, the agency's post hoc justification for failing to search Amy Heldman's files relies on circular logic. The agency's declarant admitted to inaccuracies in his initial declaration, and now states that it "inadvertently" excluded only Amy Heldman from the search. Suppl. Andoh Decl. ¶ 11 n.1. But, according to the agency, this omission is of no consequence, because "[*a*]*s evidenced by the documents the agency produced*, Ms. Heldman's emails . . . were nonetheless recovered because her supervisor, Ms. Bonds, was included in all correspondence to or from Ms. Heldman concerning Items 1 and 2 of Plaintiff's request." *Id.* (emphasis added).

The agency's reasoning is flawed. Essentially, the CDC argues that because all of the *produced* records involving Ms. Heldman also included her supervisor, Ms. Bonds, then that must necessarily be true for *all* responsive records involving Ms. Heldman. *See id*. But while it makes sense that any *produced* records involving Ms. Heldman would involve Ms. Bonds—given that those emails were likely retrieved from Ms. Bonds's inbox—that sample says nothing about whether Ms. Heldman possesses additional responsive records on which Ms. Bonds is not copied.

Instead, that a subset of Ms. Heldman's emails was nonetheless caught by a search of other custodians is a testament to her deep involvement in the subject matter of the Request, further demonstrating that the failure to search her records, an admitted oversight, was unreasonable.

Third, the agency's new disclosures bring to light additional custodians who possess responsive documents but were not searched. *See* Suppl. Andoh Decl. ¶¶ 14, 15(c). According to the supplemental declaration, Dr. Redfield's office forwarded Document 9, a copy of Mr. Mulvaney's first email, to a group of five people. *Id*. Given that the substance of Mr. Mulvaney's email goes to the core of Plaintiff's request, and given the agency's representations that Dr. Redfield's office shared the email with only a select, high-level group, it follows that these five individuals were "reasonably likely to possess" not just that forwarded email, but other "responsive documents" as well. *See Id*. ¶ 15(c); *Nat'l Day Laborer*, 877 F. Supp. 2d at 96. But at least two of these senior CDC officials, the Chief of Staff and Chief Operating Officer at the time, were not searched. *See* Suppl. Andoh Decl. ¶ 14; Andoh Decl. ¶ 9, 15 (listing custodians). And though the agency has not provided the names or titles of the other two recipients, since their "work . . . was directly affected by the subject of the emails," Suppl. Andoh Decl. ¶ 15(c), the agency also should have searched their records. Thus, because "the record raises substantial doubts regarding the agency's efforts, . . . summary judgment is not appropriate." *Charles*, 730 F. Supp. 2d at 212.

## CONCLUSION

Plaintiff respectfully requests that the Court deny the CDC's motion for summary judgment and order the CDC to release improperly withheld information from the challenged records. Plaintiff also asks the Court to order the CDC to conduct a new search for records responsive to Items 1 and 2 of the Request.

October 16, 2020                              Respectfully submitted,

/s/ Anna Diakun

Anna Diakun
Jennifer Pinsof
Alex Abdo
Knight First Amendment Institute
 at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
anna.diakun@knightcolumbia.org

*Counsel for the plaintiff*