UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────────────┐
│ USDC SDNY                                │
│ DOCUMENT                                 │
│ ELECTRONICALLY FILED                     │
│ DOC #: _____                   │
│ DATE FILED: 9/17/2021                    │
└─────────────────────────────────────────┘
```

KNIGHT FIRST AMENDMENT INSTITUTE
AT COLUMBIA UNIVERSITY,

                              Plaintiff,

        -against-                                      20 Civ. 2761 (AT)

CENTERS FOR DISEASE CONTROL AND                        **ORDER**
PREVENTION and U.S. DEPARTMENT OF
HEALTH AND HUMAN SERVICES,

                              Defendants.

ANALISA TORRES, District Judge:

Plaintiff, the Knight First Amendment Institute at Columbia University, brings this action

challenging Defendants', the Centers for Disease Control and Prevention (the "CDC") and the

United States Department of Health and Human Services ("HHS"), nondisclosure of information

requested by Plaintiff pursuant to the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA").

The parties cross-move for summary judgment. For the reasons stated below, Defendants'

motion is DENIED, and Plaintiff's motion is GRANTED in part and DENIED in part.

## BACKGROUND

On March 20, 2020, Plaintiff submitted a FOIA request to the CDC, requesting:

1. Any records relating to policies or procedures governing public communications
by CDC employees or contractors about the coronavirus;

2. Any records relating to policies or procedures for the coordination of
communications strategy between the CDC (or its employees) and the Coronavirus
Task Force led by Vice President Pence;

3. Emails sent by CDC Public Affairs Officer Jeffrey Lancashire on or around
August 31, 2017, that contain instructions for employees regarding
communications with members of the news media or the public;

4. The CDC's policies on employee communications with news media and the
public in effect from January 2017 to present; and

> 5. Any directives or guidance related to the policies on employee communications with news media and the public in effect from January 2017 to the present.

Andoh Decl. ¶ 5, ECF No. 34; Request at 4, ECF No. 1-1.  Plaintiff also requested expedited processing of the documents.  Request at 4–8.  On March 24, 2020, the CDC acknowledged receipt, and informed Plaintiff that it was unable to comply with the statutory time limits of the expedited processing.  Andoh Decl. ¶ 6; Am. Compl. ¶ 20, ECF No. 17.  Two days later, the CDC informed Plaintiff by letter that requests one and two were overly broad, and asked for "additional information, such as: names and email addresses of persons within the agency in whose records you seek; a date range for records; recommended non-universal coronavirus pandemic search terms; office(s) likely to have records requested; and/or, the precise document you seek."  Andoh Decl. ¶ 7.  On March 27, 2020, Plaintiff replied, stating that the CDC "can limit its search" to records created after January 29, 2020, and identifying eleven custodians and three specific offices as "particular custodians who [it thinks] are likely to have responsive records."  ECF No. 23-1.

On March 30 and April 8, 2020, based on enterprise[1] and manual searches, the CDC identified no documents responsive to request three, one document responsive to request four, and two documents responsive to request five.  Andoh Decl. ¶¶ 10, 13.

On April 6, 2020, the CDC ran an enterprise search for documents responsive to requests one and two, which returned approximately 60,000 responsive documents.  *Id.* ¶¶ 12, 14.  After consulting with "agency subject matter experts," the CDC refined the search parameters to include the terms: media strategy, covid communication, centralized communications, social media and news media, and communication strategy.  *Id.* ¶ 15.  On May 6, 2020, the CDC used these terms to search the email inboxes of ten of Plaintiff's eleven suggested custodians, the

---

[1] An "enterprise" search is "a computer-generated search of all contents of the agency's email system."  Andoh Decl. ¶ 8, ECF No. 34.

locations which an agency subject matter expert "determined . . . were the most likely to contain documents responsive to the terms of Plaintiff's request." *Id.*; Supp. Andoh Decl. ¶ 11 n.1, ECF No. 42.  This search uncovered a total of 525 electronically identified responsive documents and 196 manually identified responsive documents.  Andoh Decl.  ¶ 17.

On April 2, 2020, Plaintiff initiated this action, challenging the CDC's denial of expedited processing.  ECF No. 1.  On May 8, 2020, after the CDC had not responded to the requests within the statutory time period, Plaintiff amended its complaint to challenge that failure.  Am. Compl.

On June 4, 2020, the Court ordered the CDC to produce, by June 9, 2020, "(i) the CDC's currently operative employee communications or speech policies and (ii) any policies or guidelines concerning the coordination of statements and/or public appearances with the Office of Vice President Mike Pence or the White House Coronavirus Task Force. . . ."  ECF No. 24.  By July 6, 2020, the CDC was to produce the balance of the records.  *Id.*  The CDC produced documents on June 9 and July 6, 2020, totaling 629 pages of records, including 529 pages withheld in full or in part under FOIA Exemptions 5 and 6.  Andoh Decl. ¶ 18.  The CDC subsequently reviewed the documents and released certain of the previously withheld documents. *Id.*

On September 4, 2020, Defendants moved for summary judgment regarding Plaintiff's challenge to certain of the CDC's withholdings under Exemption 5, and on September 18, 2020, Plaintiff cross-moved for partial summary judgment.  ECF Nos. 32, 38.  On December 10, 2020, the parties informed the Court that three of the challenged documents were no longer in dispute because the CDC had removed the Exemption 5 withholdings.  ECF Nos. 47–48.

## DISCUSSION

I.     <u>Legal Standard</u>

    A.     Summary Judgment

A moving party is entitled to summary judgment when the record shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Feingold v. New York*, 366 F.3d 138, 148 (2d Cir. 2004).  A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Material facts are those which, under the governing law, may affect the outcome of a case.  *Id*.  The moving party must establish the absence of a genuine dispute of material fact by citing to particulars in the record.  Fed. R. Civ. P. 56(a), (c); *Celotex*, 477 U.S. at 322–25; *Koch v. Town of Brattleboro*, 287 F.3d 162, 165 (2d Cir. 2002).  If the movant satisfies this burden, the opposing party must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)).  When deciding the motion, the Court must view the record in the light most favorable to the non-moving party, *O'Hara v. Weeks Marine, Inc*., 294 F.3d 55, 61 (2d Cir. 2002), although speculation and conclusory assertions are insufficient to defeat summary judgment, *see Niagara Mohawk Power Corp. v. Jones Chem. Inc.*, 315 F.3d 171, 175 (2d Cir. 2003).

    B.     FOIA

FOIA, enacted to promote honest and open government, "calls for broad disclosure of Government records." *N.Y. Times Co. v. U.S. Dep't of Just.*, 756 F.3d 100, 111 (2d Cir. 2014) (quotation marks and citation omitted).  Under FOIA, the government must "disclose agency records upon request" unless the documents "fall within one of [the law's] enumerated

4

exemptions." *Amnesty Int'l USA v. C.I.A.*, 728 F. Supp. 2d 479, 500 (S.D.N.Y. 2010) (citations omitted). The exemptions should be construed narrowly, but because "public disclosure is not always in the public interest," the exemptions nonetheless merit "meaningful reach and application." *Human Rights Watch v. Dep't of Just. Fed. Bur. of Prisons*, No. 13 Civ. 7360, 2015 WL 5459713, at *3 (S.D.N.Y. Sept. 16, 2015) (citations omitted).

Challenges to a government agency's FOIA response are generally resolved on a motion for summary judgment. *See N.Y. Times Co. v. U.S. Dep't of Just.*, 915 F. Supp. 2d 508, 531 (S.D.N.Y. 2013), *aff'd in part, rev'd in part, and remanded*, 756 F.3d 100 (2d Cir. 2014). "In order to prevail on a motion for summary judgment in a FOIA case, the defending agency has the burden of showing that its search was adequate and that any withheld documents fall within an exemption to the FOIA." *Carney v. U.S. Dep't of Just.*, 19 F.3d 807, 812 (2d Cir. 1994). This burden can be sustained through the use of "[a]ffidavits or declarations . . . giving reasonably detailed explanations why any withheld documents fall within an exemption[.]" *Wilner v. NSA*, 592 F.3d 60, 69 (2d Cir. 2009). All doubts as to the applicability of an exemption must be resolved in favor of disclosure. *N.Y. Times Co*., 756 F.3d at 112 (quotation marks and citation omitted); *Wilner*, 592 F.3d at 69. That said, Government affidavits are "accorded a presumption of good faith." *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 489 (2d Cir. 1999) (quoting *Carney v. U.S. Dep't of Just.*, 19 F.3d 807, 812 (2d Cir. 1994)). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible." *Wilner*, 592 F.3d at 73 (citation omitted). On the other hand, "[s]ummary judgment in favor of the FOIA plaintiff is appropriate when an agency seeks to protect material which, even on the agency's version of the facts, falls outside the proffered exemption." *Bloomberg L.P. v. Bd. of Governors of Fed. Rsrv. Sys.*, 649 F. Supp. 2d 262, 271 (S.D.N.Y. 2009) (citations and alterations omitted).

