

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*86 Chambers Street*
*New York, New York 10007*

December 8, 2021

<u>By ECF and Electronic Mail</u>
Honorable Analisa Torres
United States District Judge
United States Courthouse
500 Pearl Street
New York, NY  10007

      Re:    *Knight First Amendment Institute at Columbia University v.*
               *Centers for Disease Control and Prevention and U.S. Department of*
               *Health and Human Services*, 20 Civ. 2761 (AT)

Dear Judge Torres:

      This Office represents defendants Centers for Disease Control and Prevention ("CDC") and U.S. Department of Health and Human Services (together, "Defendants") in the above-referenced matter, which was brought pursuant to the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"). In conjunction with plaintiff Knight First Amendment Institute at Columbia University ("Plaintiff" or "Knight Institute"), the parties jointly submit this letter outlining their respective positions regarding CDC's new search. *See* ECF Nos. 54, 60, 62, 64, 67, 71.

      **I.**    **CDC's Proposal Regarding the New Search**

          **A.  Background**

      On September 17, 2021, the Court issued an order denying Defendants' motion for summary judgment, and granting in part and denying in part Plaintiff's motion for summary judgment. *See* ECF No. 54 (the "Order"). After concluding that the CDC's search for documents responsive to two portions of Plaintiff's FOIA request was "not reasonably likely to uncover all responsive documents," the Court directed CDC to "conduct a new search for documents responsive to requests one and two." Order at 17, 36.[1]

---

[1] The Order also directs CDC to "conduct a reasonable search for the iteration of the [CDC Communication and Media Strategy for the Coronavirus Disease 2019 Response] responsive to the Court's June 4 order." Order at 35. "The Court's June 4 order requires the CDC to produce any operative policy. . . ." *Id.* As subsequently detailed in the Declaration of Michelle Bonds, who was the Acting Associate Director for Communications for the CDC between November 2019 and May 2020, the CDC Communication and Media Strategy for the Coronavirus Disease 2019 Response was never finalized, and was never operative or implemented by CDC or its employees. ECF No. 58-1 ¶¶ 1, 6-7. Accordingly, there are no documents at CDC that would fulfill the Court's directive

Parts 1 and 2 of Plaintiff's FOIA request seek "[a]ny records relating to policies or procedures governing public communications by CDC employees or contractors about the coronavirus," and "[a]ny records relating to policies or procedures for the coordination of communications strategy between the CDC (or its employees) and the Coronavirus Task Force led by Vice President Pence." ECF No. 1-1 at 4.

## B. CDC's Revised Search Proposal

CDC has crafted a proposal for a new search that addresses the concerns identified by the Court in connection with CDC's original search. CDC has expanded the universe of both custodians and search terms in an attempt to capture records related to the policies at issue. *See* Order at 9 ("Requests one and two seek records 'relating to' policies and procedures, and so are broader than merely the policies themselves."). As set forth below, CDC's revised search proposal is "reasonably calculated to discover" documents responsive to parts 1 and 2 of Plaintiff's FOIA request. *See Grand Cent. P'ship v. Cuomo*, 166 F.3d 473, 489 (2d Cir. 1999). "Reasonableness does not demand perfection, and a reasonable search need not uncover every document extant." *Platsky v. FDA*, 2014 WL 7391611, at *4 (E.D.N.Y. Dec. 24, 2014), *aff'd*, 642 F. App'x 63 (2d Cir. 2016) (summary order). In short, an agency is not expected to "take extraordinary measures to find the requested records, but only to conduct a search reasonably designed to identify and locate responsive documents." *Garcia*, 181 F. Supp. 2d at 368 (internal quotation marks omitted).

For part 1 of Plaintiff's FOIA request, CDC has identified 21 custodians, including the initial authors of the draft CDC Communication and Media Strategy for the Coronavirus Disease 2019 Response, as well as contributors to and reviewers of the draft media strategy. Declaration of Roger Andoh ("Andoh Decl.") ¶ 6. Collectively, these custodians constitute the universe of employees at CDC who had substantive involvement in communication policies and procedures relating to COVID-19. *Id.* ¶ 7. For part 2 of Plaintiff's FOIA request, CDC has identified 30 custodians who communicated with or had involvement with the Coronavirus Task Force. *Id.* ¶ 11.

