# Exhibit A

20-422
*NRDC v. EPA*

# In the
# United States Court of Appeals
## FOR THE SECOND CIRCUIT

––––––––––––––

AUGUST TERM 2020
No. 20-422

**NATURAL RESOURCES DEFENSE COUNCIL,**
*Plaintiff-Appellee,*

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,**
*Defendant-Appellant.*

––––––––––––––

On Appeal from the United States District Court
for the Southern District of New York

––––––––––––––

ARGUED: FEBRUARY 10, 2021
DECIDED: NOVEMBER 29, 2021

––––––––––––––

Before:      PARKER, LOHIER, and MENASHI, *Circuit Judges.*

The U.S. Environmental Protection Agency ("EPA") appeals an order entered by the U.S. District Court for the Southern District of New York (Furman, J.). The district court ordered the EPA to disclose twenty-eight records pursuant to a Freedom of Information Act ("FOIA") request submitted by the Natural Resources Defense

Council. The EPA argues that twenty-two of these records are exempt from FOIA disclosure pursuant to the FOIA's Exemption Five, which incorporates the deliberative process privilege. This appeal presents the questions of whether records reflecting an agency's discussions about how to communicate its policies to people outside the agency qualify for the deliberative process privilege and whether an agency must connect a record to a specific contemplated agency decision to claim the privilege. We conclude that the deliberative process privilege protects otherwise deliberative records that relate to and precede an agency's communications decision about a policy. In the context of a communications decision, a record is deliberative if it reflects discussions about how to communicate the agency's policies to the public or to other stakeholders. Additionally, we hold that an agency may invoke the deliberative process privilege by connecting a record either to a specific decision or to a specific decisionmaking process. Applying these conclusions to the records at issue in this appeal, we **REVERSE** in part, **VACATE** in part, and **REMAND** for further proceedings consistent with this opinion.

Judge Lohier concurs in part and dissents in part in a separate opinion.

——————

RACHEL L. FRIED (David C. Vladeck, *on the brief*), Georgetown University Law Center Civil Litigation Clinic, Washington, DC, *for Plaintiff-Appellee*.

TOMOKO ONOZAWA (Benjamin H. Torrance, *on the brief*), Assistant United States Attorney, *for Damian Williams, United States Attorney for the Southern District of New York, New York, NY, *for Defendant-Appellant*.

——————

2

MENASHI, *Circuit Judge*:

This case presents two questions regarding the scope of the deliberative process privilege. First, whether agency records reflecting deliberations about how to communicate the agency's policies to people outside the agency "bear on the formulation or exercise of policy-oriented judgment" such that those records qualify for the protection of the deliberative process privilege. *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 482 (2d Cir. 1999). Second, whether an agency record must relate to a discrete decision facing the agency in order to merit protection under the deliberative process privilege.

Our answers are yes and no, respectively. An agency exercises "policy-oriented judgment" when deciding how to communicate its policies, and the deliberative process privilege therefore protects otherwise deliberative agency records that relate to and precede the agency's final communications decision. Additionally, an agency may invoke the deliberative process privilege by connecting a record either to a specific decision or to a specific decisionmaking process.

## BACKGROUND

The dispute here arises from the efforts of the Natural Resources Defense Council ("NRDC") to obtain certain records from the U.S. Environmental Protection Agency ("EPA") through a request made pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.

## I

The NRDC submitted a FOIA request to the EPA in May 2017. The request sought records concerning the activities of Dr. Nancy Beck, then the Deputy Assistant Administrator of the EPA's Office of

Chemical Safety and Pollution Prevention. The NRDC wanted information about Beck's role in policymaking under the Toxic Substances Control Act ("TSCA") and related pesticide matters.

The EPA did not disclose the requested records by the statutory deadline, so the NRDC filed this lawsuit to compel disclosure. In response, the EPA agreed to search for records relating to the NRDC's request and identified 1,350 such records. The EPA released 277 of these records but withheld the rest, either in full or in part, on the ground that those records were exempt from FOIA disclosure. The parties then agreed that the EPA would prepare a *Vaughn* Index describing 120 of the undisclosed records and justifying the EPA's nondisclosure decisions. With the Index prepared and filed, the EPA moved for summary judgment. The district court granted the EPA's motion in part, denied it in part, and ordered the EPA to produce twenty-eight of the records identified in the *Vaughn* Index. *See Nat. Res. Def. Council v. EPA* (*NRDC I*), No. 17-CV-5928, 2019 WL 4142725, at *1 (S.D.N.Y. Aug. 30, 2019). After the district court denied the EPA's subsequent motion for reconsideration, *see Nat. Res. Def. Council v. EPA* (*NRDC II*), No. 17-CV-5928, 2019 WL 6467497 (S.D.N.Y. Dec. 2, 2019), the EPA timely appealed.

## II

In this appeal, the EPA challenges the district court's decision that the deliberative process privilege—incorporated into the FOIA's Exemption Five, 5 U.S.C. § 552(b)(5)—does not apply to twenty-two of the documents that the district court ordered the EPA to disclose. The parties, and the district court, separate these documents into two categories: "messaging records" and "briefing documents." *NRDC I*, 2019 WL 4142725, at *7, *10 (internal quotation marks omitted).

4

The messaging records "reflect[] internal deliberations by [agency] staff about how the agency should communicate its policies to people outside the agency." *Id.* at *8. The district court, consistent with its decision in an earlier case, held that such records "*can* be protected by the deliberative process privilege" but only when the records "reveal the deliberative process underlying a *not-yet-finalized* policy decision." *Id.* at *8-9 (emphasis in original) (quoting *New York v. U.S. Dep't of Commerce*, No. 18-CV-2921, 2018 WL 4853891, at *2 (S.D.N.Y. Oct. 5, 2018)). The district court further held that the privilege generally does not protect a messaging record that, in contrast, "merely reflect[s] deliberations about what message should be delivered to the public about an *already-decided* policy decision." *Id.* at *9 (emphasis in original) (quoting *New York*, 2018 WL 4853891, at *3).[1] Applying this test to seventeen of the documents at issue in this appeal, the district court held that the EPA failed to justify its nondisclosure decision because the EPA's *Vaughn* Index did not indicate that those messaging records "would reveal the deliberative

---

[1] The district court provided a narrow exception to this rule, holding that the privilege would apply to a messaging record relating to "an already-decided policy decision" if the agency's communications decision constituted an "exercise[] of [the agency's] 'essential policymaking role' in and of [itself]." *NRDC I*, 2019 WL 4142725, at *8, *10 (quoting *New York*, 2018 WL 4853891, at *3). The district court did not apply this exception to the case, nor did it explain how it would determine whether a communications decision falls within an agency's "essential policymaking role." *Id.* at *9. In its earlier decision announcing the exception, the district court explained the exception by way of example, indicating that it would apply to records reflecting "deliberations within the Federal Reserve about the timing and content of a policy announcement" regarding an already-decided policy. *New York*, 2018 WL 4853891, at *2.

process underlying a *not-yet-finalized* policy decision." *Id.* at *9 n.6 (alterations omitted).