II.     Reasonable Search

The agency bears the burden to demonstrate "beyond material doubt that it has conducted a search reasonably calculated to uncover all relevant documents." *Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't Agency*, 877 F. Supp. 2d 87, 95 (S.D.N.Y. 2012) (citation omitted); *see also Carney*, 19 F.3d at 812.  It can demonstrate this reasonableness by "relatively detailed and nonconclusory" affidavits, *Grand Cent. P'ship, Inc.*, 166 F.3d at 488–89 (citation omitted), which "describe in reasonable detail the scope of the search and the search terms or methods employed," *Gelb v. Fed. Rsrv. Bank of N.Y.*, No. 12 Civ. 4880, 2014 WL 4402205, at *4 (S.D.N.Y. Sept. 5, 2014) (quoting *Davis v. U.S. Dep't of Homeland Sec.*, No. 11 Civ. 203, 2013 WL 3288418, at *6 (E.D.N.Y. June 27, 2013)).  "This standard does not demand perfection, and thus failure to return all responsive documents is not necessarily inconsistent with reasonableness: an agency 'is not expected to take extraordinary measures to find the requested records, but only to conduct a search reasonably designed to identify and locate responsive documents.'" *Adamowicz v. I.R.S.*, 672 F. Supp. 2d 454, 462 (S.D.N.Y. 2009) (citation omitted), *aff'd*, 402 F. App'x 648 (2d Cir. 2010); *see also Immigrant Def. Project v. U.S. Immigr. & Customs Enf't. Agency*, 208 F. Supp. 3d 520, 527–28 (S.D.N.Y. 2016) (A search "need not be 'perfect' in Plaintiff['s] estimation (or even the Court's)[.]" (quoting *Fox News Network, LLC v. U.S. Dep't of Treasury*, 739 F. Supp. 2d 515, 535 (S.D.N.Y. 2010)).  Speculation that other documents exist, without more, "does not undermine the finding that the agency conducted a reasonable search." *Garcia v. U.S. Dep't of Just., Off. of Info. & Priv.*, 181 F. Supp. 2d 356, 366 (S.D.N.Y. 2002) (quotation marks and citation omitted); *Bloomberg L.P.*, 649 F. Supp. 2d at 271 ("[A] reasonable search need not uncover every document extant.").  In determining whether a search was reasonable, the Court considers "among other things, the search terms and type of search performed and the nature of the records system or database searched." *NAACP Legal*

*Def. & Educ. Fund, Inc. v. U.S. Dep't of Just.*, 463 F. Supp. 3d 474, 484 (S.D.N.Y. 2020)

(quotation marks and citation omitted).

Plaintiff challenges only the search for documents responsive to requests one and two. The CDC affidavit describes its search.  First, the CDC conducted an enterprise search of the email inboxes of ten of the eleven of Plaintiff's identified custodians, for documents within Plaintiff's identified time frame of January 29, 2020, through April 6, 2020; this search identified approximately 60,000 responsive documents.  Andoh Decl. ¶¶ 12, 14; Supp. Andoh Decl. ¶ 8. The agency then ran "electronic analyses" on the results "in order to better understand their composition, distribution among the individual accounts, and general responsiveness to the topics identified in the request," and consulted with agency subject matter experts on "the use of particular search terms" in order to "strike a balance between fully and completely capturing emails dealing with the subject matter of Plaintiff's requests and eliminating the large number of nonresponsive emails captured by the first search."  Supp. Andoh Decl. ¶¶ 9–10.  As a result, the agency narrowed its search to "include" the terms: media strategy, covid communication, centralized communications, social media and news media, and communication strategy.  Andoh Decl. ¶ 15.

Plaintiff challenges the CDC's search for documents responsive to requests one and two on three grounds: (1) that the agency unreasonably interpreted the requests, (2) that the search terms used were too restrictive, and (3) that the CDC did not search all of the custodians required.

A.      Interpretation of Requests One and Two

In requests one and two, Plaintiff requested:

1. Any records relating to policies or procedures governing public communications by CDC employees or contractors about the coronavirus;

     2.   Any records relating to policies or procedures for the coordination of communications strategy between the CDC (or its employees) and the Coronavirus Task Force led by Vice President Pence.

Request at 4.  Based upon the "plain language" of the requests, the CDC interpreted the requests as "focus[ing] . . . upon the policies, procedures, and guidance identified in the request, in descending order of specificity."  Supp. Andoh Decl. ¶ 6 (describing requests one and two as encompassing "[p]olicies or procedures governing public communications by CDC employees or contractors about the coronavirus" and "[p]olicies or procedures for the coordination of communications strategy between the CDC (or its employees) and the Coronavirus Task Force led by Vice President Pence").  This led to the agency searching for "the actual policies, directives, and guidance regarding specific types of employee communications," rather than "incidental documents related to the manner in which those policies and other guidance were disseminated to agency employees."  Andoh Decl. ¶ 17; Supp. Andoh Decl. ¶ 6 (noting that the CDC did not read the requests as suggesting that "for the specific policies and procedures related to communications with the media and the public about the coronavirus and for the coordination of such communication with the Coronavirus Task Force . . . Plaintiff had an interest . . . in CDC's internal dissemination of and communication about those policies.").  Plaintiff argues that this interpretation—searching only for the "policies themselves," *id.*—was cramped, and excluded the records *related to* the policies.  Pl. Mem. at 24–26, ECF No. 39.  The Court agrees.

     Although an agency need not expand a search beyond the four corners of the language of the request, *Am. Chemistry Council, Inc. v. HHS*, 922 F. Supp. 2d 56, 62 (D.D.C. 2013), it must "adher[e] to the full scope or the precise language of the plaintiff's request," *Charles v. Office of Armed Forces Med. Exam'r*, 730 F. Supp. 2d 205, 216 (D.D.C. 2010) (citing *Jud. Watch, Inc. v. U.S. Dep't of Energy*, 310 F. Supp. 2d 271, 306 (D.D.C. 2004), *aff'd in part, rev'd in part on other grounds and remanded*, 412 F.3d 125 (D.C. Cir. 2005)).  And, most importantly, an agency

must "construe [FOIA requests] liberally." *Immigrant Def. Project*, 208 F. Supp. 3d at 526 (quoting *Amnesty Int'l USA v. CIA*, 728 F. Supp. 2d 479, 498 (S.D.N.Y. 2010)); *see also Miller v. Casey*, 730 F.2d 773, 776–77 (D.C. Cir. 1984) ("The agency was bound to read [the request] as drafted, not as . . . agency officials . . . might wish it was drafted.").

Here, the plain language of the requests indicate that they encompass more than the CDC's interpretation. Requests one and two seek records "relating to" policies and procedures, and so are broader than merely the policies themselves. *Compare* Request at 4 *with* Supp. Andoh Decl. ¶ 6 (describing requests one and two verbatim except for omitting the phrase "any records relating to"). By reading requests one and two to include only the policies and procedures, the CDC made the phrase "relating to" superfluous—"a result that is anathema to established principles of reasoned interpretation," including in the interpretation of FOIA requests. *Conservation Force v. Ashe*, 979 F. Supp. 2d 90, 101 (D.D.C. 2013); *see also Charles*, 730 F. Supp. 2d at 216 ("Nothing in the plaintiff's narrowed request suggests any intent to restrict the scope of his request only to documents containing explicit 'statements' about these topics. . . . Applying a unilateral limitation in this manner to exclude otherwise responsive records does not comport with the fundamental FOIA policy of maximum disclosure."). Moreover, by contrast, in request four, Plaintiff does not include the phrase "records relating to," instead requesting only "[t]he CDC's policies on employee communications with news media and the public in effect from January 2017 to present." Request at 4. The comparison with requests one and two clarifies that those requests seek records beyond the policies or procedures.

Defendants nevertheless argue that the plain language of the requests upholds their reading, because requests one and two sought "more specific policies related to communications by the CDC about the more-recent coronavirus," and requests three, four, and five sought "broader, more general policies on employee communications with the news media and public

dating back to 2017." Def. Reply at 4–5, ECF No. 41. This argument ignores the rule against surplusage, and ignores the "relating to" language, which is in requests one and two, but not four.