For search terms, CDC proposes to search for the following terms in the body of emails or the subject line: ("media strategy" OR "centralized communications" OR ("social media" and "new media") OR "communication strategy" OR "COVID communication procedures" OR "COVID comm guidance" OR "media procedures" OR "media guidance" OR "COVID elevated clearance" OR "Katie Miller" OR "Olivia Troye" OR "Hannah Macinnis" OR "Devin O'Malley" OR "Ninio Fetalyo" OR "Kelly Love" OR "Deborah Birx"). *Id.* ¶¶ 8, 12. The search keywords were provided by key personnel with knowledge about the relevant communication policies and procedures, and the terms represent the phrases used by CDC employees when discussing the COVID-19 communication policies and procedures or records related to policies or procedures for the coordination of communications strategies of CDC employees and the Coronavirus Task Force. *Id.* ¶¶ 9, 13.

---

that CDC produce its "currently operative employee communications or speech policies" responsive to Plaintiff's FOIA request. ECF No. 24.

In contrast with the search terms proposed by CDC, the previous searches submitted by Plaintiff, as well as the current proposal, include a number of variant terms that pull in an excessive number of records that are not related to the subject of Plaintiff's FOIA request. *Id.* ¶¶ 10, 14. As explained further below, the large volume of search results from Plaintiff's proposal would prove unduly burdensome on the agency if it had to process the high volume of results. *Id.* The search proposed by CDC represents the FOIA office's attempt to capture all relevant records without pulling in the massive numbers of unrelated records that would be swept in through Plaintiff's proposal. *Id.* As detailed in CDC's enclosed declaration, the search terms in Plaintiff's proposal resulted in over-inclusivity of records not responsive to the request, as confirmed by a sampling of records. *Id.* Both agency knowledge about how CDC discussed policies and procedures related to communications about COVID, as well as sampling, have confirmed that Defendants' search proposal is tailored to properly pull in responsive material without placing an undue burden on the agency.

For these reasons, the Court should adopt CDC's proposal for new searches because the custodians and terms identified by CDC are reasonably calculated to discover documents responsive to parts 1 and 2 of Plaintiff's FOIA request.

### C. Processing Plaintiff's Search Proposal Would Be Unduly Burdensome

In response to CDC's search proposals, Plaintiff proposes a search that would pose onerous processing obstacles on the agency and require an enormous undertaking of time and resources that would cripple CDC's FOIA operations. "[A]n agency need not conduct a search that plainly is unduly burdensome." *Halpern v. FBI*, 181 F.3d 279, 288 (2d Cir. 1999); *see Ruotolo v. Dep't of Justice*, 53 F.3d 4, 9 (2d Cir. 1995); *Lead Indus. Ass'n v. OSHA*, 610 F.2d 70, 86 (2d Cir. 1979); *see also Am. Fed'n of Gov't Emps. v. U.S. Dep't of Commerce*, 907 F.2d 203, 209 (D.C. Cir. 1990) ("An agency need not honor a request that requires an 'unreasonably burdensome search.'" (citation omitted)). Here, requiring CDC to perform the search proposed by Plaintiff would require CDC to devote a disproportionate amount of resources, and even if CDC were to commit substantial resources to Plaintiff's proposed search, it would take years to complete processing, exacerbate the agency's backlog, and divert resources from other FOIA requesters. Andoh Decl. ¶ 18.

CDC has worked in good faith in an attempt to reach an agreement with Plaintiff regarding a new search; the CDC FOIA office has spent approximately 20-25 hours running various searches proposed by Plaintiff, preparing reports, and reviewing search results in an attempt to identify common types of non-relevant results and provide examples. *Id.* ¶ 4. On December 1, 2021, Plaintiff proposed a search, which attempted to narrow prior iterations Plaintiff had proposed. *Id.* ¶ 15. However, this search yields approximately 125,000 records; in contrast, CDC's proposed new search outlined above yields 1,200 records (which reflects the amount after deduplication, excluding documents that were previously released, and excluding certain records that are easily identified as non-responsive, including news items, for example). *Id.* Even assuming de-duplication of the initial universe of records in Plaintiff's proposed search reduces the number by 40%, the revised set of records to process and review for responsiveness would be approximately 70,000. *Id.* Based on the experience of CDC's FOIA office, the average record is five pages (a conservative, low average), which would mean CDC would need to review and process almost 350,000 pages. *Id.*