The briefing documents "are records ... created to brief senior agency staff about various topics within the agency's purview." *Id.* at *11. When analyzing whether the deliberative process privilege applied to these records, the district court was guided by language in our precedents indicating that the privilege applies only to records that both "relate to a specific decision facing the agency" and "formed an essential link in a specified consultative process." *Id.* (citation and alteration omitted) (quoting *Tigue v. DOJ*, 312 F.3d 70, 80 (2d Cir. 2002), and *Grand Cent. P'ship*, 166 F.3d at 482). The district court concluded that the four briefing documents at issue in this appeal failed to meet those criteria. *Id.*

The district court did not analyze the final record disputed in this appeal—"a draft agenda for a[n agency] ... meeting" with members of the public—as either a messaging record or a briefing document. *Id.* at *13; *see* J. App'x 162-63. Upon our review of the *Vaughn* Index entry for this record, we accept the EPA's characterization of this document as a messaging record.[2] Thus, this

_____

[2] The NRDC argues that the EPA waived its ability to characterize this record as a messaging record because the district court did not classify it as such in its opinion and the EPA failed to include this record in its motion for reconsideration before the district court. The EPA's *Vaughn* Index, however, characterized this record in a manner resembling its characterization of the other messaging records disputed here. That the district court thought this record was better characterized under a different heading does not force the EPA to forfeit its argument that it properly refused to disclose this record because it reflects deliberations about how the agency should communicate its policies to people outside the agency.

6

appeal concerns eighteen messaging records and four briefing documents.

## STANDARD OF REVIEW

We review the district court's summary judgment decision de novo. *Ctr. for Constitutional Rights v. CIA*, 765 F.3d 161, 166 (2d Cir. 2014). "[T]he defending agency has the burden of showing that ... any withheld documents fall within an exemption to the FOIA." *Carney v. DOJ*, 19 F.3d 807, 812 (2d Cir. 1994). At the same time, we "accord[] a presumption of good faith" to an agency's "[a]ffidavits or declarations," *id.*, and when an agency provides "reasonably detailed explanations" to support its decision to withhold a document, its "justification is sufficient if it appears logical and plausible," *ACLU v. DOD*, 901 F.3d 125, 133 (2d Cir. 2018).

## DISCUSSION

The district court's decision to order the EPA to disclose the disputed documents pursuant to the NRDC's FOIA request raises two independent issues regarding the scope of the deliberative process privilege. [3] First, whether the privilege applies to "messaging

---

Furthermore, a party's failure to include an argument in a motion for reconsideration does not render that argument waived on appeal when the party made the argument to the district court before the court issued the judgment that is being appealed. *See United States v. Harrell*, 268 F.3d 141, 146 (2d Cir. 2001) (holding that an argument is not waived "if it was 'pressed or passed upon below'") (quoting *United States v. Williams*, 504 U.S. 36, 41 (1992)).

[3] The decision ordering disclosure took the form of a partial denial of summary judgment. *See NRDC I*, 2019 WL 4142725, at *16. Although such decisions are generally considered non-final and therefore are not

records," that is, records relating to an agency's decision about how to communicate its policies to people outside the agency, and, if the privilege can apply, whether it makes a difference if the messaging record relates to a finalized policy or to one not yet conclusively determined. Second, when it comes to documents (such as the briefing documents in the case) that discuss an agency's ongoing activities and practices, whether those documents can qualify for the deliberative process privilege even if the information contained therein does not relate to a discrete decision facing the agency.

## I

The "FOIA mandates the disclosure of documents held by a federal agency unless the documents fall within one of nine enumerated exemptions." *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 785 (2021); *see* 5 U.S.C. § 552. The FOIA's Exemption Five excepts from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). "[T]his exemption incorporates ... the deliberative process privilege, attorney-client privilege, and attorney work-product privilege." *Sierra Club*, 141 S. Ct. at 785.

This case concerns the deliberative process privilege. "[T]he deliberative process privilege shields from disclosure 'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *Id.* (quoting *NLRB v. Sears, Roebuck & Co.*,

---

appealable, we have held that "partial disclosure orders in FOIA cases are appealable." *Ferguson v. FBI*, 957 F.2d 1059, 1063 (2d Cir. 1992).

421 U.S. 132, 150 (1975)). The privilege "encourage[s] candor, which improves agency decisionmaking," by "blunt[ing] the chilling effect that accompanies the prospect of disclosure." *Id.*[4] Consistent with the rationale underlying the deliberative process privilege, it applies only to "predecisional, deliberative documents." *Sierra Club*, 141 S. Ct. at 785. Generally, "[d]ocuments are 'predecisional' if they were generated before the agency's final decision on [a] matter, and they are 'deliberative' if they were prepared to help the agency formulate its position." *Id.* at 786.

The "predecisional" requirement excludes a document that "reflects the consummation of the agency's decisionmaking process and not a merely tentative position." *Id.* (internal quotation marks omitted). Still, a document may qualify for protection even when "nothing else follows it." *Id.* "Sometimes a proposal dies on the vine" and "documents discussing such dead-end ideas can hardly be described as reflecting the agency's chosen course." *Id.* Similarly, the Supreme Court has cautioned that its "emphasis on the need to protect pre-decisional documents does not mean that the existence of

---

[4] We have further explained that the deliberative process privilege also "protect[s] against premature disclosure of proposed policies before they have been finally formulated or adopted" and "against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action." *Grand Cent. P'ship*, 166 F.3d at 481 (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980)). Still, "[t]he key question we keep in mind when assessing the application of the deliberative process privilege to an agency record is whether disclosure would tend to diminish candor within an agency." *Nat. Res. Def. Council v. EPA*, 954 F.3d 150, 158 (2d Cir. 2020) (internal quotation marks omitted).

the privilege turns on the ability of an agency to identify a specific decision in connection with which a memorandum is prepared" and that "courts should be wary of interfering with" an agency's "continuing process of examining [its] policies." *Sears, Roebuck & Co.*, 421 U.S. at 151 n.18. To determine whether a document is "deliberative," we determine whether the document was "prepared to help the agency formulate its position," *Sierra Club*, 141 S. Ct. at 786, by analyzing "if it reflects the give-and-take of the consultative process," *Nat. Res. Def. Council*, 954 F.3d at 156.