Defendants also contend that request three, which seeks "[e]mails sent by CDC Public Affairs Officer Jeffrey Lancashire on or around August 31, 2017, that contain instructions for employees regarding communications with members of the news media or the public," Request at 4, demonstrates that Plaintiff knew how to specifically request emails discussing and disseminating policies, which they did not do in requests one and two, Def. Reply at 5 n.2. However, courts have rejected the idea that including a specific request invalidates an overlapping broader request. *See LaCedra v. Exec. Off. for U.S. Att'ys*, 317 F.3d 345, 348 (D.C. Cir. 2003); *Nation Mag. v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995). Moreover, even assuming the requests are ambiguous and both readings are reasonable, "the [agency] had a duty under the FOIA to select the interpretation that would likely yield the greatest number of responsive documents." *Conservation Force*, 979 F. Supp. 2d at 102; *see also Immigrant Def. Project*, 208 F. Supp. 3d at 531–32.

Finally, Defendants maintain that there is "no basis to conclude that CDC's focus on searching for records relating to the policies themselves necessarily 'excluded' other types of related records." Def. Reply at 4. However, the agency states that it is "confident that its search produced all documents responsive to the subject of the final narrowed request *as it understood the meaning and scope of that request*." Andoh Decl. ¶ 17 (emphasis added). Moreover, the agency states that it narrowed its initial search based, in part, on the "general responsiveness to the topics identified in the request." Supp. Andoh Decl. ¶¶ 9–10. As the CDC's interpretation of the topics in the request was overly narrow, Defendants have not met their burden to demonstrate that the search was reasonably conducted to find all documents responsive to the broader

interpretation.  *See Pub. Emps. for Env't Resp. v. U.S. Int'l Boundary & Water Comm'n*, 842 F.

Supp. 2d 219, 225 (D.D.C. 2012).

Therefore, the CDC improperly narrowed the scope of their search, and shall reconduct it

in light of this order.  Although this alone is sufficient to grant Plaintiff's motion for summary

judgment on this point, the Court discusses Plaintiff's other challenges to the search in the hopes

that the parties can come to agreement on the scope of the reconducted search.

B.      Search Terms

Next, Plaintiff challenges the CDC's search terms.  The CDC's final search "include[d]"

the terms media strategy, covid communication, centralized communications, social media and

news media, and communication strategy.  Andoh Decl. ¶ 15.  Plaintiff argues that (1) these

terms were overly narrow and the CDC did not explain its failure to use certain "clearly relevant

search terms[,]" (2) the CDC did not justify its failure to use common variants or synonyms of

the search terms, and (3) the CDC failed to provide technical detail on how the search was

conducted.  Pl. Mem. at 27–28.

The agency has discretion to "craft the search terms that they believe to be reasonably

tailored to uncover documents responsive to a FOIA request."  *Brennan Ctr. for Just. at N.Y.*

*Univ. Sch. of L. v. U.S. Dep't of Just.*, 377 F. Supp. 3d 428, 434 (S.D.N.Y. 2019),

*reconsideration denied*, No. 17 Civ. 6335, 2019 WL 2717168 (S.D.N.Y. June 28, 2019).

However, the agency must provide "'logical explanations for each of the decisions it made as to

search terms to be used and how to conduct the searches,' evincing a good faith effort to design a

comprehensive search."  *Immigrant Def. Project*, 208 F. Supp. 3d at 527–28 (S.D.N.Y. 2016)

(quoting *Fox News Network, LLC*, 739 F. Supp. 2d at 535)).

Plaintiff first challenges the limited nature of the search terms—that the agency used only

five search terms, did not include certain relevant terms such as "task force" or terms related to

the vice president, and did not use common variants or synonyms for the search terms (*i.e.*, COVID-19 or n-cov instead of covid).  Pl. Mem. at 27–28.

A failure to use certain search terms, including those emphasized by Plaintiff, is not automatically unreasonable, "so long as the agency provided an explanation as to why the search term was not used." *Immigrant Def. Project*, 208 F. Supp. 3d at 528.  Conversely, however, "FOIA requests are not a game of Battleship.  The requester should not have to score a direct hit on the records sought based on the precise phrasing of his request." *Gov't Accountability Project v. U.S. Dep't of Homeland Sec*., 335 F. Supp. 3d 7, 12 (D.D.C. 2018).  Therefore, an agency must offer a "reasonable justification" for how the limited search terms used were "reasonably likely to yield responsive records." *Knight First Amend. Inst. at Columbia Univ. v. U.S. Dep't of Homeland Sec*., 407 F. Supp. 3d 311, 325 (S.D.N.Y. 2019), *reconsideration denied,* No. 17 Civ. 7572, 2020 WL 5512540 (S.D.N.Y. Sept. 13, 2020); *see also Brennan Ctr. for Just.*, 377 F. Supp. 3d at 434 (requiring the agency to explain "why certain search terms, clearly relevant, were not used").  Similarly, an agency must search for synonyms or common variants of a term used in the request that are likely to be used in responsive documents, unless it can reasonably justify declining to use them.  *Gov't Accountability Project*, 335 F. Supp. 3d at 12–13.

The CDC did not use certain terms such as "task force" and "vice president" because it considered them likely too broad to identify responsive documents.  Supp. Andoh Decl. ¶ 10.  Courts do not consistently agree on whether such a justification is acceptable.  *Compare Immigrant Def. Project*, 208 F. Supp. 3d at 528 (accepting an agency justification that certain terms would be "overly broad when taken in context with [the agency's] work") *with NAACP Legal Def. & Educ. Fund, Inc.*, 463 F. Supp. 3d at 486–87 (concluding that an agency's justification that it did not use "broader terms" because they would be "extremely likely to capture a large number of [unresponsive] records" a "speculative and cursory explanation . . .

12

insufficient on its face to satisfy [the agency's] burden because it fails to 'describe with reasonable specificity the actual burden imposed'").  Regardless, when reconsidering the search in light of the broader interpretation of requests one and two, the CDC should determine whether other search strategies, such as Boolean connectors, might replicate these terms without such over-inclusivity.  *See Gov't Accountability Project*, 335 F. Supp. 3d at 13 n.3; *NAACP Legal Def. & Educ. Fund, Inc.*, 463 F. Supp. at 487.

The CDC justifies not including variants such as "comm" or "comms"—presumably for "communication"—because "they were unlikely to produce uniquely responsive documents." This low probability is demonstrated, the agency contends, by the number of documents produced which contained those variant terms, despite the agency not searching for them specifically.  Def. Reply at 5–6; Supp. Andoh Decl. ¶ 10.  However, the number of documents that used the variants instead of the search terms merely demonstrates the prevalence of the variants.  It does not suggest the non-existence of other responsive documents that only used the variant terms—particularly as, discussed *infra*, it is unclear how targeted the searches were. Therefore, the search was not reasonably calculated to discover *all* responsive documents.  *See NAACP Legal Def. & Educ. Fund, Inc.*, 463 F. Supp. 3d at 485–486; *Knight First Amend. Inst.*, 407 F. Supp. 3d at 326 ("[A] FOIA search's adequacy is not determined by the fruits of the search[.]" (quotation marks omitted)).

Moreover, the agency justifies its limitation of search terms as a means of "strik[ing] a balance between fully and completely capturing emails dealing with the subject matter of Plaintiff's requests and eliminating the large number of nonresponsive emails captured by the first search."  Supp. Andoh Decl. ¶ 10.  But, an agency's duty under FOIA is not to strike such a balance; it is to conduct a search reasonably calculated to uncover all relevant documents, unless such a search would be an undue burden.  *Tarzia v. Clinton*, No. 10 Civ. 5654, 2012 WL 335668,

at *9 (S.D.N.Y. Jan. 30, 2012) ("The only pertinent question is whether broadening the search terms would result in a search that plainly is unduly burdensome.  If conducting a more thorough search would *not* result in an undue burden, the agency must conduct the search." (quotation marks and citations omitted)).  The CDC has not argued that using broader search terms would be unduly burdensome, merely that it would result in a large number of documents.  That is not a relevant concern under FOIA.  *Id.*

Finally, Plaintiff correctly observes that the agency's affidavit does not give sufficient detail about how the search was conducted.  Pl. Reply at 26–27.  Though the CDC states that the search was conducted across all email fields, Andoh Decl. ¶¶ 8, 15; Supp. Andoh Decl. ¶ 11, and for the time period of January 29, 2020, through April 6, 2020, Supp. Andoh Decl. ¶ 8, it does not specify how Boolean searches were used: for instance, if it searched for the two-word terms like "covid communication" in quotes (producing only documents containing those two words in sequence), or not (producing documents with either one of those words anywhere in the document).  Moreover, for the term "social media and news media", the agency declaration does not specify if "social media" and "news media" were searched for only in conjunction, or separately, or with some other Boolean connector.  Without such detail, the Court cannot conclude that the agency demonstrated that the search terms were reasonably calculated to uncover responsive documents.  *Nat'l Day Laborer Org. Network*, 877 F. Supp. 2d at 107, 110–11 (S.D.N.Y. 2012); *NAACP Legal Def. & Educ. Fund, Inc.*, 463 F. Supp. 3d at 487.