CDC's FOIA office consists of 15 employees who work on a variety of FOIA-related tasks and are responsible for handling all FOIA requests from inception until closure, as well as FOIA administrative appeals and FOIA litigation. *Id.* ¶ 16. Included among the tasks performed by CDC's FOIA office is the processing of FOIA requests. *Id.* For fiscal year 2021, CDC's FOIA office processed approximately 260,000 pages of records. *Id.* The volume of Plaintiff's proposed search is extremely large, and will require a disproportionate amount of resources to process. *Id.* ¶ 17. Even if CDC devoted 100% of its processing capabilities by the entire FOIA staff to process Plaintiff's proposed search, it would take approximately 1 year and 2 months to complete the initial processing. *Id.* Notably, this estimate would not account for the additional time necessary for quality check reviews, consultations with other agencies, and the White House. *Id.* Further, such an approach would mean that no other FOIA requests would be processed for over one year. *Id.* Thus, even if the CDC were to commit substantial resources to Plaintiff's search, it will take years to process and exacerbate the agency's backlog and divert resources from other FOIA requesters. *Id.* Indeed, even under Plaintiff's requested processing rate of 1,000 pages per month, it would take CDC approximately 29 years to process the search results.

For these reasons, the search proposed by Plaintiff would be unduly burdensome to CDC because it requires a disproportionate amount of time and agency resources to be diverted to process only Plaintiff's request, to the detriment of all other requesters. *Id.* ¶ 18. This would significantly impact the agency's ability to respond to pending FOIA requests, which stand at 542, impact the agency's ability to respond to incoming requests, which predictably would lead to more lawsuits filed against the agency and finally would result in a substantial increase in the agency's FOIA backlog, which currently stands at about 302 requests. *Id.*

## II. The Knight Institute's Proposal Regarding the New Search

The CDC's search proposal is plainly underinclusive on several fronts, and it appears to be designed to limit the number of records the agency must process rather than to capture "*all* responsive documents." ECF No. 54 at 13. Meanwhile, Plaintiff's current proposal, attached to the Declaration of Anna Diakun ("Diakun Decl.") as Exhibit A, represents Plaintiff's good-faith effort to craft search strings that simultaneously capture responsive records while excluding most nonresponsive records. Plaintiff has already narrowed its proposal considerably, reducing the number of hits by over 70% from its initial October 8 proposal. Diakun Decl. ¶ 14. Even so, Plaintiff requested additional information from the CDC to help it narrow its proposal even further. But the CDC refused to provide that information, unilaterally ended negotiations, and now boldly urges the Court to adopt its obviously underinclusive proposal. Plaintiff respectfully requests that the Court reject the CDC's proposal and adopt Plaintiff's proposal.

However, if the Court is not inclined to adopt Plaintiff's search proposal, Plaintiff respectfully requests that the Court order the parties to continue to meet and confer to allow Plaintiff to narrow its proposal further, including in response to the new search terms report that the agency sent to Plaintiff on December 6. Diakun Decl. ¶ 14.[2]

---

[2] In light of the CDC's representation that the CDC Communication and Media Strategy for the Coronavirus Disease 2019 Response was never operative or implemented, ECF No. 58-1 ¶¶ 1, 6–7, Plaintiff does not request a renewed search for items responsive to the Court's June 4 order.

### A. The CDC's Proposed Search Is Inadequate

As was the case with the CDC's original search, the CDC's new search proposal is inadequate because it is "not reasonably calculated to discover *all* responsive documents." ECF No. 54 at 13. The proposal is underinclusive for several reasons.

First, the agency still has not adequately justified its failure to use common variants or synonyms of the proposed search terms. *See id.* The agency once again uses only the term "COVID" in its proposed search terms, *see* Andoh Decl. ¶ 8, even though, as Plaintiff pointed out during summary judgment briefing, "[t]he production shows that agency employees also use 'coronavirus,' 'nCoV,' "n-Cov,' '2019-nCov,' and 'COVID-19' interchangeably with 'covid.'" Pl.'s Br. 27, ECF No. 39. Likewise, the agency fails to consistently use variants for the term "communication," even though the Court already held that the failure to use variants such as "comm" or "comms" rendered the search inadequate. ECF No. 54 at 13; *see also* Andoh Decl. ¶ 8 (proposing "communication strategy" but not "comms strategy," and "COVID comm guidance," but not "COVID communication guidance"). "[A]n agency must search for synonyms or common variants of a term used in the request that are likely to be used in responsive documents, unless it can reasonably justify declining to use them." ECF No. 54 at 12.