Not every decision made within an agency will entail the kind of "consultative process" the deliberative process privilege is designed to protect. Our precedents have established that the deliberative process privilege protects only those records that "bear on the formulation or exercise of policy-oriented judgment." *Grand Cent. P'ship*, 166 F.3d at 482. As then-Judge Ginsburg explained when formulating this "policy-oriented judgment" proviso, "homing in on, and sheltering material implicating officials' exercise of judgment about policy matters secures the internal agency give-and-take" that the deliberative process privilege is "meant to protect" and "helps us answer the key question in these cases: whether disclosure would tend to diminish candor within an agency." *Petrol. Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1435 (D.C. Cir. 1992) (R.B. Ginsburg, J.) (internal quotation marks omitted). This concern with "diminish[ing] officials' candor or otherwise injur[ing] the quality of agency decisions" arises when an agency is compelled to disclose "materials [that] can reasonably be said to embody an agency's policy-informed or -informing judgmental process" or its "mode of formulating or exercising policy-implicating judgment." *Id.* at 1435-36. By contrast, "[t]he release of materials that do not embody agency judgments—for

10

example, materials relating to standard or routine computations or measurements over which the agency has no significant discretion— is unlikely to diminish officials' candor or otherwise injure the quality of agency decisions." *Id.* at 1436. For that reason, courts need not be concerned that "[r]equiring disclosure of such materials" would disturb "efficient government operation." *Id.*

## II

Applying these principles to the case at hand, we first consider the messaging records. These records "reflect[] internal deliberations by [agency] staff about how the agency should communicate its policies to people outside the agency." *NRDC I*, 2019 WL 4142725, at *8. Included in these records are draft talking points prepared for senior agency staff about agency policies and internal discussions and draft responses relating to inquiries from the press and from members of Congress. *Id.* at *8-9.

## A

The NRDC does not dispute that the messaging records "were generated before the agency's final decision" regarding how to communicate and are thus "predecisional" with respect to those communications decisions. *Sierra Club*, 141 S. Ct. at 786. Rather, the NRDC argues that an agency's decision about how to communicate its policies to people outside the agency does not generally involve the "formulation or exercise of policy-oriented judgment" and the deliberative process privilege therefore does not protect the EPA's internal discussions about how to formulate those communications. *Grand Cent. P'ship*, 166 F.3d at 482. We disagree.

11

An agency's decision regarding how to communicate its policies and actions to Congress, the public, and other stakeholders can have substantial consequences.[5] A poor communications decision at a congressional hearing might mean the difference between receiving the agency's requested budgetary appropriation, on the one hand, or inviting intrusive oversight hearings into agency operations, on the other. Communications with the press, industry members, and the public have similarly high stakes. An agency might attract public support that it can leverage to pursue its policy agenda or invite a backlash that would undermine that agenda. If an agency seeks to shape conduct through its policies, it must take care to explain those policies in ways that will elicit compliance.[6] As it pursues its policy agenda, moreover, the agency must maintain consistency with the explanations it has previously provided or else risk losing credibility.

---

[5] *See, e.g.*, William E. Kovacic, *Creating A Respected Brand: How Regulatory Agencies Signal Quality*, 22 Geo. Mason L. Rev. 237, 237-41 (2015) (observing that an agency's reputation is crucial to its "effectiveness," including its ability to obtain deference from judges, legislators, and public regulators, as well as its attempt to "build[] credibility with the general public, advocacy groups, universities, the media, professional societies, trade associations, and individual businesses"); *id.* at 243-44 (explaining that "[e]ach of an agency's public statements" about its "[a]ims and [a]ctivities"—whether the statement comes "by means of a decision in a case, a report, a guideline, a speech, or testimony before a government body"—builds the agency's reputation and that "achieving coherence in public expressions" can sometimes be "difficult").

[6] *See, e.g.*, Milton Russell, *Risk Communication: Informing Public Opinion*, EPA J., Nov. 1987, at 20, 20-21 ("[W]hen it comes to protecting health and the environment, it is public, not expert, opinion that counts. ... The challenge of risk communication is to provide this information in ways that it can be incorporated in the views of common citizens who have little time or patience for arcane scientific discourse.").

*See Russell v. Dep't of the Air Force*, 682 F.2d 1045, 1048 (D.C. Cir. 1982) (noting that an agency "must stand by" its "official statement[s] ... in the public forum, and ... perhaps in the judicial forum as well").

Given these considerations, "an agency's decision regarding how to present its substantive policies to the public often involves the evaluation of alternative public relations policies, policies which by their very nature are audience-sensitive and must anticipate public reaction." *Seife v. Dep't of State*, 298 F. Supp. 3d 592, 616 (S.D.N.Y. 2018). Indeed, "the decision of how, and to what extent, to convey that policy to the public may require input by many working components within the agency, or even an analysis of the underlying policy itself." *Id.* Thus, an agency's communications decisions necessarily implicate the agency's policies and must be informed by those policies. Those decisions involve "the formulation or exercise of policy-oriented judgment." *Grand Cent. P'ship*, 166 F.3d at 482; *see Petrol. Info.*, 976 F.2d at 1435 (explaining that an agency formulates or exercises "policy-oriented judgment" through its "*policy-informed or -informing* judgmental process" and its "mode of formulating or exercising *policy-implicating* judgment") (emphasis added). Because communications decisions involve "the formulation or exercise of policy-oriented judgment," deliberations about—and preceding—those decisions are protected by the deliberative process privilege. *Grand Cent. P'ship*, 166 F.3d at 482.

An agency exercises policy-oriented judgment when communicating its policies "even when [the] underlying decision or policy has already been established by the agency." *Seife*, 298 F. Supp. 3d at 616. Regardless of whether the agency has definitively determined the relevant policy, its decision regarding how to communicate that policy does not constitute a "mundane,"

"standard[,] or routine" decision "over which the agency has no significant discretion." *Petrol. Info.*, 976 F.2d at 1436 & n.8. Rather, the communications decision implicates the agency's policymaking role and remains "delicate and audience-sensitive, susceptible to distortions and vulnerable to fudging when the deliberators fear or expect public reaction." *Id.* at 1435. Applying the deliberative process privilege to records reflecting deliberations about these issues ensures that agency staff can consider communications decisions candidly and thereby promotes "efficient government operation." *Id.* at 1436.