C.      Custodians

Finally, Plaintiff challenges the locations the CDC searched.  Though an agency need not search every record system, it must search "all locations likely to contain responsive records; not simply where the records are 'most likely' to be found."  *Knight First Amend. Inst.*, 407 F. Supp. 3d at 324; *Pub. Citizen, Inc. v. Dep't of Educ.*, 292 F. Supp. 2d 1, 8 (D.D.C. 2003).  As with

search terms, the agency bears the burden to demonstrate its search was reasonable.  *Pub. Emps. for Env't Resp.*, 842 F. Supp. 2d at 225.

Here, Plaintiff, in its narrowed request, identified eleven custodians and three offices to search.  ECF No. 23-1 at 1.  The CDC searched the email inboxes of ten of the eleven identified custodians; the last, Amy Heldman, was inadvertently excluded from the search.  Supp. Andoh Decl. ¶¶ 11 & 11 n.1.  It did not specifically search for records located in the offices identified by Plaintiff: the Office of the Director, the Office of the Associate Director for Communications, and the Speaker's Bureau.  *Id.* ¶ 12.

Defendants first argue that the CDC's search was reasonable despite the omission of Heldman, because the produced records demonstrate that her supervisor, Michele Bonds, "was included in all correspondence to or from Ms. Heldman concerning items 1 and 2 of Plaintiff's request."  *Id.* ¶ 11 n.1.  However, this logic does not hold:  Bonds' inclusion on the emails uncovered by a search of her email inbox does not mean that Heldman did not send or receive other responsive emails which did not include Bonds.  Therefore, it is reasonably likely that Heldman has other, undiscovered responsive documents, and must be included in a reasonable search.  *See Campbell v. U.S. Dep't of Just.*, 164 F.3d 20, 28 (D.C. Cir. 1998), *as amended* (Mar. 3, 1999) ("[A]n agency cannot limit its search to only one record system if there are others that are likely to turn up the information requested." (quotation marks and citation omitted)).

Second, Defendants justify the agency's not searching the three identified offices because the subject matter expert Michele Bonds, the agency's Associate Director for Communications whose office includes the Speaker's Bureau, and Loretta Lepore, the lead for communications issues in the Office of the Director, helped shape the search parameters, "to ensure that all responsive documents located in those three offices were captured by the agency's electronic search."  Supp. Andoh Decl. ¶ 12.

15

"[I]t is 'well-settled that if an agency has reason to know that certain places may contain responsive documents, *it is obligated under FOIA to search barring an undue burden*.'"  *NAACP Legal Def. & Educ. Fund, Inc*., 463 F. Supp. 3d at 488 (emphasis in original) (quoting *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 327 (D.C. Cir. 1999)).  However, an agency need not search an office that individuals "well-positioned to have knowledge" of the offices reasonably determine is unlikely to have responsive documents.  *Heartland All. for Hum. Needs & Hum. Rts. v. U.S. Immigr. & Customs Enf't Agency*, 406 F. Supp. 3d 90, 117 (D.D.C. 2019); *Immigrant Def. Project*, 208 F. Supp. 3d at 531.

Here, Plaintiff identified thirteen additional individuals in the named offices who may have additional responsive documents, based on their inclusion in produced documents.  Pl. Mem. at 30.  The CDC did not refute this suggestion, outside of its contention that it searched the custodians "most likely" to have records, and the conclusory claim that the subject matter experts' assistance ensured that "all responsive documents located in those three offices were captured by the agency's electronic search."  Andoh Decl. ¶ 15; Supp. Andoh Decl. ¶ 12; *see also* Def. Reply. at 6–7.  This statement is insufficient to justify not searching the identified individuals' inboxes.  *See Pub. Emps. for Env't Resp*., 842 F. Supp. 2d at 226; *Mobley v. CIA*, 806 F.3d 568, 582 (D.C. Cir. 2015) ("Had the [agency] only searched the record systems 'most likely' to contain responsive records, its search would be inadequate.").

Plaintiff also observes that Defendants' reply briefing raises additional individuals likely to have responsive documents, as the CDC mentions people who were sent responsive documents for informational purposes.  Pl. Reply at 30; *see infra* § III.A.  Plaintiffs note that if these individuals received the documents because their work "was directly affected by the subject of the emails," Supp. Andoh Decl. ¶ 15, they are likely to have other responsive documents.  Pl. Reply at 30.

An agency has a responsibility to follow leads discovered in its search that suggest other locations with responsive documents.  *See Pub. Citizen, Inc.*, 292 F. Supp. 2d at 8; *Valencia-Lucena*, 180 F.3d at 327–28.  For that reason, whether an agency's search was reasonable is determined "based on what the agency knew at its conclusion rather than what the agency speculated at its inception."  *Campbell*, 164 F.3d at 28 ("An agency has discretion to conduct a standard search in response to a general request, but it must revise its assessment of what is 'reasonable' in a particular case to account for leads that emerge during its inquiry.").

Here, the CDC has given no reason it did not search the inboxes of the individuals identified by Plaintiff, which Plaintiff reasonably contends may contain responsive documents.  Therefore, it was unreasonable of the CDC to omit those individuals likely to have responsive documents from the search.  *Pub. Emps. for Env't Resp.*, 842 F. Supp. 2d at 226.

The Court concludes that the CDC's search for documents responsive to requests one and two was not reasonably likely to uncover all responsive documents.  Accordingly, Plaintiff's motion for summary judgment on the search is GRANTED and Defendants' motion for summary judgment on the reasonableness of the search is DENIED.

III.   Exemption 5

Plaintiffs next challenge the agency's withholding of parts or all of certain documents under FOIA Exemption 5.[2]  Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party . . . in litigation with the agency."  5 U.S.C. § 552(b)(5).  "Stated simply, agency documents which would not be obtainable by a private litigant in an action against the agency under normal discovery rules . . . are protected from disclosure under Exemption 5."  *Tigue v. U.S. Dep't of Just.*, 312 F.3d 70, 76 (2d Cir. 2002) (footnote and citation omitted); *Hopkins v. U.S. Dep't of Hous. and Urban Dev.*,

---

[2] Documents are referred to by their number in the CDC's Vaughn Index, ECF No. 34-1.

929 F.2d 81, 84 (2d Cir. 1991).  This exemption is "based on the policy of protecting the

decision making processes of government agencies," and protects "documents reflecting

advisory opinions, recommendations and deliberations comprising part of a process by which

governmental decisions and policies are formulated."  *Brennan Ctr. for Just. at N.Y. Univ. Sch.*

*of L. v. U.S. Dep't of Just.*, 697 F.3d 184, 194 (2d Cir. 2012) (quotation marks and citation

omitted).  As relevant here, Exemption 5 encompasses the presidential communications and

deliberative process privileges.  *ACLU v. U.S. Dep't of Def.*, 435 F. Supp. 3d 539, 557 (S.D.N.Y.

2020).

When an agency asserts an exemption, it "bears the burden of proof, and all doubts as to

the applicability of the exemption must be resolved in favor of disclosure."  *N.Y. Times Co. v.*

*U.S. Dep't of Just.*, 756 F.3d 100, 112 (2d Cir. 2014) (quoting *Wilner v. NSA*, 592 F.3d 60, 69

(2d Cir. 2009)).

A.    Presidential Communications Privilege

The presidential communications privilege protects "communications in performance of a

President's responsibilities, . . . and made in the process of shaping policies and making

decisions."  *ACLU v. U.S. Dep't of Def.*, 435 F. Supp. 3d 539, 559 (S.D.N.Y. 2020) (quotation

marks and citation omitted); *see also Seife v. U.S. Dep't of State*, 298 F. Supp. 3d 592, 621

(S.D.N.Y. 2018).  It covers not only the President, but also his immediate White House advisers,

when acting in their advisory capacity, as well as "members of an immediate White House

adviser's staff who have broad and significant responsibility for investigating and formulating

the advice to be given the President on the particular matter to which the communications

relate."  *In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997).  The privilege applies to both

"'communications which these advisers solicited and received from others as well as those they

authored themselves,' in order to ensure that such advisers investigate issues and provide

appropriate advice to the President." *Amnesty Int'l USA v. CIA*, 728 F. Supp. 2d 479, 522

(S.D.N.Y. 2010) (quoting *In re Sealed Case*, 121 F.3d at 752).  Moreover, as opposed to the

deliberative process privilege, it "covers final and post-decisional materials as well as

pre-deliberative ones."  *Id*. (quoting *In re Sealed Case*, 121 F.3d at 752).  "[T]his privilege

should be construed . . . narrowly."  *ACLU v. NSA*, No. 13 Civ. 9198, 2017 WL 1155910, at *13

(S.D.N.Y. Mar. 27, 2017), *aff'd*, 925 F.3d 576 (2d Cir. 2019) (quotation marks and citation

omitted).