The agency has not done so. Although it argues that Plaintiff's proposed variant terms "pull in an excessive number of records which are not related to the subject of this request," the agency has not given any examples. Andoh Decl. ¶¶ 10, 14. In fact, Plaintiff has asked the agency for precisely this information, *see* Diakun Decl. ¶¶ 9, 12, but the agency has refused to provide it. Plaintiff has nonetheless attempted to discern which terms were overinclusive, and modified its proposed search strings accordingly. *See id.* ¶¶ 5, 7 .

Second, the search terms the agency proposes are overly restrictive. To begin, the government proposes several multi-word search terms in quotation marks, meaning that those terms would capture only exact matches. However, because the suggested phrases are not terms of art, searching for such precise wording is likely to omit an abundance of responsive records, especially given the number of commonly used variants described above. A search for the agency's term "COVID elevated clearance," for example, would not capture an email that describes the same topic but refers to it as the "COVID-19 clearance process"—a phrase used by Ryan Murphy, then a senior Department of Health and Human Services official, in an email previously produced to Plaintiff in this litigation. *See* Diakun Decl. ¶ 15, Ex. B. The phrases "COVID communication procedures" and "COVID comm guidance" suffer from the same infirmities, as do the two-word phrases. To illustrate, a search for the term "media procedures," in quotation marks, would not capture an email describing the "media procedure" (singular) or "procedures for engaging with the media," let alone "media policy." This problem can be remedied by including synonyms for key terms in the search string and connecting key terms by Boolean proximity operators, which is what Plaintiff has proposed. *See* Diakun Decl., Ex. A.

Similarly, while the government proposes searching for the names of certain individuals involved in the communications clearance process, it suggests searching for their full names in quotation marks. But doing so would fail to capture records in which the individual was referred

5

to differently, such as by their title and last name. For example, a search for "Deborah Birx" would exclude all records in which she was referred to as "Dr. Birx," though there is no logical reason to include the former but exclude the latter.

Third, the agency's search terms are not reasonably calculated to discover certain records relating to the CDC's communications policies and procedures, including those describing the reasons for their development. As Plaintiff described in its FOIA request, the requirement that CDC officials coordinate with the Vice President's office "was allegedly a response to Dr. [Nancy] Messonnier's explanation of the risk of community spread, which President Trump felt 'contradicted the public messaging from the White House.'" ECF No. 1-1 at 3 (citation omitted). Yet the agency has refused to search for records related to this very incident. Such records by definition "relat[e] to" the policies or procedures sought in Items 1 and 2 of the request, ECF No. 54 at 9, and would themselves constitute informal policies or procedures if they instruct Dr. Messonnier what she could or could not say in the future.

Fourth, although the agency acknowledges that four CDC employees—Michawn Rich, Rachael Oury, Loretta Lepore, and Carrie Harmon—are appropriate custodians of the records Plaintiff seeks, the agency for the first time acknowledges that it failed to retain their records after they left the agency. Andoh Decl. ¶ 6 n.1. Troublingly, the CDC deleted the records of all four *after* Plaintiff filed its cross-motion for summary judgment challenging the adequacy of the agency's search for failure to include all custodians who were reasonably likely to possess responsive records. *See* Pl.'s Br. 30, ECF No. 39 at 29–30 (filed Sept. 18, 2020); Andoh Decl. ¶ 6 n.1 (records deleted 90 days after departure date). And it deleted the records of three of those individuals—Michawn Rich, Rachael Oury, and Loretta Lepore—even after Plaintiff identified them by name in its summary judgment brief as likely custodians. *See* Pl.'s Br. 30, ECF No. 39. Though the agency has stated that "none of these employees' accounts or their data are maintained by another employee or in a centralized space," it has not explained why it failed to follow HHS's litigation hold policy or CDC Record Management guidance. Andoh Decl. ¶ 6 n.1. More importantly, the agency's proposal does not address this deletion of responsive records by attempting to identify other individuals with whom the four custodians may have emailed on relevant matters, or any other possible solutions.

### B. Plaintiff's Proposal

#### 1. Search Terms

Plaintiff's proposal, set out in Exhibit A to the Diakun Declaration, accounts for the fact that there are several ways to phrase discussions about formal and informal communications policies and procedures. And unlike the agency's proposal, Plaintiff's proposal is designed to discover informal, ad hoc policies and procedures, as well as information concerning the creation of those policies. *See* Diakun Decl., Ex. A.