Our conclusion that otherwise deliberative messaging records merit protection under the deliberative process privilege finds support in our precedents and those of other circuits. In *ACLU v. DOJ*, we decided that certain records related to the government's use of drone strikes were not subject to FOIA disclosure. *See* 844 F.3d 126, 132-33 (2d Cir. 2016). Two of those records resembled the messaging records at issue in this case. The first, "OLC 144," was "a set of suggested talking points concerning the legal basis for drone strikes." *Id.* at 133. The second, "CIA 59 [T]ab C," was "a draft of a proposed op-ed article that suggested some ways of explaining the Government's legal reasoning in support of drone strikes." *Id.* We ruled that both of these documents were "predecisional" and therefore "need not be disclosed" pursuant to "FOIA Exemption 5" *Id.* at 132-33. Like the messaging records in this case, the documents in *ACLU* related to internal agency deliberations regarding how the agency would communicate with people outside the agency about a substantive decision the agency had already made—namely, its drone strike policy. Thus, our decision that those records were "predecisional" and protected by "Exemption 5," *id.*, implicitly acknowledged what we clarify today: Records reflecting agency

14

deliberations relating to and preceding a communications decision are covered by the deliberative process privilege.[7]

This conclusion finds additional support in the First Circuit's decision in *New Hampshire Right to Life v. HHS*, 778 F.3d 43 (1st Cir. 2015). In that case, a FOIA requester argued that "documents [that] post-date ... [HHS's] decision to proceed with a ... grant process" for a Planned Parenthood chapter were "not pre-decisional" and therefore were subject to disclosure. *Id.* at 53-54. The First Circuit rejected this argument, reasoning that the documents "pre-date the public announcement" of the decision to proceed with the grant process and the "documents deal with the Department's decision of how and what to communicate to the public, which is a decision in and of itself." *Id.* Thus, *New Hampshire Right to Life* also stands for the proposition that agency records reflecting internal deliberations about how the agency should communicate with people outside the agency qualify for the deliberative process privilege, even if those deliberations occur after the agency has adopted the underlying policy.[8]

_____

[7] The NRDC argues that we should understand our decision in *ACLU v. DOJ* to have exempted OLC 144 and CIA 59 Tab C from disclosure pursuant to the attorney work-product privilege, which Exemption Five also incorporates. Yet our repeated use of the word "predecisional" in explaining our decision, *see* 844 F.3d at 132-33, indicates that we were applying the deliberative process privilege. *See also id.* at 132 (observing that the government argued that that these "documents are predecisional drafts protected by FOIA Exemption 5").

[8] The NRDC tries to distinguish *New Hampshire Right to Life* by arguing that, "[g]iven the incendiary politics that surround allegations of government funding of abortions, the decision of whether and how to announce the

Finally, some of the very decisions from which then-Judge Ginsburg distilled the deliberative process privilege's "policy-oriented judgment" proviso indicate that agency deliberations about communications decisions qualify for the privilege. "In *Dudman Communications* [*v. Department of Air Force*, 815 F.2d 1565 (D.C. Cir. 1987),] and in *Russell v. Department of Air Force*, 682 F.2d 1045 (D.C. Cir. 1982)," the D.C. Circuit "held preliminary drafts of official military histories exempt" from FOIA disclosure pursuant to the deliberative process privilege. *Petrol. Info.*, 976 F.2d at 1434. *Russell* explained that military histories "constitute[] the Air Force's official statement concerning the history" of its operations. 682 F.2d at 1048. The court observed that "[t]he Air Force depends on this official statement to provide a basis for future military and public policy decisions" and that it also "must stand by its history in the public forum, and … perhaps in the judicial forum as well." *Id.* These military histories resemble the communications decisions at issue in this appeal. Both are agency statements to the public regarding the agency's actions to implement policies that have already been

---

funding decision [in that case was] inherently policy-laden." Brief for Plaintiff-Appellee at 34. This argument recognizes the logic that justifies our decision today. As the NRDC acknowledges, public reaction to an agency's communication of its already-decided policies affects the agency's ability to pursue its policy agenda. We reject the NRDC's effort to cabin this reasoning to issues that it considers "incendiary." *Id.* Such a standard is too subjective to provide the stable expectations that the deliberative process privilege requires, *see In re The City of New York*, 607 F.3d 923, 942 (2d Cir. 2010) ("[F]or a privilege to serve its intended function, potential litigants must be able to predict which of their materials will be protected by the privilege."), and indeed an issue might be "incendiary" within the agency's specialized sphere of responsibility even if a court might not later recognize it as such.

decided. As we do here, the D.C. Circuit recognized that such statements impact an agency's operations and accordingly records reflecting deliberations about how to formulate these statements merit protection under the deliberative process privilege. *See Dudman*, 815 F.2d at 1568-69; *Russell*, 682 F.2d at 1048-49.

In fact, the D.C. Circuit in *Russell* rejected arguments similar to those advanced by the NRDC and accepted by the district court in this case. The D.C. Circuit rejected the FOIA requesters' "argu[ment] that the deliberative process privilege is intended to protect decisionmaking concerning legal or policy matters in the context of an agency's exercise of rulemaking, adjudication, awarding of contracts or grants, or decisions involving health, safety or foreign affairs." *Russell*, 682 F.2d at 1049 n.2. The court found "nothing in the case law or legislative history that indicates the privilege is so limited." *Id.* Additionally, *Russell* noted that the FOIA requesters' "argument that the draft report is somehow post decisional because [it is] historical is faulty." *Id.* at 1049 n.1. The court continued that "[t]he report was made public [and] certain draft portions of the report were withheld" and concluded that "[t]he report itself is the agency action or decision" with respect to which "the draft ... is indisputably pre-decisional." *Id.*

The D.C. Circuit followed a similar approach in *National Security Archive v. CIA*, holding that an unpublished draft of a CIA military history was exempt from disclosure under the FOIA. 752 F.3d 460 (D.C. Cir. 2014) (Kavanaugh, J.). The court explained that "an agency's official history is a final agency decision" because it "constitutes the agency's 'official statement' concerning the agency's prior actions, and it helps educate future agency decisionmakers." *Id.* at 463 (quoting *Russell*, 682 F.2d at 1048).