Plaintiff challenges the withholding of Documents 9, 10, and 11 under the presidential

communications privilege.  Document 9 is a February 25, 2020 email authored by Mick

Mulvaney, President Donald J. Trump's then-acting White House Chief of Staff, and sent to

"Senior Government Officials," described as a "[p]roposed coordinated media communication

strategy for COVID-19 with designated speakers for various issues/topics."  Vaugh Index ¶ 9.

Document 10 is a February 25 and 27, 2020 email chain involving Mick Mulvaney, described as

an "[u]pdate and elaboration of proposed coordinated media communication strategy for

COVID-19."  *Id.* ¶ 10; Supp. Andoh Decl. ¶ 14.  Document 9 was sent to 48 individuals, 36 of

who were within the Executive Office of the President (the "EOP").  Supp. Andoh Decl. ¶ 15(a).

Document 10 was sent to the same 48 individuals, along with an additional seven individuals

within the EOP.  *Id.*  Both documents, therefore, were sent to 12 non-EOP individuals, of whom

four were members of the White House COVID-19 Task Force.  *Id.*  Of the remaining eight

individuals, only one was in the CDC: Martin Cetron, M.D., Director of the CDC's Division of

Global Migration and Quarantine, who "led the CDC division responsible for the Federal

government's only direct action to limit the spread of COVID-19."  *Id.* ¶ 15(b).  In addition, one

of the members of the White House COVID-19 Task Force who received the email was Robert

Redfield, M.D., Director of the CDC.  *Id.* ¶ 15(c); Andoh Decl. ¶ 9.  Document 11 is Redfield's

forwarding of Document 9 to his principal deputy, his chief of staff, the CDC's chief operating officer, and two members of Redfield's personal staff, who "were routinely tasked with handling on his behalf the issues discussed in the email."  Supp. Andoh Decl. ¶ 14.

Plaintiff no longer disputes that these documents were properly authored by a member of the President's staff.  Pl. Reply at 2 n.1.  However, Plaintiff disputes whether these documents were kept sufficiently confidential for the privilege to apply.  *Id.* at 2–3.

The presidential communications privilege is "rooted in the need for *confidentiality* to ensure that presidential decisionmaking is of the highest caliber, informed by honest advice and full knowledge."  *Ctr. for Effective Gov't v. U.S. Dep't of State*, 7 F. Supp. 3d 16, 22 (D.D.C. 2013) (emphasis in original) (quoting *In re Sealed Case*, 121 F.3d at 750).  Therefore, the President, or an agency invoking the privilege on his behalf, waives the privilege by the disclosure of the otherwise privileged information to third parties.  *ACLU v. U.S. Dep't of Just.*, No. 15 Civ. 1954, 2016 WL 889739, at *3 (S.D.N.Y. Mar. 4, 2016) (citing *In re Sealed Case*, 121 F.3d at 741).  Specifically, "the transmittal of a document to persons who are unlikely to be in a position to give advice to the President waives the privilege."  *ACLU v. U.S. Dep't of Def.*, 435 F. Supp. 3d at 559 (quoting *ACLU v. U.S. Dep't of Just.*, 2016 WL 889739, at *4).  Maintaining the privilege, therefore, requires keeping the information in a "circle [which] . . . has a narrow diameter."  *Id.*

In *Center for Effective Government v. United States Department of State*, the Honorable Ellen Huvelle identified a number of factors that determine when the presidential communications privilege applies.  7 F. Supp. 3d at 25–29 (D.D.C. 2013); *see also ACLU v. U.S. Dep't of Just.*, 2016 WL 889739, at *4–5 (adopting Judge Huvelle's analysis).  Judge Huvelle reasoned that the privilege's "broad purpose" is to "protect[] the President's ability to 'operate effectively.'"  *Ctr. For Effective Gov't*, 7 F. Supp. 3d at 25 (quoting *In re Sealed Case*, 121 F.3d

at 745).  In rejecting the agency's assertion of that privilege, Judge Huvelle noted first that the case did not involve "a quintessential and nondelegable Presidential power," but rather, a policy that was "exercised or performed without the President's direct involvement." *Id.* (quoting *In re Sealed Case*, 121 F.3d at 752–53).  Second, she determined that the contested document was not "revelatory of the President's deliberations such that its public disclosure would undermine future decision-making." *Id.* (quotation marks and citation omitted).  Third, because the document was "distributed far beyond the President's close advisers," the "President's ability to communicate his . . . decisions privately," was not implicated. *Id.* (quotation marks and citation omitted).

Next, Judge Huvelle considered whether the document "was intended to be, or has been treated as, a confidential presidential communication." *Id.*  She observed that the document at issue was "a non-classified document . . . that lacks any inherent (or claimed) basis for secrecy," and that the claim of privilege was not based on a need to protect state secrets. *Id.*  She then observed that the President had publicly discussed the directive in the media. *Id.*  She further noted that there appeared to be no limitations to prevent recipients from further distributing the documents. *Id.* at 26.

Finally, Judge Huvelle stressed that the privilege did not attach where the document was distributed throughout the Executive Branch for "non-advisory purposes." *Id.* at 27–29 ("The purpose underlying the distribution of a presidential communication beyond the President's closest advisers is paramount.  If distribution is limited to advisory purposes, the privilege may apply; but if distribution is far broader, the purposes animating the privilege will not justify its application.").

This reasoning applies equally to Documents 9 and 10.  Disclosure of the documents would not prevent the President from operating effectively.  The media strategy of an executive

agency is not a quintessential presidential power like the removal power; it is and was performed without presidential input.  Nor would disclosing the documents undermine future presidential decision-making; as discussed below, the policies appear to have been forward-looking plans to coordinate strategy.  And finally, because the policies were distributed to more than just the President's closest advisors, his ability to communicate his final decisions privately was not implicated.

Moreover, the documents were not treated as confidential for purposes of the privilege. The Government does not assert that they contain independently classified information.  *See* Vaughn Index ¶¶ 9–11.  Although the Government did not "publicly tout[]" the information in the documents, *Ctr. for Effective Gov't*, 7 F. Supp. 3d at 25, Document 35, a "rundown" that "contained a direct reference to the subjects discussed" in Documents 9 and 10, has since been disclosed to the public, Supp. Andoh Decl. ¶¶ 14,18; ECF No. 47.  And, there does not appear to have been any limitation on forwarding the email, as Redfield freely forwarded the email to members of his staff and other CDC officials.  Supp. Andoh Decl. ¶¶ 14, 15(c); *see also Brennan Ctr. for Just. at N.Y. Univ. Sch. of L. v. U. S. Dep't of State*, No. 17 Civ. 7520, 2019 WL 10984173, at *5–6 (S.D.N.Y. Mar. 29, 2019) (finding insufficient an agency declaration that did not clarify whether the "high-ranking personnel" who received certain records were prohibited from further distributing the records).  Moreover, the information contained within the documents was "ultimately disseminated to other CDC officials in general terms."  Supp. Andoh Decl. ¶ 15(c); *Ctr. for Effective Gov't*, 7 F. Supp. 3d at 25–26.

The documents were also distributed throughout the Executive Branch, including to individuals whom Defendants have not established are covered by this privilege.  Though Defendants state that the majority of the recipients were in the EOP, not all individuals in the EOP are within the narrow circle of the presidential communications privilege.  *See Prop. of the*

*People, Inc. v. Office of Mgmt. & Budget*, 330 F. Supp. 3d 373, 387 (D.D.C. 2018) (rejecting the proposition that all Office of Management and Budget officers qualify as "immediate White House advisers"); *Ctr. for Biological Diversity v. Office of Mgmt. & Budget*, No. 07 Civ. 4997, 2008 WL 5129417, at *12 (N.D. Cal. Dec. 4, 2008). Moreover, of those recipients not in the EOP, the CDC identifies four as in the COVID-19 Task Force, and one as Cetron, but does not name the other seven, much less establish they are within the required narrow circle. Supp. Andoh Decl. ¶ 15. And, as there appears to have been no limitation on distributing the email, and as the CDC did not search the inboxes of non-CDC officials, non-CDC recipients may have distributed the documents more broadly.