While the agency's proposal uses multi-word search terms in quotation marks that would exclude records that employ slight variations in phrasing, Plaintiff uses Boolean connectors that would allow the agency to account for those variations while still minimizing the number of nonresponsive results. For example, while the agency uses only the term "COVID" for COVID-

6

19, Plaintiff replaces that term with the following search string: "(coronavirus OR COVID OR COVID-19 OR nCoV OR n-Cov OR 2019-nCov)." *See* Diakun Decl., Ex. A. And in place of the agency's multi-word search terms in quotation marks—which will only pick up exact matches—Plaintiff connects groups of synonyms with proximity operators.

### 2. Custodians

For Item 1, Plaintiff proposes searching the 21 custodians that the CDC identified in its proposal for Item 1, *see* Andoh Decl. ¶ 6, as well as five additional custodians: Katherine Lyon Daniel, Robert Redfield, Anne Schuchat, Sherri Berger, and Nancy Messonnier. *See* Diakun Decl., Ex. A.

Contrary to the agency's representation that its list for Item 1 "constitute[s] the universe of employees at CDC who had substantive involvement in communication policies and procedures relating to COVID-19," Andoh Decl. ¶ 7, the agency's production to date shows that Katherine Lyon Daniel also had "substantive involvement." *See, e.g.*, ECF No. 40-10; *see also* ECF No. 39 at 29. Additionally, by virtue of their senior positions, it is likely that Robert Redfield (then the CDC Director), Anne Schuchat (then the CDC's Principal Deputy Director), and Sherri Berger (then the CDC's Chief Operating Officer) would also have had "substantive involvement" in those policies. This is particularly so for Sherri Berger, who just months prior had signed off on the revised "CDC Media Relations Policy: Release of Information to News Media," showing that this type of issue fell directly within her purview.[3] But even if these individuals did not have "substantive involvement" in those policies and procedures, the agency is wrong to limit potential custodians to those with "substantive involvement." Plaintiff seeks "[a]ny records relating to policies or procedures governing public communications by CDC employees or contractors about the coronavirus," which would include emails discussing or applying policies or procedures, including informal or ad hoc policies, which these senior agency officials are all likely to possess. Finally, as described above, an incident involving Nancy Messonnier was central to the development of COVID-19 communications policies and procedures, and any related records in her possession are critical to understanding how these policies developed and were applied.

For Item 2 of Plaintiff's FOIA request, Plaintiff accepts the CDC's proposal to search the 30 identified custodians who communicated with or had involvement with the Coronavirus Task Force. Andoh Decl. ¶ 11; Ex. A.

### 3. The Court Should Accept Plaintiff's Proposal or Order the Parties to Continue Negotiating

#### a. Item 1

Plaintiff's current proposal significantly narrows the number of records captured by its proposed search for Item 1 of its FOIA request. While the agency complains that Plaintiff's

---

[3] *See* CDC Media Relations Policy: Release of Information to News Media at 1, CDC (last updated Sept. 3, 2019), *available at* https://knightcolumbia.org/documents/76c1440fd4.

proposal still captures 90,614 records and that processing them would be unduly burdensome, Andoh Decl. ¶ 15, this number is misleading for at least two reasons.

First, the agency states that typically, approximately 40% of returned records are duplicates. *Id.* For this search, then, the current number of unique records is more likely around 54,368. *Id.* However, given the number of custodians and the subject matter of the request, the number of duplicates could in fact be much higher.

Second, because the agency has not yet undertaken a preliminary responsiveness review, the number of responsive records—those that would require review for redaction—would likely be far lower than the agency's initial numbers suggest. Though Plaintiff has made an effort to tailor its search strings, Boolean searches are an inexact science. Screening out nonresponsive records is a normal part of the process, and an agency's responsiveness review may filter out many—or even most—of the initial pool of records. For example, in a previous Knight Institute case, an agency conducted an initial responsiveness review of 27,809 pages. *See* Letter at 1, *Knight First Amendment Inst. at Columbia Univ. v. Dep't of Homeland Sec'y*, Case No. 17-CV-7572 (ALC) (S.D.N.Y. May 14, 2018), ECF No. 58. Of those, the agency determined that only 990 pages, or 3.5%, were actually responsive, and thus requiring far less time to review than initially anticipated. *Id.* at 1–2.