17

Likewise, in *Reporters Committee for Freedom of the Press v. FBI*, the D.C. Circuit decided that communications decisions made in the context of "public debate" surrounding an agency's policy called for the exercise of a policy-oriented judgment and were therefore protected by the deliberative process privilege. 3 F.4th 350, 362 (D.C. Cir. 2021). The deliberative materials in *Reporters Committee* included drafts of a letter to the editor by FBI Director James Comey that "defended" an already-settled policy of the FBI regarding undercover investigations and the agency's prior implementation of that policy. *Id.* With regard to those messaging records, the D.C. Circuit concluded that the "discussions regarding proposed revisions to Director Comey's letter" were exempt from disclosure under the FOIA's Exemption Five because those deliberations about the agency's public statement "were part of an internal dialogue about critical judgment calls aimed at advancing the agency's interests." *Id.* at 363. Such a public statement, the court said, did not result from the sort of merely "descriptive discussions" that do not warrant the protection of the deliberative process privilege. *Id.* To the contrary, the deliberations over how to craft the agency's defense of its prior conduct contained "the type of back-and-forth exchange of ideas, constructive feedback, and internal debate over how best to promote and to preserve the undercover policy that sits at the heart of the deliberative process privilege." *Id.* at 364.

We agree that while merely "descriptive discussions" do not qualify for the deliberative process privilege, agency deliberations over how to communicate and promote existing policies to people

outside the agency is not solely a "descriptive" exercise. *Id.*[9] Rather, such communications "can be delicate and audience-sensitive" and require the agency to "exercise ... policy-oriented judgment" to effectively pursue its policymaking agenda. *Petrol. Info.*, 976 F.2d at 1435. The agency's communications decisions affect whether the agency will be able to "preserve an existing policy," *Reps. Comm.*, 3 F.4th at 362, or will attract opposition.

All in all, judicial precedent indicates that an agency exercises "policy-oriented judgment" when communicating its policies to people outside the agency. *Grand Cent. P'ship*, 166 F.3d at 482. Therefore, records reflecting deliberations—as opposed to merely descriptive discussions—regarding those decisions are protected by the deliberative process privilege.

---

[9] Indeed, as we note *infra* in Part III.B., records reflecting the attempt of agency employees merely to describe the agency's current practices to a superior official do not qualify for the deliberative process privilege. Our decision is consistent with another holding of *Reporters Committee*—that the deliberative process privilege did not apply to drafts of an "FBI presentation ... to the White House ... that did nothing more than explain [an] existing FBI policy." 3 F.4th at 367. While we would consider such a presentation a policy-oriented exercise if it occurred before members of the public or Congress, that conclusion does not hold for the scenario at issue in *Reporters Committee*. Because the FBI reports to the President, we would not view the presentation at issue in *Reporters Committee* as the culmination of an agency communications decision that merited the protection of the deliberative process privilege under the standard announced today, and deliberations over that presentation would therefore not implicate the policy-oriented judgment involved in communicating with outside stakeholders.

**B**

Having concluded that an agency's communications decision generally constitutes an "exercise of policy-oriented judgment," *Grand Cent. P'ship*, 166 F.3d at 482, we now consider whether the messaging records at issue in this appeal in fact reflect "deliberations" regarding communications decisions. As noted, we consider a document deliberative "if it reflects the give-and-take of the consultative process." *Nat. Res. Def. Council*, 954 F.3d at 156.

In the context of a messaging record, we believe that the relevant "consultative process" includes the agency's effort to determine what to say about a policy and how to formulate that message. Records designed to contribute to those decisions are deliberative. However, records that are not related to the form and content of the communication will generally lie outside the scope of the privilege, even if those records were created while the agency was making its communications decision. In other words, only those agency documents that "bear on the formulation or exercise" of the "policy-oriented judgment" embodied in an agency communication qualify as deliberative. *Grand Cent. P'ship*, 166 F.3d at 482. Records that bear on technical matters "peripheral to" that communications decision, such as what time of day an agency spokesman will be available to deliver that message or which conference room to use for a press briefing, lie outside the scope of the privilege. *Id.*[10]

---

[10] To be clear, we do not hold that records related to matters that appear technical, such as scheduling considerations, can *never* be covered by the deliberative process privilege. Rather, if an agency invokes the deliberative process privilege to withhold messaging records that do not relate to the form and content of a communications decision, the agency must provide a

Bearing this in mind, we reverse the district court's decision with respect to eleven of the messaging records it ordered disclosed: Documents 401, 8309, 9765, 11126, 21815, 22970, 23178, 25096, 25349, 25605, and 25606.[11] The *Vaughn* Index entry for each of these records demonstrates that it was created as part of the EPA's efforts to communicate with people outside the agency about specific policies *and* that the document reflects discussions about what to say about the policy or how to formulate that message. *See* J. App'x 77-78, 91-95, 135-37, 141-42, 148-50, 172-73, 186-87, 194-95.[12] Furthermore, these entries indicate that the records reflect the views of agency staff, not the ultimate communications decision on which the EPA itself settled.[13] Thus, these records are predecisional and deliberative and

---

specific "reasonably detailed explanation[]," *ACLU v. DOD*, 901 F.3d at 133, as to why that record in fact "bear[s] on the formulation or exercise" of the "policy-oriented judgment" embodied in that agency communication. *Grand Cent. P'ship*, 166 F.3d at 482.

[11] The EPA's *Vaughn* submissions to the district court identified records using extended alphanumeric strings. For ease of reference, we refer to those records by their unique terminal digits. For example, we refer to "ED_001338_00000401" as "Document 401."

[12] For example, Document 401 is a "two-page draft of talking points for then-EPA Administrator Scott Pruitt." J. App'x 77. The EPA's *Vaughn* submission explains that the withheld information "reflects draft language on how to present the EPA program for reviewing new chemicals under the Toxic Substances Control Act," which "was shared with a senior manager for her opinions, edits, and recommendations on how to present information about the new chemicals review." *Id.*

[13] The draft talking points in Document 401, for example, "do[] not reflect an official Agency policy or decision" because the talking points were "still being edited and reviewed" when the document was created. J. App'x 77. Rather, the document "reflect[s] the incomplete view of some staff who[] shared the document for internal discussion." *Id.* at 78.

exempt from disclosure pursuant to the FOIA's Exemption Five and the deliberative process privilege. *See Grand Cent. P'ship*, 166 F.3d at 483 (concluding that a document was "pre-decisional" because it was "directly related to the three agency decisions ... and precede[d] all three in temporal sequence" and that the document was "deliberative" because it "formed an important ... link in [the agency's] consultative process, ... reflects the personal opinions of its writer," and "may well reflect inaccurately upon or prematurely disclose the views of [the agency]").