Finally, the documents appear to have been distributed to some of the recipients for a non-advisory purpose. Redfield forwarded the email "for information purposes only" to staff members whose work "was directly affected by the subject of the emails," Andoh Decl. ¶¶ 15(c), 17, suggesting that he sent the email to inform the employees of the current policy, not to create advice for the President. Moreover, Document 35, a "rundown" email containing references the subject matter of Documents 9 and 10, was sent not only to Rachel Oury, the person in charge of communication efforts at the CDC who had a direct relationship with the President, but also to three CDC communications officials with no connection to the President. *Id.* ¶ 18; ECF No. 48-1. Although Defendants contend that "the details and full meaning of the privileged information being conveyed would have been understood only by" Oury, they cite no law for the proposition that the waiver of privileged information via its dissemination requires proof that the recipients fully comprehended that information. *See* Def. Reply at 14; Supp. Andoh Decl. ¶ 18.

In sum, Defendants have not met their burden of demonstrating that the presidential communications privilege covers Documents 9 and 10, given the scope of dissemination of those documents. And, because Document 9 does not fall into the privilege, Document 11, forwarding

it, is similarly not covered.  Accordingly, Plaintiff's motion for summary judgment on the presidential communications privilege withholdings of Documents 9, 10, and 11 is GRANTED, and Defendants' motion is DENIED.

### B.    Deliberative Process Privilege

The deliberative process privilege requires the disclosure of "all opinions and interpretations which embody the agency's effective law and policy," and the withholding of "all papers which reflect the agency's group thinking in the process of working out its policy and determining what its law shall be."  *Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't.*, 486 F. Supp. 3d 669, 690 (S.D.N.Y. 2020) (quoting *NLRB v. Sears, Roebuck, & Co*., 421 U.S. 132, 153 (1975)).  Pursuant to this privilege, "[a]n inter- or intra-agency document may be withheld . . . if it is: (1) predecisional, *i.e.*, prepared in order to assist an agency decisionmaker in arriving at his decision, and (2) deliberative, *i.e*., actually . . . related to the process by which policies are formulated."  *Nat'l Council of La Raza v. U.S. Dep't of Just.*, 411 F.3d 350, 356 (S.D.N.Y. 2005) (quotation marks and citation omitted); *see also Grand Cent. P'ship, Inc.*, 166 F.3d at 482 ("The privilege protects recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." (quotation marks and citation omitted)).

Plaintiff challenges the CDC's withholding of three documents under the deliberative process privileges: Documents 27, 28, and 12.[3]

### 1.    Documents 27 and 28

The Vaughn Index describes Documents 27 and 28 identically as a "02/25 – 02/26/2020 Division of Global Migration and Quarantine email chain . . ." and the information withheld

---

[3] Plaintiff originally also challenged the withholding of Document 1.  Pl. Mem. at 21–22.  In light of the CDC's subsequent disclosure that Document 1 is a duplicate of Document 29, Plaintiff withdrew that challenge, though, as discussed *infra*, it now requests certain additional searches.  Pl. Reply at 16.

within them as a "[d]iscussion of how to apply 02/25/2020 EOP email to Senior Government Officials."  Vaugh Index ¶¶ 27–28, ECF No. 34-1.  The referenced February 25, 2020 email, Document 9, contains a "[p]roposed coordinated media communication strategy for COVID-19 with designated speakers for various issues/topics."  Vaughn Index ¶ 9, Supp. Andoh Decl. ¶ 14.  The agency declaration elaborates that Documents 27 and 28 involve "discussions about a clearance process."  Andoh Decl. ¶ 22.  The CDC withheld Document 27 in full, but the redacted Document 28 reveals a four-email-long chain between Cetron and Caitlin Shockey, his division's Associate Director for Communications, with the subject line redacted.  Doc. 28, ECF No. 40-2; Supp. Andoh Decl. ¶ 16.  The one non-redacted piece of text consists of Shockey informing Cetron that, "You have an interview with Five Thirty Eight (science reporter) about quarantine tomorrow.  I'll try to get it cleared, otherwise we can cancel."  ECF No. 40-2.

Defendants justify withholding these documents by characterizing Document 9 as a proposed policy, and Documents 27 and 28 as "ongoing discussions within CDC about how to proceed in light of" that proposal.  Def. Reply at 10.  However, even taking the agency's representations as true, Documents 27 and 28 are discussions of how to apply a binding policy, rather than conferring about developing that policy.  Although Defendants describe Document 9 as a "proposed . . . strategy," in the Vaughn Index, Vaughn Index ¶ 9, in its declaration the CDC explains that the topic of the discussion in Documents 27 and 28—Document 9—is "a clearance process . . . that was not intended or expected to be a long-term or permanent one," and "an attempt by the government to articulate a framework for addressing—in the moment—the need for providing useful information as rapidly but also as thoughtfully as possible."  Andoh Decl. ¶ 22.  These descriptions do not reflect a procedure circulated for discussion, but a process transmitted to subordinates for application, if only for a short period.  Therefore, any discussion of its application was post-decisional, and outside the scope of the privilege.

Defendants also argue that Document 9 was not an operative policy because on February 27, a new email was sent, erasing the February 25 framework.  Supp. Andoh Decl. ¶ 16; Vaughn Index ¶ 10.  However, although the Document 9 policy may have been temporary, it is still a final decision while in effect.  *ACLU v. U.S. Dep't of Def.*, No. 15 Civ. 9317, 2017 WL 4326524, at *8 (S.D.N.Y. Sept. 27, 2017) ("More guidance soon . . . does not undercut the finality of the guidance already given." (quotation marks and citation omitted)).  Therefore, a discussion of its application is post-decisional.  *Nat'l Day Laborer Org. Network*, 486 F. Supp. 3d at 698–99 (finding that redactions of "one section laying out two options for moving forward with the form rollout [the policy choice at issue], and the recommendation by the paper author on new language for the form," related to the "implementation or [] application of an existing policy . . . as opposed to the formulation of a new policy." (quotation marks and citation omitted)).

Defendants also contend that Document 9 was non-final, and thus Documents 27 and 28 could not be discussing a final policy, because the content of Documents 27 and 28 demonstrate that the CDC did not view Document 9 as binding.  Def. Reply at 10.  Specifically, in those emails, Cetron expressed that he planned to suggest a change to the Document 9 framework, and Shockey indicated her view that Cetron may not be bound by that framework.  Supp. Andoh Decl. ¶ 16.  However, discussions regarding a proposed change of a policy do not render the existing policy non-operative.  *Pub. Citizen, Inc.*, 598 F.3d at 875–76.  And Shockey's statement demonstrates that she and Cetron were interpreting the Document 9 framework in the context of how to apply it to the CDC, not how the Document 9 framework might be made into a final policy.  *See Nat'l Day Laborer Org. Network*, 486 F. Supp. 3d at 707 (excluding from the deliberative process privilege emails "relat[ing] to the explanation, interpretation or application of an existing policy, as opposed to the formulation of a new policy").

In addition, the CDC has not sufficiently articulated a harm associated with disclosing Documents 27 and 28.  "[A]n agency must release a record—even if it falls within a FOIA exemption—if releasing the record would not reasonably harm an exemption-protected interest and if its disclosure is not prohibited by law."  *Nat'l Day Laborer Org. Network*, 486 F. Supp. 3d at 691 (emphasis omitted).  To satisfy this "foreseeable harm" standard, an agency must "explain how a particular Exemption 5 withholding would harm the agency's deliberative process." *NRDC v. EPA*, No. 17 Civ. 5928, 2019 WL 3338266, at *1 (S.D.N.Y. July 25, 2019) (quoting *Rosenberg v. U.S. Dep't of Def.*, 342 F. Supp. 3d 62, 78 (D.D.C. 2018)) (alterations omitted); *Reporters Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 370 (D.C. Cir. 2021) ("[W]hat is needed is a focused and concrete demonstration of why disclosure of the particular type of material at issue will, in the specific context of the agency action at issue, actually impede those same agency deliberations going forward[.]").

Defendants merely assert that disclosure of some of the documents withheld under the deliberative process privilege "could cause harm by chilling future free exchange of ideas and opinions by agency leadership on similarly sensitive matters."  Andoh Decl. ¶ 21.  However, the CDC makes this statement regarding a 2017 media communications policy, not Documents 27 and 28.  *Id.* ¶ 22.  To the extent the CDC seeks to apply it to Documents 27 and 28 in its briefing, Def. Mem. at 12–13, this assertion is not specific enough to meet the FOIA requirements. *NRDC*, 2019 WL 3338266, at *1; *Jud. Watch, Inc. v. U.S. Dep't of Com.*, 375 F. Supp. 3d 93, 101 (D.D.C. 2019) ("If the mere possibility that disclosure discourages a frank and open dialogue was enough for the exemption to apply, then Exemption 5 would apply whenever the deliberative process privilege was invoked regardless of whether disclosure of the information would harm an interest protected by the exemption.").