But even if all of the records were responsive, the CDC's complaints would still ring hollow. Plaintiff has asked for additional information to help it narrow its search further, and the CDC has refused to provide it. For example, Plaintiff asked the CDC to provide the titles of CDC custodians the agency had identified so that Plaintiff could consider eliminating some from the list. Diakun Decl. ¶ 4. The CDC refused. *Id.* Plaintiff also asked the agency to help it identify search terms that were capturing large numbers of non-responsive records, given that such information was solely in the agency's possession. Diakun Decl. ¶¶ 9, 12. Again, the agency refused.

Moreover, on December 6, the agency provided a new search terms report listing the numbers of records captured by the search strings in Plaintiff's current proposal. Diakun Decl. ¶ 14. But instead of giving Plaintiff an opportunity to further narrow its search proposal for Item 1 in response to this new information—which Plaintiff would like to do—the agency instead uses the report to try to make Plaintiff look unreasonable. In light of this, Plaintiff respectfully requests that the Court either adopt Plaintiff's search proposal for Item 1 or order the parties to continue to negotiatet o narrow the proposed search further.

b.     Item 2

Plaintiff's proposed search for Item 2 is not unduly burdensome. The agency estimates that Plaintiff's proposed search strings will capture approximately 15,525 unique records, Andoh Decl. ¶ 15, which is well within the range of records that agencies process in response to FOIA requests—especially considering that this total includes nonresponsive records. *See, e.g.*, *Clemente v. Fed. Bureau of Investigation*, 71 F. Supp. 3d 262, 265 (D.D.C. 2014) (ordering the FBI to process 30,000 *responsive* documents at a rate of 5,000 pages a month); *Seavey v. Dep't of Just.*, 266 F. Supp. 3d 241, 248 (D.D.C. 2017) (ordering the FBI to process 102,000 pages at a rate of

2,850 pages per month); *Inst. for Just. v. Internal Revenue Serv.*, No. 1:18-cv-01477 (CJN), 2021 WL 4935536, at *1 (D.D.C. July 8, 2021) (remarking that the IRS had produced approximately 26,000 pages of records, and that "tens of thousands" of pages of records remain for review). The Court should thus adopt Plaintiff's proposed search strings for Item 2. And again, if the Court disagrees, Plaintiff remains willing to discuss with the agency ways to further narrow its Item 2 proposal.

4. Processing Rate

The Knight Institute respectfully requests that the Court order the CDC to conduct a responsiveness review to identify the number of pages captured by Plaintiff's search that are responsive to the request, and then process those responsive records at a rate of 1,000 pages per month. Plaintiff initially submitted this FOIA request over twenty months ago, and the agency's unreasonable interpretation of the request and unduly restrictive search terms have significantly delayed the release of responsive records. Given this delay, and the fact that courts in this district and others have regularly ordered agencies to process records at rates exceeding 1,000 pages per month, this rate is more than reasonable. *See, e.g.*, Order, *Nat'l Immigr. Project v. U.S. Dep't of Homeland Sec.*, No. 18-cv-659-RA (S.D.N.Y. Apr. 6, 2018), ECF No. 55 (ordering DOS and DHS to process 1,500 pages per month); *Seavey v. DOJ*, 266 F. Supp. 3d 241, 248 (D.D.C. 2017) (ordering the FBI to process 2,850 pages per month); *Elec. Priv. Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 218 F. Supp. 3d 27, 37 (D.D.C. 2016) (summarizing initial order requiring DHS to process at least 2,000 pages per month); *Clemente v. FBI*, 71 F. Supp. 3d 262, 264, 269 (D.D.C. 2014) (ordering the FBI to process 5,000 pages per month).

\* \* \*

Plaintiff respectfully requests that the Court adopt its search proposal and processing schedule. But if the Court determines that Plaintiff's revised search would be unduly burdensome, Plaintiff respectfully requests that the Court order the parties to continue to meet and confer to narrow the proposal, rather than accept the CDC's proposal. Ultimately, Plaintiff's ability to craft a tailored search proposal is limited by the information the agency is willing to provide. The agency's refusal to provide further information should not lead to a rejection of Plaintiff's good-faith efforts and acceptance of the agency's plainly underinclusive proposal.

We thank the Court for its consideration of this submission.

          Respectfully submitted,

          DAMIAN WILLIAMS
          United States Attorney for the
          Southern District of New York

By: */s/ Natasha W. Teleanu*
    NATASHA W. TELEANU
    Assistant United States Attorney
    Telephone: 212-637-2528
    Facsimile: 212-637-2786
    E-mail: natasha.teleanu@usdoj.gov

Encl.

cc:    All counsel of record via ECF