However, the EPA's *Vaughn* Index entries for the remaining seven messaging records that the district court ordered the EPA to disclose do not provide sufficient details from which we can ascertain the records' deliberative character. These records are Documents 2048, 5427, 7169, 13150, 13257, 19639, and 22782. Six of these records arguably reflect agency discussions leading up to a communications decision regarding its policies, but the entries for these records do not indicate whether these discussions concerned the agency's decision of what to say about the policy or how to formulate that message. *See* J. App'x 86-87, 89-90, 101-02, 104-05, 137-38, 162-63.[14] Consequently,

---

[14] The entry for Document 7169, for example, reveals only that the record "discuss[es] a request from an Associated Press reporter for an interview about asbestos" and "reflect[s] pre-decisional deliberations ... about responding to [that] request." J. App'x 89-90. If these deliberations concerned how the EPA would present its position on some asbestos-related policy in that interview, the document would qualify for the deliberative process privilege. But the description does not indicate the focus of the discussions reflected in Document 7169. The EPA's effort to "respond[] to a request from a reporter ... for an interview," *id.* at 90, could involve a host of technical considerations, such as scheduling conflicts, and a record that relates to those issues would likely fall outside the scope of the

we cannot discern whether these records relate to the "consultative process" relevant to these communications decisions, *Nat. Res. Def. Council*, 954 F.3d at 156, or instead concern matters merely "peripheral to" those decisions, *Grand Cent. P'ship*, 166 F.3d at 482.

The seventh of these records presents a somewhat unique case. This record, Document 22782, contains "draft suggestions and responses to [a] reporter's question" that "do[] not reflect an official Agency policy or final agency action or decision." J. App'x 141. If this reporter's question concerned one of the EPA's policies, then we would have little trouble concluding that the record is deliberative. Yet the reporter inquired about the agency's "*postponed meeting* on glyphosate," a chemical compound then under review. *Id.* (emphasis added). Absent any explanation in the *Vaughn* Index entry, we cannot determine whether the EPA's initial decision to postpone that meeting resulted from considerations that would allow us to conclude that the agency's communications decision regarding the postponement involved the exercise of policy-oriented judgment.[15]

_____

deliberative process privilege. Additionally, the entry does not explain what, if any, asbestos-related policy issues the reporter inquired about. The deliberative process privilege does not automatically apply when an agency simply connects a record to a topic within its purview.

[15] Perhaps the meeting was postponed because of weather-related transportation delays or cancellations. It is hard to imagine how communicating that information requires policy-oriented judgment. But the EPA's communications decision regarding the postponement could have involved the exercise of policy-oriented judgment. Perhaps the agency postponed the meeting because it was reconsidering its position on glyphosate. If that was the case, the agency would have had to carefully formulate its response to the reporter's question if it did not want

We nonetheless vacate the district court's order requiring the EPA to disclose these seven messaging records and remand for the agency to provide additional explanation consistent with the standard we describe here. Until now, our precedents had not provided clarity regarding what types of messaging records an agency may withhold pursuant to the deliberative process privilege. When the EPA prepared its *Vaughn* Index, it could not have known the details that we would require to uphold its reliance on the privilege. Accordingly, the EPA should have the opportunity to explain its withholding decisions in light of the clarified standard, and we remand to allow the EPA to revise its *Vaughn* Index entries for these seven records if it chooses to do so.

### III

We now turn to the four briefing documents, Documents 14518, 14561, 14935, and 25173. These documents "are records ... created to brief senior agency staff about various topics within the agency's purview." *NRDC I*, 2019 WL 4142725, at *11. Specifically, these documents reflect efforts by agency employees to "provid[e] [a] senior manager with information and supporting documentation in response to her questions and comments on the role of epidemiology data in [the agency's] human health risk assessments." J. App'x 117, 121.

---

prematurely to disclose that it was reconsidering those policies. Still, the current *Vaughn* Index entry for Document 22782 fails to provide a sufficiently "reasonably detailed explanation[]" to justify the EPA's decision to withhold this record. *ACLU v. DOD*, 901 F.3d at 133.

## A

In setting out the "[a]pplicable [l]egal [p]rinciples" for the deliberative process privilege, the district court explained that for a document to qualify as predecisional the agency "must be able to demonstrate that, *ex ante*, the document for which [the] privilege is claimed related to a specific decision facing the agency." *NRDC I*, 2019 WL 4142725, at *6 (quoting *Tigue*, 312 F.3d at 80). The district court then applied this requirement when it ordered the EPA to disclose the briefing documents, holding that those records were not "predecisional" because the records did not "'relate to a specific decision facing the agency.'" *Id.* at *11 (internal citation and alteration omitted) (quoting *Tigue*, 312 F.3d at 80).

Requiring that a record "relate to a specific decision facing the agency," however, places an unduly restrictive gloss on the deliberative process privilege's predecisional requirement. While that requirement excludes records that discuss a decision already made, *see Sierra Club*, 141 S. Ct. at 786, it "does not mean that the existence of the privilege turns on the ability of an agency to identify a specific decision in connection with which a memorandum is prepared," *Sears, Roebuck & Co.*, 421 U.S. at 151 n.18. To the contrary, "[a]gencies are, and properly should be, engaged in a continuing process of examining their policies," and "courts should be wary of interfering with this process." *Id.* In light of this admonition, we hold that a record is predecisional if it relates to a specific decision *or a specific decisionmaking process* and was generated before the conclusion of that decision or process. The D.C. Circuit has long recognized that the privilege does not "require that [a] document contribute to a single, discrete decision" but rather protects records that, more broadly,

relate to a "definable decisionmaking process." *Access Reps. v. DOJ*, 926 F.2d 1192, 1196 (D.C. Cir. 1991).

For example, an agency may undertake a critical review of its regulations without the objective of implementing a specific new statute or achieving a particular amendment to the regulations. If the deliberative process privilege applied only to documents that relate to a specific decision facing the agency, one might argue that deliberations occurring in the course of that review do not qualify for the privilege. But under our test, the agency's critical review represents a specific decisionmaking process and the agency may withhold records reflecting deliberations relevant to that process. The agency might also undertake a critical review of its decisionmaking processes—such as the agency's methodology for conducting cost-benefit analyses when it regulates—even if that review is not directed at altering, repealing, or promulgating a specific regulation. Records relating to that review would be connected to a specific decisionmaking process.