Accordingly, Plaintiff's motion for summary judgment as to the withholdings of Documents 27 and 28 is GRANTED and Defendants' motion is DENIED.

2.      Media Strategy Document

The CDC produced, but redacted in full, a number of iterations of a document titled "CDC Communication and Media Strategy for the Coronavirus Disease 2019 Response," (the "Media Strategy").  Vaughn Index ¶¶ 1, 12–16, 18–25, 29, 31–32; Andoh Decl. ¶ 20.  Plaintiff has narrowed its Exemption 5 challenge of these redactions to just Document 12, but separately asserts that the CDC failed to produce a responsive version in its initial production.

a)      Document 12

The CDC justifies withholding Document 12 in full because the Media Strategy was "never finalized" because "the size, scope, and complexity of the coronavirus pandemic evolved and grew so rapidly that it was impossible for the agency ever to develop a static 'final' strategy."  Supp. Andoh Decl. ¶¶ 19–20.  Therefore, it argues, the deliberative process privilege applies to any draft of the Media Strategy, as any draft was pre-decisional to a final media strategy.  Plaintiff argues that Document 12 was operative for some time, taking it out of the scope of the privilege.  Pl. Mem. at 18–20.

FOIA does not require every series of memos an agency produces to culminate in a final, operative document; even if an agency ultimately never resolves the decision a memo evaluated, the deliberative process privilege may still protect the draft.  *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc*., 141 S. Ct. 777, 786 (2021) ("A document is not final solely because nothing else follows it.  Sometimes a proposal dies on the vine.").  However, the labeling of a document as a draft is not dispositive.  *Id.* (requiring a court to "evaluate the documents 'in the context of the administrative process which generated them.'" (quoting *Sears*, 421 U.S. at 138)); *Fox News Network, LLC*, 678 F. Supp. 2d at 167–68 ("While drafts often may be protected by the

28

deliberative process privilege and therefore fall within Exemption 5, [the agency] still is

obligated to provide" information such as "the authors and recipients" of the documents and

"what their respective positions are in the decisional hierarchy.").

Instead, the Court must consider whether the document "communicates a policy on which

the agency has settled," or, put another way, if it has "real operative effect" that binds the agency

officials. *U.S. Fish & Wildlife Serv.*, 141 S. Ct. at 786. This is a "functional rather than formal

inquiry" that turns on "the legal, not practical, consequences that flow from an agency's action."

*Id.* at 787–88.

Therefore, an agency never labeling a document as "final" does not mean that the

document was never operative. *Fox News Network, LLC v. Dep't of the Treasury*, 678 F. Supp.

2d. 162, 168–69 (S.D.N.Y. 2009). Instead, a document stops being predecisional "[a]t the very

instant that an agency aligns its policy or program congruently with the views expressed in a

particular document[.]" *Gen. Elec. Co. v. Johnson*, No. 00 Civ. 2855, 2006 WL 2616187, at *4

(D.D.C. Sept. 12, 2006). A policy in development can be operative in an interim form, as long

as the agency at some point intended it to have "operative effect." *ACLU v. U.S. Dep't of Def.*,

2017 WL 4326524, at *8. This principle prevents an agency from developing a body of "'secret

law[]' used by it in the discharge of its regulatory duties and in its dealings with the public, but

hidden behind a veil of privilege because it is not designated as formal, binding, or final." *Am.

Immigr. Council v. U.S. Dep't of Homeland Sec.*, 905 F. Supp. 2d 206, 218 (D.D.C. 2012)

(quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 867 (D.C. Cir. 1980)).

Here, the CDC avers that Document 12 was "revised and circulated to help frame

ongoing deliberative discussions within CDC for anticipated consideration by CDC

decisionmakers," but that no Media Strategy was ultimately decided upon. Andoh Decl. ¶ 20.

Plaintiff has identified a number of features of Document 12 that suggest it is, at least, the closest

to final version of the Media Strategy produced.  Pl. Mem. at 18–19.  For instance, Document 12 has no visible edits in track changes, and has a table of contents—a final step for the CDC in transmitting a memo.  Supp. Pinsof Decl. Ex. 1, ECF No. 45-1; Pl. Mem. at 18–19.  It is also dated March 18, 2020, whereas the other iterations of the Media Strategy are dated May 8, 2020.  Pl. Mem. at 18–19.  Because the CDC conducted its search "on or about" May 6, 2020, the May 8, 2020 dates suggest that an auto-generated field dated the other iterations with the day the document was last opened, whereas Document 12 included a date certain.  *Id.*; Andoh Decl. ¶ 15.  And, only the final draft generated by the CDC before transmittal to HHS for review also has a table of contents and no edits.  Supp. Pinsof Decl. Ex. 1.  Logically, Plaintiff argues, a similar, later document, firmly dated, would be the final draft after HHS's review.  Pl. Reply at 11.

Moreover, in the Vaughn Index the CDC labelled Document 12 as a "[p]lan to provide timely, accurate, relevant, and actionable information for the public, healthcare providers, first responders, border officials, policymakers, media, and the public health community," as compared to other iterations of the Media Strategy, which it labelled as minor variations of "Edits to Draft CDC Communication and Media Strategy for the Coronavirus Disease 2019 Response."  Vaughn Index ¶¶ 1, 12–16, 18–25, 29, 31–32.  Produced documents discussing the Media Strategy also indicate that the goal was "to finalize the first iteration of this strategy document," Pinsof Decl. Ex. 12 at 1, ECF No. 40-12, which indicates that the CDC intended to create an operative version, even if that version was to be updated.

The CDC disputes that any of these factors indicate finality.  It explains that it originally intended to use the Vaughn Index language for the first iteration of the Media Strategy listed in the Vaughn Index, but because Document 1 is heavily edited, the agency decided to use the language on the first unedited version, which happened to be Document 12.  Supp. Andoh Decl. ¶ 21.  Moreover, it observes that other iterations of the Media Strategy are either unedited, have a

table of contents, or both, and that it is "aware of no particularly reason" for Document 12's

different date.  *Id.*

Absent a suggestion of bad faith, of which there is none here, the Court must give an

agency declaration a presumption of good faith.  *Grand Cent. P'ship, Inc*., 166 F.3d at 488–89.

Moreover, there may well be no final version of a document.  *U.S. Fish & Wildlife Serv*., 141 S.

Ct. at 786.  However, the CDC also does not state that no version of the Media Strategy ever

became *functional*, as opposed to *final*.  *See* Andoh Decl.; Andoh Reply Decl; *cf. Knight First*

*Amend. Inst.*, 407 F. Supp. 3d at 330 (finding sufficient an agency declaration that stated, "[t]o

the best of my knowledge, the analysis has not been publicly adopted formally or informally.

The document offers legal analysis of a range of possible policy options, and this analysis was

not binding on the Department or the President").  Nor does the "draft" label foreclose the

document from having become operative; Plaintiff observes that the CDC labelled a concededly

operative "playbook" a draft.  Pl. Mem. at 19–20.

The CDC also does not describe, specifically for Document 12, the author, its recipient,

or those individuals' relationships to each other and the decision-making process, details which

have been considered "critical" to a court's analysis under the deliberative process privilege.

*Fox News Network, LLC*, 678 F. Supp. 2d. at 167; *Ctr. for Investigative Reporting v. U.S.*

*Customs & Border Prot*., 436 F. Supp. 3d 90, 102 (D.D.C. 2019) (concluding defendants had not

carried their burden where they "have made essentially no effort to satisfy the 'key feature' by

identifying 'the relation between the author and recipients of the document." (citation omitted)).

It similarly does not articulate how Document 12 reflects the "personal opinions of the writer

rather than the policy of the agency."  *Grand Cent. P'ship, Inc.*, 166 F.3d at 482 (citation and

quotation marks omitted).  Without this information, the Court cannot determine if Exemption 5

applies to Document 12.  *See Gen. Elec. Co*., 2006 WL 2616187, at *5 ("[T]he agency must

establish that it has never implemented the opinions or analyses contained in the document, incorporated them into final agency policy or programs, referred to them in a precedential fashion, or otherwise treated them as if they constitute agency protocol.").