It is true that our opinion in *Tigue* stated that an agency "must be able to demonstrate that, *ex ante*, the document for which executive privilege is claimed related to a specific decision facing the agency," 312 F.3d at 80, but *Tigue* did not adopt this requirement as the law of our circuit or hold that it was the exclusive test for applying the privilege. Rather, we employed that language to explain the "Ninth Circuit['s] … holding that … the government must show that the material was prepared to assist the agency in the formulation of some specific decision." *Id.* (discussing *Maricopa Audubon Soc'y v. U.S. Forest Serv.*, 108 F.3d 1089, 1094 (9th Cir. 1997)). The relevant discussion in *Tigue* rejected the plaintiffs' argument in that case that, if the Ninth Circuit's test were to apply, it would require a different result than

the one we had reached under our prior decision in *Grand Central Partnership*. *See id.*[16]

**B**

Even under the test we adopt today for determining whether a document is predecisional, we cannot conclude on the present record that the EPA properly withheld the four briefing documents. The *Vaughn* Index entries for those records merely note that the records contain information "on the role of epidemiology data in [the agency's] risk assessments" and were prepared in response to a senior official's "questions and comments" on that topic. J. App'x 117, 121. In its briefing before our court, the EPA insists that these documents related to two ongoing rulemaking processes under the TSCA, but the corresponding *Vaughn* Index entries do not draw any such connection. And while the entries do indicate that the information contained in these records "was considered as part of the Agency's deliberations on the role of epidemiology data in [the agency's] human health risk assessments," the entries do not explain whether the agency had undertaken to critically review or revise its practices regarding the use of epidemiology data. *Id.* at 117-18, 121-22. In other

---

[16] Our opinion in *Brennan Ctr. for Justice v. DOJ*, 697 F.3d 184 (2d Cir. 2012), also did not adopt a specific decision requirement. In *Brennan Center* we quoted from a First Circuit case to say that "an agency *may* meet its burden of proof under the predecisional document test by demonstrating … that the document was originated to facilitate an identifiable final agency decision." *Id.* at 202 (emphasis added) (internal quotation marks omitted) (quoting *Providence J. Co. v. U.S. Dep't of Army*, 981 F.2d 552, 559 (1st Cir. 1992)). Relying on the language of "*may*"—not "*must*"—implies that identifying a "specific decision" is a possible, but not the exclusive, way for an agency to "meet its burden of proof under the predecisional document test." *Id.*

27

words, these *Vaughn* Index entries do not clarify whether the information contained in these records was collected and curated to assist in an agency decisionmaking process related to the role of epidemiology data or if the material was instead prepared merely to describe the agency's current practices to an agency official.

Nonetheless, we will vacate the district court's order requiring the EPA to disclose these four briefing documents. When the EPA prepared its *Vaughn* Index, it lacked guidance from our court regarding how a record relevant to a decisionmaking process—as opposed to a specific decision—might qualify for the deliberative process privilege. The EPA should have the opportunity to explain its withholding decisions in light of the clarified test we adopt today, and we remand for the EPA to revise its *Vaughn* Index entries for these four briefing documents if it chooses to do so.[17]

## CONCLUSION

Agencies exercise policy-oriented judgment when determining how to communicate with people outside the agency about a policy. Therefore, the deliberative process privilege shields otherwise deliberative agency records that relate to and precede an agency's

---

[17] The district court also decided that these records were not "deliberative" because the records did not "form[] an essential link in a specified consultative process." *NRDC I*, 2019 WL 4142725, at *11 (quoting *Grand Cent. P'ship*, 166 F.3d at 482). Yet when viewing the deliberative process privilege's application in the context of a broader decisionmaking process— a view that the district court might have thought our precedents foreclosed—material that provides an overview of an agency practice implemented across many decisions, such as the EPA's use of epidemiology data in human health risk assessments, might very well constitute a record related to that consultative process.

28

communications decision. In this context, a record is "deliberative" if it reflects discussions about what the agency should say about a policy or how to formulate that message. Additionally, an agency may invoke the deliberative process privilege by connecting a record not only to a specific contemplated decision but also to a specific decisionmaking process.

In this case, the EPA's *Vaughn* submissions establish that eleven of the "messaging records" subject to the EPA's appeal meet the standards outlined above. Accordingly, we **REVERSE** the district court's decision denying the EPA summary judgment with respect those eleven records—Documents 401, 8309, 9765, 11126, 21815, 22970, 23178, 25096, 25349, 25605, and 25606.[18] We also **VACATE** the district court's order requiring the EPA to disclose the other records disputed in this case and **REMAND** for the EPA to revise the corresponding *Vaughn* Index entries if it so chooses and for further proceedings consistent with this opinion.

---

[18] Despite the NRDC's insistence, we need not remand for the district court to determine whether the EPA "reasonably foresees that disclosure" of these records "would harm an interest protected by" Exemption Five. 5 U.S.C. § 552(a)(8)(A)(i). The district court already determined that the EPA met the "foreseeable harm" requirement and concluded that "summary judgment must be and is granted to the agency on this issue." *NRDC I*, 2019 WL 4142725, at *5.* The district court did not carve out any records from its holding regarding the foreseeable harm requirement.

1    LOHIER, *Circuit Judge*, concurring in part and dissenting in part:

2          Congress passed the Freedom of Information Act, 5 U.S.C. § 552, to

3    provide the public with access to "official information long shielded

4    unnecessarily from public view." Envtl. Prot. Agency v. Mink, 410 U.S. 73, 80

5    (1973).  The statute revised the public disclosure section of the Administrative

6    Procedure Act, 5 U.S.C. § 1002 (1964 ed.), which had fallen "far short of its

7    disclosure goals." Id. at 79.  Where the Administrative Procedure Act had

8    allowed the Government to evade disclosure wherever it claimed secrecy was "in

9    the public interest," id., FOIA set forth "a general philosophy of full agency

10   disclosure unless information is exempted under clearly delineated statutory

11   language," S. Rep. No. 813, 89th Cong., 1st Sess., 3 (1965).  Even FOIA's

12   exemptions "do not obscure . . . that disclosure, not secrecy, is the dominant

13   objective of the Act." Dep't of Air Force v. Rose, 425 U.S. 352, 361 (1976).  In

14   2016, out of concern that "some agencies [were] overusing FOIA exemptions," S.

15   REP. NO. 4, 114th Cong., 1st Sess. 2 (2015), Congress adopted the FOIA

16   Improvement Act, Pub. L. No. 114–185, 130 Stat. 538 (2016), under which

17   agencies may withhold information under a FOIA exemption only if the agency

18   "reasonably foresees that disclosure would harm an interest protected by an

1    exemption" or if "disclosure is prohibited by law," FOIA Improvement Act § 2,

2    130 Stat. at 539 (codified at 5 U.S.C. § 552(a)(8)(A)(ii)).