Next, Plaintiff argues that Document 12 should not be withheld because it is a "messaging" document.  Though courts in this district are split over how to handle messaging documents, *see Nat'l Day Laborer Org. Network*, 486 F. Supp. 3d at 700–01, the Court agrees that when considering documents "about how the agency should communicate its policies to people outside the agency," it must focus on "whether the drafts or communications reflect deliberations about what 'message' should be delivered to the public about an already-decided policy decision, or whether the communications are of a nature that they would reveal the deliberative process underlying a not-yet-finalized policy decision."  *NRDC v. EPA*, No. 17 Civ. 5928, 2019 WL 4142725, at *8 (S.D.N.Y. Aug 30, 2019) (emphasis omitted) (quoting *Citizens Union of City of N.Y. v. Att'y Gen. of N.Y.*, 269 F. Supp. 3d 124, 164 (S.D.N.Y. 2017)), *reconsideration denied*, No. 17 Civ. 5928, 2019 WL 6467497 (S.D.N.Y. Dec. 2, 2019).  This analysis applies without reference to the finality of the messaging documents; if those documents do not pertain to substantive decision-making, they cannot be withheld even if non-final.  *See id.* at *10.

However, as opposed to the talking points discussed in *NRDC v. EPA*, which framed an underlying policy, Document 12 may be a draft of a plan for communication which is itself a substantive agency policy.  Vaughn Index ¶ 12;  *NRDC*, 2019 WL 4142725, at *9.  On this record, the Court cannot determine if Document 12 is merely articulating how to discuss agency policy, or if it is itself an expression of the CDC's "essential policymaking role."  *NRDC*, 2019 WL 4142725, at *10.

Accordingly, the Court cannot yet decide whether Document 12 falls into the deliberative process privilege.  "Where an agency fails to meets its burden, FOIA provides courts 'a host of procedures' to determine whether the exemption claim is proper, including discovery, further agency affidavits, and in camera review of the records in question."  *Bloche v. U.S. Dep't of Def.*, 370 F. Supp. 3d 40, 55 (D.D.C. 2019).  Here, the court finds *in camera* review most appropriate. 5 U.S.C. § 552(a)(4)(B); *Halpern v. FBI*, 181 F.3d 279, 292 (2d Cir. 1999) (permitting *ex parte*, *in camera* review "where the record showed the reasons for withholding were vague or where the claims to withhold were too sweeping or suggestive of bad faith, or where it might be possible that the agency had exempted whole documents simply because there was some exempt material in them").

b)      Factual Material in Document 12

Next, Plaintiff challenges the CDC's withholding of any facts included in Document 12. Pl. Mem. at 23; Pl. Reply at 14–15.  The CDC does not deny that there are factual portions of the document, but instead argues that those portions are not reasonably segregable from the deliberative portion.  Supp. Andoh Decl. ¶ 22; Def. Reply at 15–16.

Although the deliberative process privilege does not protect "purely factual" material, *Grand Cent. P'ship, Inc*. 166 F.3d at 482, it does protect factual material that is "inextricably intertwined with policy making recommendations so that [its] disclosure would compromise the confidentiality of deliberative information that is entitled to protection under Exemption 5." *Lead Indus. Ass'n, Inc. v. Occupational Safety & Health Admin*., 610 F.2d 70, 85 (2d Cir. 1979) (quotation marks and citation omitted).

The CDC does not, however, justify its withholding based on inextricable intertwining of facts and opinions.  Rather, it defends the withholding because the facts about COVID-19 were changing frequently, and therefore any facts in the Media Strategy are "no more than . . .

hypotheses advanced but later revised or rejected altogether." Supp. Andoh Decl. ¶ 22. The CDC states that releasing such "seemingly factual statements" would "cause damage both to the agency—by contradicting and/or undercutting the more reliable information that it ultimately released—and to the public, by creating confusion and potentially sowing mistrust in the guidance provided by the CDC and other Federal agencies." *Id.*

Defendants cite no law for the validity of such a justification under FOIA, Def. Reply at 15–16, and the Court is aware of none. As a court in the Northern District of Illinois stated,

> If the intention of [the agency's] assertion is to suggest that the public must be shielded from inaccurate factual suppositions made by the agency, then we think the affidavit is misguided. We understand the purpose of the FOIA to be to expose agency decisions to public view. Exemption 5 was not intended as a shield to spare agencies the embarrassment of being exposed as having gotten their facts wrong. To the extent that the [agency] affidavit implies that the public should be spared the "confusion" that would result from revelation of inaccurate factual assumptions by the [agency], we find the document condescending and at odds with the spirit of the FOIA.

*City of W. Chicago v. U.S. Nuclear Regul. Comm'n*, 547 F. Supp. 740, 748 (N.D. Ill. 1982); *cf. Heffernan v. Azar*, 417 F. Supp. 3d 1, 18 (D.D.C. 2019) ("[T]he legitimacy of withholding . . . turn[s] on . . . whether the selection or organization of facts is part of an agency's deliberative process." (quoting *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 513 (D.C. Cir. 2011)).

Moreover, the deliberative process privilege focuses on whether disclosure would "expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions." *Reilly v. EPA*, 429 F. Supp. 2d 335, 344–45 (D. Mass. 2006) (quoting *Dudman Comms. Corp. v. Dep't of Air Force*, 815 F.2d 1565, 1568 (D.C. Cir., 1987)). The CDC does not argue that disclosure of the facts would chill the CDC's internal discussion. Supp. Andoh Decl. ¶ 22. Therefore, the Court rejects the agency's justification for withholding the factual portions of the document. *See*

*Ancient Coin Collectors Guild*, 641 F.3d at 513 ("Purely factual material usually cannot be withheld under Exemption 5 unless it reflects an exercise of discretion and judgment calls." (quotation marks and citation omitted)).

c)      Compliance with June 4 Order

Finally, Plaintiff argues that, though it is no longer challenging the withholding of Document 1, the agency's admission that the record was "simply chosen at random" for the June 9, 2020 priority production is at odds with the Court's June 4, 2020 order that the CDC produce any records of "(i) the CDC's currently operative employee communications or speech policies and (ii) any policies or guidelines concerning the coordination of statements and/or public appearances with the Office of Vice President Mike Pence or the White House Coronavirus Task Force[.]"  Pl. Reply at 16 (quoting ECF No. 24).  Because the CDC chose Document 1 at random from the iterations of the Media Strategy, without attempting to discern whether it, or any version, was currently operative, Plaintiff contends, it failed to comply with the Court's order. *Id.* at 16–17.

The Court agrees.  The Court's June 4 order requires the CDC to produce any operative policy, not a draft of a policy chosen at random.  As Plaintiff correctly observes, discovering if such a policy was operative at that time, or what the most-final document was, was fully within the CDC's capability.  Pl. Reply at 16–17.

Therefore, the Court DENIES without prejudice both Defendants' and Plaintiff's motions for summary judgment as to Document 12.  Defendants shall, pursuant to this opinion, (1) re-examine Document 12, un-redact any segregable factual material, and disclose those portions to Plaintiff; (2) conduct a reasonable search for the iteration of the Media Strategy responsive to the Court's June 4 order, (3) submit Document 12 to the Court for *in camera* review by **October 8, 2021**.

**CONCLUSION**

For the reasons stated above, Defendants' motion for summary judgment is DENIED without prejudice and Plaintiff's cross-motion is GRANTED in part and DENIED in part without prejudice.  Specifically,

1) The CDC shall conduct a new search for documents responsive to requests one and two, pursuant to this opinion.  By **October 8, 2021**, the parties shall meet and confer and engage in a good faith effort to agree to search terms, initial custodians for the search, and a reasonable timeline for Defendants' production.  The parties shall also confer on a search for items responsive to the Court's June 4 order, as discussed in § III.B.2.  If the parties cannot reach agreement, they shall file a joint submission setting forth their respective positions within seven days of their meeting.

2) By **September 24, 2021**, Defendants shall release to Plaintiff un-redacted versions Documents 9, 10, 11, 27, and 28.  Defendants may apply other exemptions, where warranted.

3) By **October 1, 2021**, Defendants shall produce Document 12 to Plaintiff with all segregable factual material un-redacted, pursuant to this opinion;

4) By **October 8, 2021**, Defendants shall submit Document 12 to the Court under seal for *in camera* review, along with an affidavit or revised Vaughn Index describing whether it, or any iteration of the document, was ever operative, pursuant to this opinion.

After completing the productions described above, the parties may renew their motions for summary judgment.  The Clerk of Court is directed to terminate the motions at ECF Nos. 32 and 38.

SO ORDERED.

Dated: September 17, 2021
      New York, New York

_____
ANALISA TORRES
United States District Judge