3          This case concerns Exemption Five, which, among other things, shields

4    from disclosure "documents reflecting . . . deliberations comprising part of a

5    process by which governmental decisions and policies are formulated." U.S. Fish

6    & Wildlife Serv. v. Sierra Club, Inc., 141 S. Ct. 777, 785 (2021) (quotation marks

7    omitted).  To be protected by the deliberative process privilege, a document must

8    be both predecisional, meaning that it was generated before an agency's final

9    decision on a matter, and deliberative, meaning that it was "prepared to help the

10    agency formulate its position." Id. at 786.

11          With this background in mind, I concur in the majority's analysis as to the

12    four briefing documents.  Because agencies continually examine and reexamine

13    their policies, I agree that a record can be predecisional if it relates either to a

14    specific decision or to a specific decisionmaking process, and the Environmental

15    Protection Agency should have the opportunity to clarify its Vaughn Index

16    entries in light of this holding.

17          I write separately, however, to address the majority's approach to

18    messaging records.  There is quite a bit of merit to the idea that messaging—that

2

1    is, how the agency chooses to communicate with people and entities outside the

2    agency—can implicate policy.  As the majority notes, how an agency chooses "to

3    present its substantive policies to the public often involves the evaluation of

4    alternative public relations policies" and may even require "an analysis of the

5    underlying policy itself."  Majority Op. at 13 (quoting Seife v. Dep't of State, 298

6    F. Supp. 3d 592, 616 (S.D.N.Y. 2018)).  Where communications decisions involve

7    the "exercise of policy-oriented judgment," Grand Cent. P'ship, Inc. v. Cuomo,

8    166 F.3d 473, 482 (2d Cir. 1999) (quotation marks omitted), the deliberative

9    process privilege may protect deliberations that directly relate to and precede

10   those decisions.

11          But not all communications decisions implicate policy in this way.  See

12   New York v. U.S. Dep't of Commerce, No. 18-CV-2921, 2018 WL 4853891, at *2

13   (S.D.N.Y. Oct. 5, 2018) ("[N]ot all 'messaging' decisions are so intimately bound

14   up with an agency's central policy mission.").  Sometimes, messaging

15   communications "amount to little more than deliberations over how to spin a

16   prior decision, or merely reflect an effort to ensure that an agency's statement is

17   consistent with its prior decision."  Id.  When that is so, FOIA does not permit an

18   agency to invoke the deliberative process privilege to avoid disclosure.

1       The D.C. Circuit recently concluded as much in <u>Reporters Committee for</u>

2   <u>Freedom of the Press v. FBI</u>, reasoning that "documents that discuss, describe, or

3   defend an already-determined agency policy" fail to "advance the purposes of

4   the deliberative process privilege—to allow agency employees to have the

5   candid discussions necessary to make the best possible policy decisions in service

6   of the public." 3 F.4th 350, 363–64 (D.C. Cir. 2021). The facts of <u>Reporters</u>

7   <u>Committee</u> illustrate the point. Among the documents at issue in that appeal

8   were emails discussing proposed changes to a draft letter to the editor that FBI

9   Director James Comey had written to defend the agency's use of media

10  impersonation as an investigative tactic. The D.C. Circuit concluded that these

11  documents qualified for protection under the deliberative process privilege

12  because they contained a "back-and-forth exchange of ideas" that formed "part

13  of an internal dialogue about critical judgment calls aimed at advancing the

14  agency's interests in the midst of a vigorous public debate about an FBI

15  undercover policy with a decidedly uncertain future at the time." <u>Id.</u> at 363–4.

16  The emails, in other words, did not simply "defend an already-determined

17  agency policy." <u>Id.</u> at 363. To the contrary, the FBI policy at issue was in flux:

18  The FBI was under "significant external pressure" to change its guidelines

1 regarding the impersonation of news media during undercover operations,

2 which it ultimately did.  Id. at 363–64.

3        As Reporters Committee recognized, however, circumstances like the FBI's

4 will not always be present when an agency communicates its policies to the

5 public.  While the majority suggests otherwise, see Majority Op. at 18–19, agency

6 deliberations over how to communicate and promote existing policies can, in

7 fact, be merely a "descriptive" exercise—as, for example, when the agency seeks

8 to explain a policy decision that is truly already settled rather than in flux.  In my

9 view, therefore, FOIA compels a flexible approach under which agency

10 messaging records are not always or even presumptively protected by the

11 deliberative process privilege.  Although that approach hews closely to the D.C.

12 Circuit's reasoning in Reporters Committee, I recognize that it departs from the

13 path taken in New Hampshire Right to Life v. HHS, where the First Circuit

14 referred to an agency's "decision of how and what to communicate to the public"

15 as "a decision in and of itself."  778 F.3d 43, 54 (1st Cir. 2015).  But such a

16 categorical approach risks expanding Exemption Five so much that it swallows

17 the very purpose of FOIA.

1    Because agencies should not be allowed to withhold messaging documents

2    that merely "discuss, describe, or defend an already-determined agency policy,"

3    Reps. Comm., 3 F.4th at 363, I am not persuaded on the present record that the

4    EPA properly withheld the following eleven documents in this case: 401, 8309,

5    9765, 11126, 21815, 22970, 23178, 25096, 25349, 25605, and 25606.  As the majority

6    asserts, the Vaughn Index entries for these records indicate that they were

7    deliberative documents "created as part of the EPA's efforts to communicate

8    with people outside the agency about specific policies."  Majority Op. at 21.  In

9    my view, that description is not enough for the records to qualify for protection

10   under the deliberative process privilege.  The agency would also have had to

11   make clear that the communications involved more than merely determining

12   how to describe or spin policy decisions the agency had already made—for

13   example, by showing that the process of deciding which message to deliver was

14   both deliberative and related to a policy decision that was not finalized.  Because

15   the EPA did not do so with respect to the eleven records referenced above, I

16   would vacate rather than reverse the District Court's decision as to those records

17   and remand for the agency to provide additional explanation consistent with the

18   standard described here.  Aside from its fidelity to FOIA's language, that

1    standard has the added benefit of incentivizing agencies to provide more rather

2    than less information in their <u>Vaughn</u> Index, thus exposing agency justifications

3    to the "revealing 'sunlight' of public scrutiny."   <u>Mead Data Cent., Inc. v. U.S.</u>

4    <u>Dep't of Air Force</u>, 566 F.2d 242, 259 (D.C. Cir. 1977).  That itself can only further

5    promote the aims of FOIA, which "stack[s] the scales in favor of disclosure and

6    against exemption."  <u>Id.</u>

7        For these reasons I very respectfully concur in part and dissent in part.